## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------x
                  :

In re:                    :     Chapter 11

                    :

**HERITAGE HOME GROUP LLC,** *et al.,*  :     Case No. 18-11736 (____)

                    :

     Debtors.[1]          :     (Joint Administration Requested)

                    :

------------------------------------------------------------------x

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WORKFORCE OBLIGATIONS AND (B) MAINTAIN AND CONTINUE EMPLOYEE WAGES AND BENEFITS AND PAY RELATED OBLIGATIONS AND (II) AUTHORIZING BANKS AND FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND ELECTRONIC TRANSFERS

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

represent in support of this motion (the "<u>Motion</u>") as follows:

### RELIEF REQUESTED

1.     By this Motion, the Debtors request entry of interim and final orders, substantially

in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "<u>Interim Order</u>" and the "<u>Final</u>

<u>Order</u>," respectively), pursuant to sections 105(a), 363(b), 503(b), 507(a)(4), and 507(a)(8) of

title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), and Rules

6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"),

(i) authorizing, but not directing, the Debtors to (a) pay, honor, or otherwise satisfy prepetition

obligations incurred in relation to Compensation Obligations, Payroll Taxes and Deductions,

Supplemental Workforce Obligations, Vacation and Additional Leave, Severance Program,

Expense Reimbursements (including the Corporate Cards and the P-Cards), and Employee

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are:  Heritage Home Group LLC (9506); HH Global II B.V. (0165); HH Group Holdings US, Inc. (7206); HHG Real Property LLC (3221); and HHG Global Designs LLC (1150).  The Debtors' corporate headquarters is located at 1925 Eastchester Drive, High Point, North Carolina 27265.

Benefits (each as herein defined and, together with all fees, costs, and expenses incident thereto, including amounts owed to third-party administrators, the "Workforce Obligations")[2] and (b) maintain the Debtors' business practices, programs, and policies for their employees (collectively, the "Employee Wages and Benefits Programs") as such were in effect as of the commencement of these chapter 11 cases and as such may be modified, amended, or supplemented from time to time in the ordinary course of business, and honor and pay any ongoing fees, costs, and expenses incident thereto, including amounts owed to third-party administrators; and (ii) authorizing the Debtors' banks and other financial institutions (collectively, the "Banks") to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgements in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and legal predicates for the relief requested herein are sections 105(a), 363(b), 503(b), 507(a)(4), and 507(a)(8) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004.

---

[2] The Debtors believe that this list of compensation, benefits, and other obligations is a comprehensive list of obligations arising from the Debtors' employee compensation and benefits programs.  To the extent that any plan or program obligation was inadvertently omitted, the term "Workforce Obligations" includes such obligation.

## BACKGROUND

### I.    General Background

5.    On the date hereof (the "Petition Date"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no committees have been appointed or designated.

6.    The Debtors have requested that these chapter 11 cases be consolidated for procedural purposes only and jointly administered pursuant to Bankruptcy Rule 1015(b).

7.    Information regarding the Debtors' businesses, capital structure, and the circumstances leading to these chapter 11 cases is set forth in the Declaration of Robert D. Albergotti in Support of Chapter 11 Petitions and First-Day Motions (the "First Day Declaration"),[3] which is incorporated herein by reference and filed contemporaneously herewith.

### II.    The Debtors' Workforce

8.    As of the Petition Date, all of the Debtors' approximately 1,520 employees are employed in the United States by Debtor Heritage Home Group LLC.  The Debtors' employee base is divided and categorized as follows:  (i) approximately 1,050 individuals work as non-exempt manufacturing employees (the "Manufacturing Employees"); (ii) approximately 135 individuals work as non-exempt sales and office employees (the "Office Employees"); (iii) approximately 280 individuals work as exempt employees in the United States (the "Exempt Employees"); and (iv) approximately 55 non-exempt individuals work as sales representatives (the "Sales Agents" and, collectively with the Manufacturing Employees, the Office Employees,

---

[3] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the First Day Declaration.

and the Exempt Employees, the "Employees").[4]  The Manufacturing Employees and the Office Employees are paid on an hourly basis, while the Exempt Employees are salaried.  The Sales Agents typically are paid solely on commission basis.

9.      To supplement their workforce, the Debtors utilize (i) approximately 45 independent contractors (collectively, the "Independent Contractors") that provide a variety of essential functions for the Debtors, including information technology assistance, design consultation, and sales representation, and (ii) approximately 45 temporary workers (collectively, the "Temporary Workers" and together with the Employees and the Independent Contractors, the "Workforce") whose varied services, including retail sales and corporate office support services, are procured through approximately 10 staffing agencies (collectively, the "Staffing Agencies").

10.     As described more fully below, the Debtors' ability to operate their businesses depends on the continued loyalty and morale of their Workforce, as well as their specialty training and skills.  As a specialty manufacturing business, any delay in the processing of regular compensation or benefits payments to the Workforce would cause the Debtors and their businesses irreparable harm.  Disruption in the manufacturing processes or the inability to process orders due to disruptions in the Workforce will significantly impair the Debtors' ability to continue operations during these chapter 11 cases.

## III.    Workforce Obligations

### A.      Compensation Obligations

11.     In the ordinary course of business, the Debtors incur and pay obligations (the "Compensation Obligations") relating to the Employees' wages, salaries, and other compensation, including sale commissions (the "Commissions") and other incentive-based

---

[4] The Debtors, by this Motion, are not acknowledging or admitting to an employer/employee relationship with the Sales Agents by the Debtors.  Participating Sales Agents must pay for the full cost of their participation in the Employee Benefits programs.

compensation, as described in greater detail below.  Employees generally are paid bi-weekly in arrears on Friday, such that each payroll covers approximately two weeks ending on the Saturday prior to the payroll date.  The Debtors last issued payroll on July 27, 2018.

12.    The Debtors require Employees to setup direct deposit.  As such, the Debtors ordinarily pay the Compensation Obligations by direct deposit through electronic transfer of funds directly to the Employees.  Corporate policy is to allow only one paper check per Employee while establishing or resolving direct deposit.  As a result, there may be live payroll checks issued in the ordinary course of business, but uncashed as of the Petition Date.  The Debtors believe the total amount of these uncashed payroll checks to be no more than $13,000 at any given time.

13.    The Debtors estimate that their average bi-weekly Compensation Obligations are approximately $3.0 million in the aggregate, and that the amount of accrued, but unpaid, Compensation Obligations as of the Petition Date equal approximately $2,121,000.  As of the Petition Date, one Employee, who is not an insider of the Debtors, is owed approximately $1,500 in excess of the $12,850 cap imposed by section 507(a)(4) of the Bankruptcy Code.  The Debtors do not believe that any other Employees are owed prepetition Compensation Obligations in an amount that exceeds the statutory cap.  By this Motion, the Debtors seek authority to continue paying Compensation Obligations in the ordinary course and to pay any prepetition amounts owed in full; *provided*, that pending entry of the Final Order, no individual Employee will be paid more than $12,850, in the aggregate, on account of the Compensation Obligations and Vacation and Additional Leave (defined below).

14.    The Compensation Obligations include Commissions and other incentive-based compensation to the Debtors' salesforce.  The Debtors' salesforce historically has been

compensated through a variety of sales commission and incentive plans (the "Sales Compensation Plans"), which are described below.

1.    **Commission Plans**

a.    Retail and Showroom Design Consultants

15.    In addition to hourly compensation, in the ordinary course of business, the Debtors also pay Commissions to approximately 15 Employees who work at Thomasville retail stores and outlets and at Luxury brand showrooms (the "Design Consultants"). Design Consultants are paid Commissions based on a percentage of the value of sales completed by the Design Consultants. These Commissions are paid in arrears in the second payroll cycle of the current month for the prior month. Based on the historical Commissions earned over the prior year, the Debtors estimate that accrued, but unpaid, Commissions owing to the Design Consultants are approximately $25,000 as of the Petition Date.

b.    Wholesale Account Managers

16.    In addition to salaried compensation, the Debtors also pay Commissions to approximately 40 Employees who work as account managers across their Thomasville, Luxury, and Broyhill brands (the "Wholesale Account Managers" and collectively, with the Design Consultants and Sales Agents, the "Salesforce Employees"). Wholesale Account Managers are paid Commissions calculated as a percentage of the value of sales completed by these Employees. The Commissions are paid in arrears in the second payroll cycle of the current month for the prior month. Based on the historical Commissions earned over the prior year, the Debtors estimate that accrued, but unpaid, Commissions payable to the Wholesale Account Managers is approximately $240,000 as of the Petition Date.

c.      Sales Agents

17.      The Sales Agents' compensation consists entirely of Commission-based wages, which are calculated as a percentage of the value of sales completed by these Employees.  Sales Agents' Commissions are paid in arrears according to the terms of the Sales Agent's individual agreement.  Based on the historical Commissions earned over the prior year, the Debtors estimate that the accrued, but unpaid, Commissions owing to the Sales Agents is approximately $230,000 as of the Petition Date.

18.      Because Commissions earned by the Salesforce Employees represent compensation as a percentage of sales and the exact volume of completed sales prior to the Petition Date is not yet known, the amount owed to these Employees may possibly exceed the $12,850 priority cap.[5]      Nevertheless, although Commission amounts vary widely, the Commissions are an important component of the Design Consultants' and Wholesale Account Managers' overall compensation and constitute the entire amount of the Sales Agents' compensation.  As such, the Commissions are essential to these Employees' livelihood.  Further, the Commissions provide substantial value to the Debtors' estates because they encourage the Salesforce Employees to achieve important performance targets.

2.      **Sales Incentive Plans**

19.      In the ordinary course of business, the Debtors offer incentive-based compensation to certain of their non-insider managers (the "Managers") that is in addition to the Employees' regular wages under various sales incentive plans.  The Managers are not eligible to receive Commissions.

---

[5] In the event that a Commission earned exceeds the $12,850 priority cap, the Debtors reserve the right to petition the Court to pay such amount in excess of the priority cap.

a.      Retail Store Manager Bonus Plan

20.     The Retail Store Manager Bonus Plan (the "Retail Store Plan") encourages Managers of retail stores associated with the Thomasville and Luxury brands to achieve sales quotas that are established for individual stores.  Participants are eligible to receive monthly incentive payments only if they exceed a specified percentage of their sales quota, and the amount of the incentive payments increases if participants exceed their sales quotas.  As of the Petition Date, the Debtors estimate that they have approximately $15,000 in outstanding obligations under the Retail Stores Plan.

b.      Sales Bonuses

21.     In addition to their base compensation, in the ordinary course of business, certain Managers may earn quarterly or annual sales bonuses (the "Sale Bonuses") based on obtaining certain present target sales quotas.  As of the Petition Date, the Debtors estimate that they have approximately $11,000 in accrued, but unpaid, Sales Bonuses.

**B.      Payroll Taxes and Deductions**

22.     The Debtors are required by law to withhold from an Employee's wages amounts related to federal, state, and local income taxes, and social security and Medicare taxes (collectively, the "Withholding Taxes") and to remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities").

23.     In addition, the Debtors are required to make matching payments from their own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes").  The Debtors

believe that, as of the Petition Date, approximately $170,000 has accrued and remains unpaid on account of Employer Payroll Taxes.

24.     The Debtors also withhold certain amounts for garnishments (such as tax levies, child support, payments to bankruptcy trustees, and student loans) and other pre-tax and after-tax deductions payable to certain of the Employee benefit plans discussed herein (such as an Employee's share of health care benefits, insurance premiums, 401(k) contributions, legally ordered deductions, and other miscellaneous deductions) (collectively, the "<u>Deductions</u>").  As of the Petition Date, the Debtors believe that approximately $390,000 has not been remitted to various third-party recipients on account of the Deductions.  Accordingly, the Debtors seek authority to continue to forward prepetition Deductions to the applicable third-party recipients on a postpetition basis in the ordinary course of their business.

25.     The Debtors utilize a service provided by Automatic Data Processing, Inc. and certain of its affiliates (collectively, "<u>ADP</u>") to remit Withholding Taxes and to administer garnishments, unemployment compensation, and other Employee-related services.  The Debtors also utilize the products and services of Kronos Inc. for Employee timekeeping and Rimini Street for support with the Debtors' human resources information system, which is used in the calculation of payroll.  The Debtors also use the services of VCG Consultants to administer services related to Qualified Medical Child Support Orders.  As of the Petition Date, the Debtors estimate that, with respect to prepetition services provided to the Debtors, no amounts currently are owing to VCG Consultants, Kronos, Inc., or Rimini Street, and approximately $18,000 is owed to ADP.

### C.     Supplemental Workforce Obligations

26.     The Debtors also pay obligations to the Independent Contractors and Staffing Agencies (collectively, the "<u>Supplemental Workforce Obligations</u>").  Approximately 40 of the

Independent Contractors (the "Independent Sales Representatives") provide sales representation services associated with the Debtors' Broyhill and Luxury brands and are paid Commissions, calculated as a percentage of sales completed by the representatives, in arrears on the fifteenth of the month for the prior month.  The remaining Independent Contractors, as well as the Staffing Agencies, are paid through the Debtors' accounts payable system following submission of documented and supported invoices, which must be approved by members of the relevant Debtors' operational team prior to payment.  On average, the Debtors pay Independent Contractors approximately $360,000 per month in the aggregate and Staffing Agencies approximately $100,000 per month in the aggregate.

27.     Based on historical monthly averages, as of the Petition Date, the Debtors estimate that approximately $650,000 in prepetition Supplemental Workforce Obligations remains outstanding.  To the best of the Debtors' knowledge, as of the Petition Date, none of the Staffing Agencies on account of one individual is owed more than $12,850 in accrued but unpaid Supplemental Workforce Obligations.  However, nine of the Independent Sales Representatives are owed in excess of the statutory cap.  Given the significant role that these individuals and agencies play in supporting the Debtors' businesses, the Debtors are seeking authority, but not direction, to pay all prepetition Supplemental Workforce Obligations, *provided*, that Independent Sales Representatives will only be paid in excess of $12,850 subject to entry of the Final Order.

### D.     Vacation and Additional Leave

28.     The Debtors provide eligible full-time Employees with various leaves of absence (paid and unpaid) (collectively, "Vacation and Additional Leave").  Eligible Employees are entitled to earn vacation ranging from 40 hours to 160 hours based upon years of service and pursuant to company policy.  Vacation cannot be carried over unless required by state law, or, pursuant to company policy for Manufacturing Employees.  Vacation historically has been paid

out upon termination.  The Debtors estimate that, as of June 30, 2018, eligible Employees had accrued vacation valued at approximately $650,000.

29.     The Debtors also provide eligible Employees with various (paid and unpaid) miscellaneous leave, including, but not limited to, certain holidays, jury duty, bereavement, family and medical leave, and voting leave.

30.     By this Motion, the Debtors request authority, but not direction, to continue to honor Vacation and Additional Leave that accrued prepetition solely to the extent that Employees may use Vacation and Additional Leave during the administration of these cases in accordance with the Debtors' prepetition policies.  For the avoidance of doubt, the Debtors are not requesting to make cash distributions on account of accrued prepetition Vacation and Additional Leave in the event that an Employee leaves or is terminated from the Debtors' employment, unless cash payment for unpaid Vacation and Additional Leave is required under applicable law.

### E.     Severance Program

31.     The Debtors offer a severance program (as such program, practices, and policies may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors' operations, the "Severance Program") to certain Employees.  To be eligible for the Severance Program, the Employee must *not*:  (i) work on a part-time basis; (ii) be a non-exempt employee who is covered by an advance notice of termination that is expressly issued pursuant to the Worker Adjustment and Retraining Notification Act; (iii) be classified by the Debtors as a "statutory employee"; or (iv) be an "insider" consistent with the use of such term in section 503(c) of the Bankruptcy Code.  Employees are also ineligible to receive benefits under the Severance Program if they voluntarily terminate their employment, or, if their employment is terminated voluntarily for cause.

01:23333205.7

32.     Under the Severance Program, Employees may receive one week of pay for every year of service, subject to a two-week minimum payment and a nine-week maximum payment. In addition, participants in the Severance Program (and any dependents) are covered under the Debtors' group medical plans for 30 days after a participant's date of termination at no additional cost.  If the participant or any of his or her dependents elect to continue coverage after this 30-day period pursuant to COBRA, the participant is solely responsible for the payment of any required premiums.

33.     There are four former Manufacturing Employees, three former Office Employees, and two former Exempt Employees (collectively, the "Former Employees") that were terminated prior to the Petition Date between May and July 2018, and are entitled to receive payments and benefits under the Severance Program.   The remaining severance payments to the Former Employees are less than $40,000 in the aggregate.  Approximately $10,000 of these severance payments will come due on the Debtors' next regularly scheduled payroll date of August 10, 2018, with no individual Former Employee scheduled to receive a payment in excess of $2,500.[6] The Debtors request authority, but not direction, to: (i) make the next regularly scheduled payment under the Severance Program to the Former Employees due to the *de minimis* nature of such payments and the extreme hardship that would result to the Former Employees if these amounts were not paid, and (ii) continue making payments under the Severance Program in the ordinary course of business.

34.     To be clear, the Debtors are not by this Motion seeking authority to make any payments inconsistent with section 503(c) of the Bankruptcy Code.  Moreover, the Debtors are only seeking to make payments up to the $12,850 priority cap.  Accordingly, the Debtors seek

---

[6]  Although one Former Employee is scheduled to receive in excess of $2,500 on the August 10, 2018 payroll date, the Debtors are not seeking authority in the Interim Order to make this severance payment.  This Former Employee will only receive payments under the Severance Program subject to the entry of the Final Order.

authority, in their discretion, to make payments to the Former Employees in the ordinary course of business under the Severance Program: (i) pursuant to the Interim Order, in an amount not to exceed $10,000, and (ii) pursuant to the Final Order, in an amount not to exceed $40,000.

35.     Subject to entry of the Final Order, the Debtors seek authority to continue the Severance Program in the ordinary course of business to the extent eligible Employees are terminated, and subject to the $12,850 priority cap.  Indeed, in the normal course of business, and, especially if operational restructuring initiatives become necessary to preserve the value of their estates during these chapter 11 cases, it is likely that the Debtors may incur severance obligations after the Petition Date.  If severance payments are not honored, current eligible Employees will become more concerned about the Debtors' employment practices and may seek out new employment immediately, to the detriment of the Debtors' businesses and their estates. The Debtors believe that it is critical that they be authorized, but not directed, to continue the Severance Program in the ordinary course of business.

**F.     Expense Reimbursements**

36.     Employees incur various expenses in the discharge of their duties to the Debtors for items such as travel, lodging, and meal expenses (the "Expense Reimbursements").  Because these expenses are incurred as part of their official duties and in furtherance of the Debtors' businesses, the Employees are reimbursed in full after submission of appropriate documentation to the Debtors' accounting department.  With respect to certain Employees, these expenses are charged to American Express corporate cards (the "Corporate Cards").[7]  The Debtors pay American Express directly for the business charges and fees incurred in connection with the

---

[7]  The Debtors also maintain a commercial credit card program consisting of four p-cards (the "P-Cards") under a certain agreement (as amended, restated, supplemented or otherwise modified from time to time, the "P-Card Agreement"), between certain of the Debtors and PNC Bank, N.A. (the "P-Card Program"), pursuant to which PNC Bank, N.A. is authorized to make advances to the Debtors from time to time up.  The Debtors' obligations under the P-Card Agreement are secured by the ABL Credit Agreement dated as of March 13, 2017.  The Debtors seek authorization to continue the P-Card Program in the ordinary course of business.

Corporate Cards, but the Employee cardholders are individually liable for the expenses on these cards.

37.    The Debtors incur approximately $320,000 per month in Expense Reimbursements.  However, it is difficult to determine with precision the aggregate amount of outstanding Expense Reimbursements due as of the Petition Date.  Employees incurred these expenses on the Debtors' behalf and with the understanding that they would be reimbursed.  Due to the commencement of these chapter 11 cases, however, there may be Expense Reimbursements that were not paid to the applicable Employee prior to the Petition Date.

38.    To avoid harming the Employees who incurred these expenses, the Debtors seek the authority to continue reimbursing the Employees for Expense Reimbursements in accordance with prepetition practices (including, as applicable, making payments on behalf of Employees to certain third parties, such as American Express), and to honor and pay all unpaid Expense Reimbursements.  As of the Petition Date, the Debtors estimate that approximately $160,000 in Expense Reimbursements remain outstanding.

### G.    Employee Benefits

39.    In the ordinary course of business, the Debtors provide eligible Employees, directly or indirectly, with a number of employee benefits (collectively, the "Employee Benefits"),[8] including, but not limited to: (i) medical, dental, and vision coverage (collectively, the "Health Plans"); (ii) flexible spending and health savings accounts; (iii) basic life and accidental death and dismemberment insurance; (iv) travel insurance; (v) disability benefits; and (vi) certain other Employee benefits, including a 401(k) retirement savings plan, supplemental

---

[8] Maestro Health ("Maestro") serves as benefits administrator and coordinator for a majority of the Employee Benefits.  The Debtors pay Maestro approximately $15,000 a month for these services.  The Debtors estimate that approximately $30,000 is accrued, but unpaid, for prepetition services performed by Maestro on behalf of the Debtors.

01:23333205.7

insurance, and furniture discount program.  A summary of the significant Employee Benefits is set forth below.

### 1.    Medical, Dental, and Vision Plans

40.    The Debtors provide medical coverage and prescription drug coverage through a self-insured program (the "Medical Plan").  UMR, a UnitedHealthcare Insurance Company ("UMR"), administers the medical coverage provided under the Medical Plan, and Caremark PCS Health, LLC ("Caremark") administers the prescription drug coverage under the Medical Plan.  Prior to January 2018, BlueCross BlueShield of North Carolina ("BCBS") administered the medical coverage.  The Medical Plan is paid approximately 70% by the Debtors and 30% by the covered Employees through Deductions.  However, because the Debtors provide coverage through a self-insured program, the Medical Plan's cost to the Debtors varies based upon the usage of health care services by covered Employees and their dependents, *i.e.* the amount of Employee claims.  On account of the Medical Plan, the Debtors pay, on average, approximately $160,000 per month in fixed costs and approximately $1,100,000 per month on account of Employee claims under the Medical Plan.  As of the Petition Date, the Debtors estimate that they have an outstanding liability of approximately $90,000 owed to BCBS and $550,000 owed in total to UMR and Caremark on account of Employee claims under the Medical Plan.

41.    The Debtors maintain a stop-loss insurance policy through Berkley Life and Health Insurance Company, which is administered by Maestro, to provide protection against catastrophic losses under the Medical Plan.  The stop-loss policy covers amounts in excess of $400,000 per occurrence per year.  The Debtors pay approximately $74,000 per month for the policy.

42.    In addition to the Medical Plan, the Debtors also make vision and dental insurance available to eligible Employees through Delta Dental of North Carolina, United Concordia

Dental, and EyeMed, which is administered by Maestro.  The premiums for vision insurance are paid entirely by the electing Employee.  The Debtors provide dental coverage partially through a fully-insured program and partially through a self-insured program.  Covered Employees under the dental insurance program contribute annually toward this coverage through Deductions.  In addition, Employees make payments toward deductibles pursuant to the terms and conditions of the applicable dental plan and various co-insurance obligations.

### 2.      Flexible Spending Accounts and Health Savings Accounts

43.      The Debtors provide flexible spending accounts ("FSAs") for out-of-pocket healthcare and dependent care for eligible Employees.  An FSA is a tax-advantaged financial account that allows an Employee to set aside a portion of his or her earnings to pay for qualified expenses, such as medical care or dependent day care.  The FSAs are administered by Maestro. Each eligible Employee can choose to contribute pre-tax dollars up to the limits set by the Internal Revenue Service to his or her FSA.  The Debtors also provide health savings accounts ("HSAs") through Optum Bank for Employees to save for their health care needs through payroll deductions.  The contributions to the FSAs and the HSAs are funded entirely by the electing Employees.

### 3.      Life Insurance and AD&D Insurance

44.      The Debtors maintain basic life and accidental death and dismemberment coverage for eligible Employees (the "Life and AD&D Insurance"), which is provided through SunLife Financial.  The insurance coverage provided to an individual Employee depends on how the Employee is classified.  The Debtors pay approximately $7,000 per month in insurance premiums associated with the Life and AD&D Insurance.  As of the Petition Date, the Debtors estimate that they have an outstanding liability of no more than $14,000 on account of the Life and AD&D Insurance.

45.    In addition, certain Employees are also eligible to purchase optional life insurance, accidental death and dismemberment insurance, and dependent life insurance for themselves and/or eligible dependents at an annual cost to such Employees (the "Voluntary Insurance").  The insurance premiums associated with the Voluntary Insurance are entirely funded by the Employees who choose to enroll.

### 4.    Travel Insurance

46.    The Debtors provide Employees with travel accident insurance (the "Travel Insurance") through ACE American Insurance Company ("ACE").  The policy is for 36 months with a total premium of $30,000 payable in annual installments of $10,000.  As of the Petition Date, the Debtors estimate that they do not have any outstanding liability on account of the Travel Insurance.

### 5.    Disability Benefits

47.    The Debtors provide Employees with a short-term disability plan (the "Short-Term Disability Plan") through Liberty Mutual, which is administered by Maestro.  Coverage provided by the Debtors under the Short-Term Disability Plans varies depending upon how an individual Employee is classified.  The Short-Term Disability Plan is fully insured.  The Debtors estimate that they incur costs of approximately $37,000 per month with respect to the Short-Term Disability Plan.  As of the Petition Date, the Debtors estimate that they have outstanding liabilities of approximately $74,000 on account of the Short-Term Disability Plan.

48.    Certain Employees also are eligible to purchase optional short-term disability and long-term disability insurance for themselves at an annual cost to such Employees (the "Voluntary Disability Insurance").  The contributions/insurance premiums associated with the Voluntary Disability Insurance are funded entirely by the Employees who choose to enroll.

### 6. Additional Benefits

#### a. 401(k) Plan

49. The Debtors maintain a retirement and savings plan pursuant to section 401 of the Internal Revenue Code, which includes both traditional and Roth components (as applicable, the "Traditional 401(k) Plan" and the "Roth 401(k) Plan," and, together, the "401(k) Plan"). Through automatic payroll deductions, participating Employees can contribute a portion of their wages on a pre-tax or post-tax basis into the Traditional 401(k) Plan, or on a post-tax basis into the Roth 401(k) Plan.

50. Contributions to the 401(k) Plan are held in trust by State Street Bank and Trust and administered by Transamerica Retirement Solutions, LLC. The Debtors do not make any matching contributions to the 401(k) Plan. The costs incurred to administer the 401(k) in excess of the amount paid from the plan participants through their contributions are paid by the Debtors. Based on historical averages, the Debtors estimate that they have accrued liabilities of approximately $7,000 or less related to the administration of the 401(k) Plan.

#### b. Accident and Critical Illness Insurance

51. The Debtors also provide eligible Employees the opportunity to purchase accident and critical illness/cancer insurance ("Accident and Critical Illness Insurance") through Unum Group. The premiums for the Accident and Critical Illness Insurance are paid entirely by the electing Employee.

#### c. Employee Purchase Program

52. The Debtors also maintain an employee furniture purchase program, which provides Employees with purchase vouchers that enable Employees to purchase company-branded furniture at cost plus a small mark-up (the "Employee Purchase Program"). The

01:23333205.7

Debtors administer the Employee Purchase Program and incur only *de minimus* administrative costs to maintain the program.

## BASIS FOR RELIEF REQUESTED

**I.      THE COURT SHOULD AUTHORIZE, BUT NOT DIRECT, THE DEBTORS, IN THEIR DISCRETION, TO PAY OR OTHERWISE HONOR THE WORKFORCE OBLIGATIONS AND MAINTAIN THE WAGES AND BENEFITS PROGRAMS.**

53.     The Debtors seek the relief requested herein because any delay in paying or otherwise honoring the Workforce Obligations could severely disrupt the Debtors' relationship with, and irreparably impair the morale of the Workforce at a time when the Employees' continued dedication, confidence, and cooperation are most critical to the Debtors and the success of these chapter 11 cases.  The Debtors face the risk that the success of these cases and their ability to effectively operate their businesses may be severely jeopardized if the Debtors are not immediately granted authority to pay the Workforce Obligations.

54.     At this critical stage, the Debtors simply cannot risk the substantial disruption of their business and affairs that would, in all likelihood, accompany any decline in workforce morale attributable to the Debtors' failure to pay the Workforce Obligations in the ordinary course of business.   Absent the requested relief herein, the Employees would suffer great hardship and, in many instances, financial difficulties, because these monies are needed to enable them to meet their personal obligations.  Additionally, without the requested relief, the Debtors' stability would be undermined by the potential threat that otherwise loyal Employees at all levels would seek other employment.   Similarly, the Independent Contractors and Staffing Agencies may choose to end their relationships with the Debtors, resulting in disruptions to the Debtors' business at this crucial time.  Granting the relief requested in this Motion will allow the Debtors to continue to operate with minimal disruption and enable them to maximize the value of the estates for the benefit of all stakeholders.

01:23333205.7

55.    Pursuant to section 507(a)(4) of the Bankruptcy Code, each Employee may be granted a priority claim for:

> allowed unsecured claims, but only to the extent of $12,850 for each individual or corporation, as the case may be, earned within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for –
>
> (A)    wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual; or
>
> (B)    sales commissions earned by an individual or by a corporation with only 1 employee, acting as an independent contractor in the sale of goods or services, for the debtor in the ordinary course of the debtor's business if, and only if, during the 12 months preceding that date, at least 75 percent of the amount that the individual or corporation earned by acting as an independent contractor in the sale of goods or services was earned from the debtor…

*See* 11 U.S.C. § 507(a)(4).

56.    Likewise, under section 507(a)(5) of the Bankruptcy Code, Employees may ultimately be granted a priority claim for:

> allowed unsecured claims for contributions to an employee benefit plan –
>
> (A)    arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only
>
> (B)    for each such plan, to the extent of –
>
> > (i)    the number of employees covered by each such plan multiplied by $12,850; less
> >
> > (ii)    the aggregate amount paid to such employees under paragraph (4) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

*See* 11 U.S.C. § 507(a)(5).

57.     The Debtors believe that a substantial portion, if not all, of the relief requested herein is within the statutory caps of sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. The Debtors would therefore be required to pay these claims in full to confirm any chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims for wages, salaries, and commissions, and certain allowed unsecured claims for contributions to an employee benefit plan). Thus, granting the relief requested herein would only affect the timing, and not the amount, of the payment of such amounts to the extent that they constitute priority claims.

58.     Even if a particular claim is not entitled to priority, payment is nonetheless justified under section 105(a) of the Bankruptcy Code and the well-established "doctrine of necessity." The Court's power to utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equity powers and its statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The United States Supreme Court first articulated the doctrine of necessity over a century ago in *Miltenberger v. Logansport Railway Company*, 106 U.S. 286 (1882), in affirming the authorization by the lower court of the use of receivership funds to pay pre-receivership debts owed to employees, vendors, and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership. *See id.* at 309–14. The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in *Miltenberger. See In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581–82 (3d Cir. 1981) ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the continued operation of the [debtor] in serious jeopardy.").

59.     The doctrine of necessity permits the Court to authorize payment of certain prepetition claims prior to the completion of the reorganization process where the payment of such claims is necessary to the reorganization.  *See In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment); *see also In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a pre-petition unsecured creditor, a debtor must show that the payment is necessary to avert a serious threat to the Chapter 11 process.").

60.     The Debtors' ability to maximize value depends, in large part, upon the motivation of the Employees whose efforts will be critical to a successful sale process.  Any disruption from Employee resignations or lack of morale could have adverse effects on the Debtors' businesses and the resolution of these chapter 11 cases.  If the Debtors delay in paying, or fail to pay, the Workforce Obligations, Employees may suffer extensive personal hardship or face legal action that makes it difficult or impossible for them to continue working for the Debtors.  The Debtors, therefore, believe it is critical to pay the prepetition amounts owing on account of the Workforce Obligations to preserve the Workforce and maximize the value of the Debtors' businesses.

61.     In addition, the Debtors' businesses are enhanced by the engagement of the Independent Contractors and Staffing Agencies.  The personnel support provided by them is critical to the Debtors' businesses and ability to deliver the highest quality of product to their customers.  Without the ability to satisfy outstanding Supplemental Workforce Obligations, it is

01:23333205.7

possible that the Independent Contractors and Staffing Agencies will refuse to provide services to the Debtors or will provide services in a less than satisfactory manner, which would affect the Debtors' ability to maximize the value of their estates.

62.     For the reasons set forth above, the Debtors submit that the relief requested herein is in the best interests of the Debtors, their estates, and their creditors, and, therefore, should be granted.

## II.     THE COURT SHOULD AUTHORIZE THE BANKS TO HONOR AND PROCESS THE DEBTORS' PAYMENTS ON ACCOUNT OF THE WORKFORCE OBLIGATIONS.

63.     The Debtors also request that the Court authorize the Banks, when requested by the Debtors, in their discretion, to honor and process any checks or electronic funds transfers drawn on the Debtors' bank accounts to pay any prepetition obligations described herein, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that sufficient funds are available in the applicable bank accounts to make such payments.  The Debtors further request that all of the Banks be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Motion.

## REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

64.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21-days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."  The Debtors submit that the facts described herein demonstrate that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors' business operations and the value of the Debtors' estates, and that Bankruptcy Rule 6003 has been satisfied to permit such payments.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)

65.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

66.    Nothing contained herein is intended or should be construed as an admission of the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their rights to contest any invoice or claim related to the relief requested herein in accordance with applicable law.

## NOTICE

67.    Notice of this Motion will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) PNC Bank, National Association, in its capacity as Pre-Petition Agent and DIP Agent; (iii) KPS Special Situations Fund III (A), L.P., in its capacity as Pre-Petition Term Agent; (iv) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors, as filed with the Debtors' chapter 11 petitions; (v) the Banks; and (vi) those parties who have filed formal requests for notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court enter Interim Order and Final Order, substantially in the forms attached hereto, granting the relief requested herein and granting the Debtors such other and further relief as is just and proper.

Dated: July 29, 2018
      Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Jaime Luton Chapman*
Pauline K. Morgan (No. 3650)
Kenneth J. Enos (No. 4544)
Jaime Luton Chapman (No. 4936)
Ashley E. Jacobs (No. 5635)
Shane M. Reil (No. 6195)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Proposed Counsel to the Debtors and Debtors in Possession*

01:23333205.7

**EXHIBIT A**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------x
                                           :
In re:                                     :   Chapter 11
                                           :
**HERITAGE HOME GROUP LLC**, *et al.*,      :   Case No. 18-11736 (____)
                                           :
    Debtors.[1]                            :   Jointly Administered
                                           :
                                           :   **RE: Docket No. ____**
                                           :
-----------------------------------------------------------------x

### INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WORKFORCE OBLIGATIONS AND (B) MAINTAIN EMPLOYEE WAGES AND BENEFITS PROGRAMS AND PAY RELATED OBLIGATIONS AND (II) AUTHORIZING THE BANKS TO HONOR AND PROCESS RELATED CHECKS AND ELECTRONIC TRANSFERS

Upon consideration of the motion (the "Motion")[2] of the Debtors for the entry of interim and final orders, pursuant to sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of the Bankruptcy Code, (i) authorizing, but not directing, the Debtors to (a) pay, honor or otherwise satisfy prepetition Workforce Obligations, and (b) maintain Employee Wages and Benefits Programs as such were in effect as of the commencement of these chapter 11 cases and as such may be modified, amended, or supplemented from time to time in the ordinary course of business, and honor and pay any ongoing fees, costs, and expenses incident thereto, including amounts owed to third-party administrators and (ii) authorizing the Banks to receive, process, honor, and pay all related checks and electronic transfers; and upon consideration of the Motion and all pleadings related thereto, including the First Day Declaration; and it appearing that this Court has jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are:  Heritage Home Group LLC (9506); HH Global II B.V. (0165); HH Group Holdings US, Inc. (7206); HHG Real Property LLC (3221); and HHG Global Designs LLC (1150).  The Debtors' corporate headquarters is located at 1925 Eastchester Drive, High Point, North Carolina 27265.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

01:23333205.7

*Amended Standing Order* dated February 29, 2012, from the United States District Court for the District of Delaware; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and proper and adequate notice of the Motion and the hearing thereon having been given; and it appearing that no other or further notice being necessary; and it appearing that the relief requested in the Motion and provided for herein is in the best interest of the Debtors, their estates, and their creditors; and after due deliberation and sufficient cause appearing therefor, it is hereby it is hereby **ORDERED THAT**:

1.       The Motion is **GRANTED** on an interim basis as set forth herein.

2.       The Debtors are authorized, but not directed, in their discretion, to pay, honor, or otherwise satisfy the prepetition Workforce Obligations; *provided*, *however*, notwithstanding anything to the contrary contained herein, that, except as provided by further order of this Court, (i) no payment to any Employee on account of prepetition Compensation Obligations and Vacation and Additional Leave, and no payment to any Independent Contractor on account of prepetition Supplemental Workforce Obligations, shall exceed the $12,850 statutory cap provided for under section 507(a) of the Bankruptcy Code, unless amounts above the $12,850 statutory cap are a result of cash payment for unpaid Vacation and Additional Leave that is required under applicable law and (ii) the total amount of payments made by the Debtors pursuant to this Order on account of prepetition Workforce Obligations (excluding Employee claims under the Health Plans) shall not exceed $4.0 million in the aggregate.

3.       The Debtors are authorized, but not directed, in their discretion, to maintain, and continue to honor and pay all amounts with respect to, the Employee Wages and Benefits Programs as such were in effect as of the commencement of these chapter 11 cases and as such

may be modified or supplemented from time to time, in the ordinary course of business and to honor and pay any fees, costs, and expenses incident to the Employee Wages and Benefits Programs, including amounts owed to third-party administrators.

4.      Absent further order of this Court, the Debtors shall not make cash distributions on account of accrued prepetition Vacation and Additional Leave in the event that an Employee leaves or is terminated from the Debtors' employment, unless cash payment for unpaid Vacation and Additional Leave is required under applicable law.

5.      The Debtors are authorized to pay amounts owing under the Severance Program to the Former Employees, provided that such payments shall not exceed $10,000 in the aggregate.

6.      The Banks are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process any checks or electronic funds transfers drawn on the Debtors' bank accounts to pay any prepetition obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that the Debtors have sufficient standing in their credit with such Bank.

7.      Each Bank is authorized, but not directed, to rely on the Debtors' representations with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Order, and the Banks shall not have any liability to any party for relying on such representations by the Debtors as provided for herein, and shall not be liable to any party on account of (i) following the Debtors' representations, instructions, or presentations as to any order of this Court (without any duty of further inquiry), (ii) honoring of any prepetition checks, drafts, wires, or automated clearing house transfer in a good-faith belief or upon a representation by the Debtors that this Court has authorized such prepetition

01:23333205.7

check, draft, wire, or automated clearing house transfer, or (iii) an innocent mistake made despite implementation of reasonable handling procedures.

8.     The Debtors are authorized to issue postpetition checks or to effect postpetition fund transfer requests in replacement of any checks or fund transfer requests in respect of any prepetition obligations authorized in this Order that were dishonored or rejected as a consequence of the commencement of the Debtors' chapter 11 cases.

9.     Nothing in this Order (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code, or (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates.

10.     Nothing in the Motion or this Order shall be deemed to (i) authorize the payment of any amounts that are subject to section 503(c) of the Bankruptcy Code, including, for the avoidance of doubt, payment of any obligations related to the Severance Program to or on behalf of any "insider" (as defined by section 101(31) of the Bankruptcy Code) or (ii) violate or permit a violation of section 503(c) of the Bankruptcy Code.

11.     The Debtors are authorized to take any and all actions necessary to effectuate the relief granted herein.

12.     A final hearing on the relief sought in the Motion shall be conducted on _____, 2018 at _____ (ET).  The deadline by which objections to entry of the proposed Final Order must be filed is _____, 2018 at 4:00 p.m. (ET). Objections, if any, must be filed and served on: (i) proposed counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Kenneth J. Enos, Esq. (kenos@ycst.com) and Jaime Luton Chapman,

Esq. ([jchapman@ycst.com](mailto:jchapman@ycst.com)); (ii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware, 19801, Attn: Linda Richenderfer, Esq. ([linda.richenderfer@usdoj.gov](mailto:linda.richenderfer@usdoj.gov)); (iii) counsel to the Pre-Petition Agent and DIP Agent, Blank Rome LLP, 1201 North Market Street #800, Wilmington, Delaware 19801, Attn: Regina Kelbon, Esq. ([Kelbon@BlankRome.com](mailto:Kelbon@BlankRome.com)) and Stanley B. Tarr, Esq. ([Tarr@BlankRome.com](mailto:Tarr@BlankRome.com)); (iv) counsel to the Pre-Petition Term Agent, Cozen O'Connor, 1201 North Market Street, Suite 1001, Wilmington, Delaware 19801, Attn: Mark Felger, Esq. ([mfelger@cozen.com](mailto:mfelger@cozen.com)) and Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Attn: Jeffrey D. Saferstein, Esq. ([JSaferstein@paulweiss.com](mailto:JSaferstein@paulweiss.com)), Jacob A. Adlerstein, Esq. ([JAdlerstein@paulweiss.com](mailto:JAdlerstein@paulweiss.com)), and Sarah Harnett, Esq. ([SHarnett@paulweiss.com](mailto:SHarnett@paulweiss.com)); and (v) counsel to any statutory committee appointed in these chapter 11 cases.  If no objections to entry of the proposed Final Order are timely filed, this Court may enter the proposed Final Order without further notice or a hearing.

13.     The requirements of Bankruptcy Rule 6003(b) are satisfied.

14.     Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be effective and enforceable immediately upon its entry.

15.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2018
         Wilmington, Delaware     _____

                                  United States Bankruptcy Judge

**EXHIBIT B**

**Proposed Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------x
:
In re:                                          :    Chapter 11
:
**HERITAGE HOME GROUP LLC,** *et al.*,          :    Case No. 18-11736 (____)
:
Debtors.[1]                                     :    Jointly Administered
:
:    **RE: Docket Nos. ____**
:
-------------------------------------------------------------x

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY
PREPETITION WORKFORCE OBLIGATIONS AND (B) MAINTAIN
EMPLOYEE WAGES AND BENEFITS PROGRAMS AND PAY RELATED
OBLIGATIONS AND (II) AUTHORIZING THE BANKS TO HONOR
AND PROCESS RELATED CHECKS AND ELECTRONIC TRANSFERS**

Upon consideration of the motion (the "<u>Motion</u>")[2] of the Debtors for the entry of interim

and final orders, pursuant to sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of the Bankruptcy

Code, (i) authorizing, but not directing, the Debtors to (a) pay, honor or otherwise satisfy

prepetition Workforce Obligations, and (b) maintain Employee Wages and Benefits Programs as

such were in effect as of the commencement of these chapter 11 cases and as such may be

modified, amended, or supplemented from time to time in the ordinary course of business, and

honor and pay any ongoing fees, costs, and expenses incident thereto, including amounts owed to

third-party administrators and (ii) authorizing the Banks to receive, process, honor, and pay all

related checks and electronic transfers; and upon consideration of the Motion and all pleadings

related thereto, including the First Day Declaration; and it appearing that this Court has

jurisdiction to consider the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are:  Heritage Home Group LLC (9506); HH Global II B.V. (0165); HH Group Holdings US, Inc. (7206); HHG Real Property LLC (3221); and HHG Global Designs LLC (1150).  The Debtors' corporate headquarters is located at 1925 Eastchester Drive, High Point, North Carolina 27265.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

*Amended Standing Order* dated February 29, 2012, from the United States District Court for the District of Delaware; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and proper and adequate notice of the Motion and the hearing thereon having been given; and it appearing that no other or further notice being necessary; and it appearing that the relief requested in the Motion and provided for herein is in the best interest of the Debtors, their estates, and their creditors; and after due deliberation and sufficient cause appearing therefor, it is hereby it is hereby **ORDERED THAT**:

1.      The Motion is **GRANTED** on a final basis as set forth herein.

2.      The Debtors are authorized, but not directed, in their discretion, to pay, honor, or otherwise satisfy the prepetition Workforce Obligations; *provided*, *however*, notwithstanding anything to the contrary contained herein, that, except as provided by further order of this Court, the total amount of payments made by the Debtors pursuant to this Order on account of prepetition Workforce Obligations (excluding Employee claims under the Health Plans) shall not exceed $4.2 million in the aggregate.

3.      The Debtors are authorized, but not directed, in their discretion, to maintain, and continue to honor and pay all amounts with respect to, the Employee Wages and Benefits Programs as such were in effect as of the commencement of these chapter 11 cases and as such may be modified or supplemented from time to time, in the ordinary course of business and to honor and pay any fees, costs, and expenses incident to the Employee Wages and Benefits Programs, including amounts owed to third-party administrators.

4.      Absent further order of this Court, the Debtors shall not make cash distributions on account of accrued prepetition Vacation and Additional Leave in the event that an Employee

leaves or is terminated from the Debtors' employment, unless cash payment for unpaid Vacation and Additional Leave is required under applicable law.

5.      The Debtors are authorized to pay amounts owing under the Severance Program to the Former Employees, provided that such payments shall not exceed $40,000 in the aggregate and such payments to any individual Former Employee shall not exceed $12,850.

6.      The Banks are authorized, when requested by the Debtors, in the Debtors' discretion, to honor and process any checks or electronic funds transfers drawn on the Debtors' bank accounts to pay any prepetition obligations authorized to be paid hereunder, whether such checks or other requests were submitted prior to, or after, the Petition Date, provided that the Debtors have sufficient standing in their credit with such Bank.

7.      Each Bank is authorized, but not directed, to rely on the Debtors' representations with respect to whether any check or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Order, and the Banks shall not have any liability to any party for relying on such representations by the Debtors as provided for herein, and shall not be liable to any party on account of (i) following the Debtors' representations, instructions, or presentations as to any order of this Court (without any duty of further inquiry), (ii) honoring of any prepetition checks, drafts, wires, or automated clearing house transfer in a good-faith belief or upon a representation by the Debtors that this Court has authorized such prepetition check, draft, wire, or automated clearing house transfer, or (iii) an innocent mistake made despite implementation of reasonable handling procedures.

8.      The Debtors are authorized to issue postpetition checks or to effect postpetition fund transfer requests in replacement of any checks or fund transfer requests in respect of any

01:23333205.7

prepetition obligations authorized in this Order that were dishonored or rejected as a consequence of the commencement of the Debtors' chapter 11 cases.

9.    Nothing in this Order (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code, or (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their estates.

10.    Nothing in the Motion or this Order shall be deemed to (i) authorize the payment of any amounts that are subject to section 503(c) of the Bankruptcy Code, including, for the avoidance of doubt, payment of any obligations related to the Severance Program to or on behalf of any "insider" (as defined by section 101(31) of the Bankruptcy Code) or (ii) violate or permit a violation of section 503(c) of the Bankruptcy Code.

11.    The Debtors are authorized to take any and all actions necessary to effectuate the relief granted herein.

12.    Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be effective and enforceable immediately upon its entry.

13.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:    _____, 2018
   Wilmington, Delaware     _____

                United States Bankruptcy Judge

01:23333205.7

4