## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------x
                                          :
In re:                                    :   Chapter 11
                                          :
HERITAGE HOME GROUP LLC, et al.,          :   Case No. 18-11736 (____)
                                          :
            Debtors.¹                     :   (Joint Administration Requested)
                                          :
------------------------------------------------------------x
```

## DECLARATION OF ROBERT D. ALBERGOTTI IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS

I, Robert D. Albergotti, hereby declare under penalty of perjury that the following is true and correct:

1.      I am a Managing Director in the Global Turnaround and Restructuring Group of AlixPartners LLP, an affiliate of AP Services, LLC ("**APS**"), and the Interim Chief Financial Officer ("**CFO**") and  Chief Restructuring Officer ("**CRO**") of Heritage Home Group, LLC ("**Heritage**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**," and collectively with their non-Debtor affiliates, the "**Company**").  I have been working with the Debtors since late September 2017 when APS was retained by the Debtors to assist them as financial advisors.  Subsequent to my engagement, I was appointed CFO on October 27, 2017 when the prior CFO needed to leave the Company.  On July 26, 2018, the Debtors and APS entered into a new engagement agreement, pursuant to which APS would provide certain temporary employees to the Debtors to assist them with their anticipated restructuring efforts.  The Debtors retained me as CRO on July 13, 2018.

---

¹  The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are:  Heritage Home Group LLC (9506); HH Global II B.V. (0165); HH Group Holdings US, Inc. (7206); HHG Real Property LLC (3221); and HHG Global Designs LLC (1150).  The Debtors' corporate headquarters is located at 1925 Eastchester Drive, High Point, North Carolina 27265.

2.      Through my work with the Debtors, I have become familiar with the Debtors' operations, day-to-day business affairs, and books and records.   I submit this declaration ("**Declaration**") to assist the Court and parties-in-interest in gaining an understanding of the circumstances that led to the commencement of these chapter 11 cases (collectively, the "**Chapter 11 Cases**"), and in support of the Debtors' petitions and motions requesting various types of "first day" relief (collectively, the "**First Day Motions**").

3.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition with the Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**").   The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.   The Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. No trustee or examiner has been appointed in the Chapter 11 Cases.   As of the date hereof, no creditors' committee has been appointed.

4.      Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussions with members of the Debtors' senior management, and information provided to me by the team working under my supervision or the Debtors' other professional advisors, including Young Conaway Stargatt & Taylor, LLP, counsel to the Debtors, and Houlihan Lokey Capital, Inc. ("**Houlihan**"), the Debtors' investment banker.  If I were called upon to testify, I would testify competently to the facts set forth herein.

5.      As described in further detail below, the Debtors have filed the Chapter 11 Cases to maximize the value of their estates for the benefit of all their stakeholders through the

sale of their business units and remaining assets.  Headquartered in High Point, North Carolina and with operations in various other domestic and international locations, the Company is a world leader in designing, manufacturing, sourcing, and retailing home furnishings.   The Company markets its products through a wide range of channels, including company-owned Thomasville retail stores, interior design partners, multi-line/independent retailers, and mass merchant stores.  The Company also distributes its products internationally through a number of partnerships with key wholesale channels in a variety of markets, and sells branded and private label products to certain governmental and hospitality customers, both domestically and around the world.

6.    Unfortunately, due to the challenges discussed herein, the Debtors have found themselves unable to satisfy the obligations under the Prepetition Credit Facilities (as defined below) and are facing near-term liquidity issues.  To address these challenges, the Debtors and their professional advisors, after considering all available strategic options, have determined that the best course to maximize the value of the Debtors' estates is to sell their business units and remaining assets through the Chapter 11 Cases.

7.    I am authorized by the Debtors to submit this Declaration.  I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe that the relief sought in each First Day Motion:  (i) will enable the Debtors to transition into chapter 11 without a deleterious effect on the value of the Debtors' business units; (ii) is critical to the Debtors' efforts to maximize value through the Chapter 11 Cases; and (iii) best serves the interests of the Debtors' estates and creditors.  It is my further belief that the relief sought in the First Day Motions is, in each case, narrowly tailored and necessary to achieve the goals identified above.

8.     Part I of this Declaration provides an overview of the Debtors' businesses. Part II provides a description of the Debtors' capital structure.  Part III provides a discussion of the events that compelled the commencement of the Chapter 11 Cases.  Part IV addresses the Debtors' strategy to maximize the value of their business units.  Part V affirms and incorporates the facts that support the relief requested in the First Day Motions.

## Part I

## THE COMPANY'S BUSINESS

**A.     History and Overview**

9.     Heritage was formed by an affiliate of KPS Capital Partners, LP ("**KPS**") in November 2013 to acquire the brand portfolio and certain related assets of Furniture Brands International, Inc. ("**Furniture Brands**").

10.     Furniture Brands was formed in 1996 to bring together the Thomasville, Broyhill, and Lane furniture companies and eventually others, reaching peak levels of success in the early 2000s, during which time it was generating over $2.0 billion in annual sales.  As the decade progressed however, Furniture Brands dropped significant market share, and saw revenue decline every year from 2007 until 2013, when Furniture Brands commenced bankruptcy proceedings before the Court to sell substantially all of its assets.  *See In re FBI Wind Down, Inc. (f/k/a Furniture Brands Int'l, Inc.)*, Case No. 13-12329 (CSS).  For the 12-month period immediately prior to the Heritage acquisition, Furniture Brands generated sales of approximately $940 million and negative EBITDA of approximately $58 million.  On November 22, 2013, the Court approved the sale of Furniture Brands' assets to Heritage for $280.0 million (subject to working capital adjustments).  The brands purchased by Heritage from Furniture Brands, which

are discussed in greater detail below, included Thomasville, Broyhill, Lane, Drexel Heritage, Henredon, Pearson, Hickory Chair, Lane Venture, and Maitland-Smith.

11.     The Company's brand portfolio includes some of the best known and most respected brands in the furniture industry, with each of the brand's origins tracing back to the early 1900s.

**B.     The Brands**

12.     Through its brands, the Company offers customers a wide array of home furnishings, including (i) case goods, consisting of bedroom, dining room, and living room furniture, (ii) stationary upholstery products, consisting of sofas, loveseats, sectionals, and chairs, (iii) motion upholstered furniture, consisting of reclining upholstery and sleep sofas, (iv) occasional furniture, consisting of wood, metal and glass tables, accent pieces, home entertainment centers, and home office furniture, and (v) decorative accessories and accent pieces.  The brands are featured in nearly every price and product category in the residential furniture industry, and are also distributed through agreements with the United States government, as well as hotels and resorts around the world.

13.     The Company currently operates across three distinct business units. These units are:  (i) Thomasville & Co., which is comprised of Thomasville, Drexel, and Henredon; (ii) the Luxury Group, which is comprised of Hickory Chair, Pearson, and Maitland-Smith; and (iii) Broyhill.  A description of each business unit follows.

14.     <u>Thomasville & Co.</u>  Thomasville, founded in 1904, Drexel, founded in 1903, and Henredon, founded in 1945, are three of the most well-known brands in the home furnishings industry.  These three brands were formally organized as a stand-alone business unit under Thomasville & Co. to complement one another in a coordinated selling approach to the

premium home furnishings market.  Thomasville is considered a more classic American brand, Drexel focuses on producing more contemporary furniture with modern designs, and Henredon markets its style and sophistication, incorporating hand and detail work.

15.    Thomasville & Co. operates today through two segments:  Thomasville & Co. Residential focused on consumer channels (i.e., retail, wholesale, and select e-commerce partner channels); and Thomasville & Co. Contract focused on government and hospitality channels.  Thomasville & Co. Residential products have broad distribution channels throughout the United States, China, and Japan through legacy franchise locations,[2] premium furniture stores, department stores, an owned retail store network, and a portfolio of licensing agreements with major retailing partners.  Thomasville & Co. Contract serves the United States government, as well as hotels and resorts around the world.

16.    <u>The Luxury Group</u>.  Hickory Chair, founded in 1911, has been crafting fine furniture for the past 95 years.  Pearson, founded in 1941, and Maitland-Smith, founded in 1979, function as complementary brands to Hickory Chair.  Pearson offers finely tailored upholstered furniture in the premium-price category, and Maitland-Smith designs and manufactures premium hand-crafted, antique-inspired furniture, accessories, and lighting.

17.    The Luxury Group reaches a wide array of customers domestically and abroad through two distinct channels—Interior Design and Wholesale Retail.  The Luxury Group has twelve interior design-focused sales professionals covering the domestic market, and maintains five designer trade showrooms across the United States that feature an assortment of

---

[2]  Heritage does not operate a franchise program; however, as part of the Chapter 11 purchase in 2013 it allowed certain retail partners to maintain the use of the Thomasville brand for their retail stores.  These stores are known as the "legacy franchises."

Hickory Chair, Pearson, and Maitland-Smith pieces.[3]   The wholesale retail channel has five dedicated retail sales professionals, and a network of agents for international distribution.

18.    <u>Broyhill</u>.  Broyhill began in 1926 as The Lenoir Chair Company.  Through the years, Broyhill had grown through acquisitions of local furniture factories and internally generated expansion.  Broyhill creates high-quality furniture that is designed to be lived in, combining the latest styles with everyday practicality in a way that complements today's busy lifestyles.  Broyhill offers collections of mid-priced furniture, including both wood furniture and upholstered products, in a wide range of styles and product categories including bedroom, dining room, living room, occasional, home office, and home entertainment.  Broyhill products are sold through internet retailers and other department and outlet stores.

## C.    Organizational Structure

19.    HH Global II B.V. ("**HH Global**") is the direct or indirect parent of each of the other Debtors and the non-Debtor subsidiaries located in the Netherlands, Mexico, China, Hong Kong, Indonesia, Philippines, Malaysia, and Vanuatu.[4]   HH Group Holdings US, Inc. ("**HH Group**"), a subsidiary of HH Global, is the direct parent of Heritage, HHG Real Property LLC, and HHG Global Designs LLC.   Attached hereto as **<u>Exhibit A</u>** is a summary of the Company's organizational structure.

**Part II**

**<u>PREPETITION CAPITAL STRUCTURE</u>**

20.    As of the Petition Date, the Debtors have approximately $280.0 million in outstanding secured and unsecured debt obligations.   The Debtors' primary funded debt

---

[3] The Luxury Showrooms also offer the Debtors' other brands for sale, as well as select third-party brands.

[4]  The Company also has a branch office in Vietnam.

obligations consist of:   (i) a prepetition asset-based revolving facility (the "**Prepetition ABL Facility**") for which PNC Bank, National Association ("**PNC**") serves as agent (in such capacity, the "**ABL Agent**") for the prepetition lenders party thereto (as party thereto from time to time, the "**ABL Lenders**"), and (ii) a prepetition term loan facility (the "**Prepetition Term Loan Facility**")  for which KPS Special Situations Fund III (A), L.P. serves as agent (in such capacity, the "**Term Loan Agent**") for the prepetition lenders party thereto (as party thereto from time to time, the "**Term Loan Lenders**").   The significant liabilities of the Debtors are described in greater detail below.

## A.      Prepetition Funded Debt

### i.      *Prepetition ABL Facility*

21.     On March 13, 2017, Heritage entered into the Prepetition ABL Facility through that certain *ABL Credit Agreement* (as amended, restated, modified, supplemented, or replaced from time to time, the "**Prepetition ABL Agreement**"), by and among Heritage, the ABL Lenders, and the ABL Agent.   The Prepetition ABL Facility was used to refinance Heritage's then-existing revolving credit facility and to add a $17.5 million intellectual property loan and an additional advance on finished goods and third-party inventory in transit.  The ABL Lenders agreed to provide the Debtors with this additional liquidity in light of, among other things, the agreement of KPS, as Term Loan Lender, to subordinate its security interests over substantially all of the non-working capital assets of the Debtors to the ABL Lenders' liens and security interests (while retaining a second priority lien over substantially all of the assets of the Debtors), thereby significantly enhancing the ABL Lenders' collateral position.

22.     The Prepetition ABL Facility is a three-year asset-based revolving credit facility that permits borrowings in an aggregate amount outstanding not to exceed $105.0 million, subject to a borrowing base of certain accounts receivable and inventory less a $12.5

million reserve and other reserves established by the ABL Agent in its reasonable credit judgment. All borrowings under the Prepetition ABL Facility are guaranteed by HH Global, HH Group, and Heritage's domestic subsidiaries, and are secured by (i) a first priority lien on substantially all of the assets of Heritage and the guarantors (the "**ABL Collateral**") and (ii) a second priority lien on the remaining assets of Heritage and the guarantors (the "**Term Collateral**" and together with the ABL Collateral, the "**Collateral**").

23.    The interest rate on cash borrowings outstanding under the Prepetition ABL Facility is either: a base rate (the greater of the prime rate, Federal Funds Rate plus 0.50%, and LIBOR) or LIBOR plus the applicable margin. The applicable margin for borrowings under the Prepetition ABL Facility ranges from 4.25% to 5.0% for base rate borrowings and 5.25% to 6.0% for LIBOR borrowings. Amounts repaid under the Prepetition ABL Facility, unless accompanied by a permanent reduction in commitments, may be re-borrowed.

24.    To further support the business and provide additional liquidity, the parties to the Prepetition ABL Agreement entered into that certain *Second Amendment to ABL Credit Agreement* (the "**Second Amendment**") on October 25, 2017. Among other things, the Second Amendment provided that the ABL Agent, as seller, and KPS Special Situations Fund III, LP, KPS Special Situations Fund III (A), L.P., and KPS Special Situations Fund III (Supplemental), LP, as purchasers (collectively, the "**Last Out Participants**") would enter into a participation agreement (the "**Participation Agreement**") that provided that the Last Out Participants would purchase a last out participation in the Prepetition ABL Facility in the aggregate amount of $15.0 million. On October 25, 2017, the ABL Agent and Last Out Participants entered into the Participation Agreement.

25.    In June 2018, in accordance with the Prepetition ABL Agreement, the ABL Lenders subjected the Debtors to a cash-dominion structure, whereby all cash held at in the Debtors' master concentration account at PNC is swept up on a daily basis into an account maintained by the ABL Agent.  In this cash-dominion structure, the Debtors are required to re-borrow cash from the ABL Lenders on an as-needed basis to make disbursements out of the master operating account.

26.    As of the Petition Date, the aggregate amount of all obligations owing by Heritage to the ABL Lenders under and in connection with the ABL Credit Agreement was not less than $83,432,557, which includes revolving loans outstanding under the Pre-Petition Credit Agreement and outstanding letters of credit in the aggregate amount of $805,000.

ii.    *Prepetition Term Loan Facility*

27.    On November 25, 2013, Heritage entered into the Prepetition Term Loan Facility through that certain *Term Loan Credit Agreement* (as amended, restated, modified, supplemented, or replaced from time to time, the "**Prepetition Term Loan Agreement**"), by and among Heritage, the Term Loan Lenders, and the Term Loan Agent.

28.    The full amount of the Prepetition Term Loan Facility, $100.0 million, was borrowed on November 25, 2013.  However, through amendments to the Prepetition Term Loan Credit Agreement, the maximum borrowings under the Prepetition Term Loan Facility were increased to approximately $137.8 million.  Subject to certain exceptions, all borrowings under the Prepetition Term Loan are guaranteed by HH Global, HH Group, and Heritage's domestic subsidiaries, and are secured by (i) a first priority lien on the Term Collateral and (ii) a second priority lien on the ABL Collateral.

29.    The Term Loan matures on September 9, 2020, and the interest rate is tied to the prime rate.  To provide the Company with additional liquidity, beginning in November

2013, KPS, as Term Loan Lender, voluntarily agreed that interest on the Term Loan would be paid-in-kind, rather than in cash.  The Prepetition Term Loan Facility may be prepaid, in whole or in part, prior to the maturity date without a prepayment premium.  Amounts repaid under the Prepetition Term Loan Facility may not be re-borrowed.

30.     As of the Petition Date, the aggregate amount of all obligations owing by Heritage to the Term Loan Lenders under and in connection with the Prepetition Term Loan Agreement was not less than $167,401,802.

*iii.*     *The Prepetition Intercreditor Agreement*

31.     Agents under the Prepetition ABL Facility and the Prepetition Term Loan Facility are also party to an Intercreditor Agreement, dated as of March 13, 2017 (as amended, restated, supplemented, or modified from time to time, the "**Prepetition Intercreditor Agreement**"), which sets forth the priorities of the two lender groups under the Prepetition ABL Facility and the Prepetition Term Loan Facility, with respect to the Collateral.

**B.     Unsecured Obligations**

32.     In the ordinary course of operating their businesses, the Debtors purchase goods and services from thousands of trade creditors.  As of the Petition Date, the Debtors estimate that they owe approximately $27.0 million to third-party trade creditors.  Additionally, the Debtors are obligated to each other for certain intercompany obligations owing from one Debtor to another, plus intercompany international trade debt.

**Part III**

**EVENTS LEADING TO CHAPTER 11**

**A.     Declining Sales**

33.     From its inception in late 2013, Heritage's sales have been heavily impacted by the negative effects of the Furniture Brands bankruptcy.  Following years of sales

declines, many furniture retailers had lost faith in the ability of the Company to produce, deliver, and service its products, and the bankruptcy led many of them to shift their purchases to a variety of competitors or even further utilize their own private label offerings.

34.    In addition, the Company's operations and performance depend significantly on economic conditions, particularly in the United States, and their impact on levels of existing home sales, new home construction, and consumer discretionary spending.  Although economic conditions have been steadily improving in recent years, the Debtors have struggled to adjust to certain shifts in consumer lifestyles, which include:  (i) lower home-ownership levels and more people renting; (ii) more apartment living and single-person households; (iii) older consumers that want to age in place; and (iv) cash-strapped millennials that are slow in forming households relative to prior generations.

35.    Consumer browsing and buying practices are rapidly shifting as well toward greater use of social media, internet- and app-based catalogs and e-commerce platforms, and the Company has been unable to develop a substantial sales base for its brands through this key growth channel.

36.    Furthermore, the residential furniture industry is highly competitive and fragmented.  The Company competes with many other manufacturers and retailers, some of which offer widely advertised, well-known, branded products, and other competitors are large retail furniture dealers who offer their own private label products.  This competitive landscape has proved challenging for some of the Company's larger brands as well-capitalized competitors continue to gain market share at the expense of the Debtors.

37.     In addition, the Company's historically highly profitable contract business has suffered from a loss of orders and a loss of market share due to increased competition leading to unexpected operating losses in that segment since late 2017.

38.     The combination of these, as well as other, conditions resulted in continual year-over-year declines in the Company's sales.

39.     The Company's sales have decreased during recent earnings periods in comparison with prior year's results, and sales are also down significantly versus projections. For the five-month period ended June 30, 2018, sales decreased 27% in comparison to June 2017.  The Debtors also missed their sales projections for the five months ended May 2018 by approximately 9.5% against their annual operating plan.

**B.    Operational Restructuring Actions**

40.     Coming out of the bankruptcy in late 2013, Heritage embarked on a highly ambitious restructuring program that was intended to streamline the legacy Furniture Brands asset base, drive greater efficiencies in the Company's supply chain and distribution, and eliminate excess layers of underperforming management.  Given the continuing sales declines, however, the extent of the restructuring program was greatly expanded over time in an attempt to achieve profitability for the Company.  Ultimately, Heritage reduced its cost structure by nearly $300 million through a combination of greater spending discipline and overhead, selling and general and administrative fixed cost reductions.

41.     In late 2017, following an extensive repositioning exercise to develop new identities, target customers, and product lines for each of Heritage's brands, the Company underwent a further restructuring of the business into the three aforementioned business units— Thomasville & Co, Luxury Group and Broyhill—and designated the Lane and Lane Venture

businesses for divestiture.  First, it sold the Lane business to United Furniture Industries, Inc.

Second, Heritage sold the Lane Venture business to Bassett Furniture Industries, Inc.  These

transactions not only created additional liquidity for Heritage, but also reduced the complexity of

the Company's brand portfolio and sharpened its focus on the growth opportunities for its

remaining brands.  The Company's hope was that the creation of these new business units would

provide the focus and resources that the brands needed to efficiently respond to the specific

demands of the Company's customers in a fast-changing retail environment and secure the next

phase of growth for the Company.

### C.    KPS' Prepetition Efforts to Improve Company's Liquidity Position

42.    KPS support for Heritage has been significant since its acquisition of the

Company and instrumental in the Company's ability to continue as a going concern to this point.

From late 2015 through 2017, KPS invested significant incremental capital into the Company to

provide additional liquidity in support of the operational restructuring efforts described above.

Given the operational challenges described above, beginning in November 2013, KPS also

voluntarily agreed to defer cash interest payments in the aggregate amount of $32.4 million on its

Term Loans to the Company, accruing payment-in-kind rather than cash-pay interest, ensuring

the Debtors had access to additional liquidity.  In sum, this support, in the form of incremental

capital and deferred cash-pay interest, totaled approximately $82.4 million.

43.    Furthermore, in March 2017, KPS, as Term Loan Lender, agreed to

subordinate its first priority lien on substantially all non-working capital assets of the Debtors to

the ABL Lenders' liens and security interests (while retaining a second priority lien over

substantially all of the assets of the Debtors), which provided the Company with more than $20

million of incremental liquidity.

**D.    Constrained Liquidity**

44.    The Company's most significant sources of liquidity consist of cash generated from working capital and borrowings under the Prepetition ABL Facility.  However, as a result of continued declines in sales, the Company's liquidity position has become severely constrained.  As of the Petition Date, the Company's available cash and cash equivalents totaled less than $500,000.  Moreover, the Company no longer has any availability under the Prepetition ABL Facility.

## Part IV

## THE SALE OF THE BUSINESS UNITS AND POST-PETITION FINANCING

45.    In recent months, the Debtors have diligently evaluated, in consultation with their professionals, a number of options to address their financial issues.  These efforts have included sharing information and engaging in discussions with the Debtors' secured lenders with the goal of consensually restructuring the Debtors' balance sheet to bring it into line with the Debtors' current debt servicing capabilities.

46.    In November 2017, the Debtors retained Houlihan to investigate the Debtors' operations and market their business units to viable parties who were interested in purchasing some or all of the Company as a going-concern business.  Houlihan spent significant time with the Company's management team, developing a full operating and integrated cash flow model, confidential information memorandum, electronic data site and management presentation.

47.    Commencing in February 2018, Houlihan initiated a sale process, and as of June 2018, Houlihan had contacted approximately 168 parties.  Out of the contacted parties, approximately 90 parties executed a confidentiality agreement and were sent a confidential

information memorandum, and fifteen submitted offers. After significant discussions with, and further due diligence by, those parties that had submitted offers, the Debtors determined to proceed with Hickory Chair, LLC, a subsidiary of Rock House Farms (RHF), the parent company of Century Furniture ("**Century**") regarding the sale of the Luxury Group, and a buyer of substantially all of the assets of the Broyhill and Thomasville & Co. businesses. The Debtors are continuing negotiations with the Broyhill and Thomasville & Co. buyer, and hope to execute an asset purchase agreement shortly after the filing of these cases.

48.     Since receiving the Century bid and a bid for the balance of the business, the Company continued discussions with PNC regarding the terms of additional financing so that they could have adequate funding to finalize the terms of potential sales of the Debtors' business units.

49.     In consultation with the ABL Agent and the Term Loan Agent, the Debtors determined to file for chapter 11 protection to implement an orderly sales process pursuant to section 363 of the Bankruptcy Code. In conjunction therewith, the Debtors and Century finalized a form asset purchase agreement (the "**Luxury APA**") setting forth a proposed disposition of the Luxury Group (the "**Luxury Group Assets**"), and the Debtors are near finalized on a form asset purchase agreement (the "**Non-Luxury APA**") setting forth a proposed disposition of the Debtors' remaining assets (the "**Non-Luxury Assets**" and together with the Luxury Group Assets, the "**Target Assets**"). The Debtors propose to have the Luxury APA and Non-Luxury APA serve as stalking horse bids to incentivize other parties to participate in an open, free, and fair auction process which the Debtors believe will derive the highest and best offers for the Target Assets. Although the Debtors believe that the bids for the Luxury Group Assets and the Non-Luxury Assets represent fair and reasonable offers for the Target Assets,

they remain receptive to alternative proposals that may ultimately maximize value for the Debtors' estates.  In light thereof, the Debtors believe that an auction process conducted pursuant to section 363 of the Bankruptcy Code will produce the highest and best offers for the Target Assets, and is the most efficient way to test the marketplace for such assets.

50.     To implement their planned sale process and preserve asset value during the pendency of the Chapter 11 Cases, the Debtors realized that they would require an infusion of new liquidity.  In light of the existing liens on substantially all of the Debtors' assets and the need for immediate liquidity, the Debtors' existing lenders were the most practical and reasonable source of financing.  Accordingly, to finance the Chapter 11 Cases, and provide sufficient liquidity to preserve the value of the Debtors' assets while the sale process is pending, the Debtors negotiated the terms of debtor-in-possession financing to be provided by PNC.  After extensive arm's-length negotiations, PNC has agreed to provide the Debtors with the DIP Facility (defined below).  PNC's proposal should provide the Debtors with sufficient liquidity to conduct a fulsome and flexible sale process so that they may ultimately commence a competitive auction for the sale of the Debtors' assets under section 363 of the Bankruptcy Code, and maximize the value of the Debtors' estates.

51.     With respect to DIP financing, PNC has committed to enter into a senior secured priming debtor-in-possession credit facility (the "**DIP Facility**") that will consist of a $98 million revolving loan commitment that will be used to refinance all outstanding obligations under the Prepetition ABL Facility and provide the Debtors with sufficient funding to sustain their operations during the Chapter 11 Cases.  $25 million of this revolving commitment will be available immediately upon entry of an order of the Bankruptcy Court approving the DIP Facility on an interim basis.

52.     Given their challenging financial position, the Debtors' paramount goal is to maximize the value of their estates for the benefit of their creditor constituencies and other stakeholders.  Following careful consideration of all alternatives, the Debtors have determined that implementation of the sale process pursuant to the terms set forth in the DIP Financing and the Luxury APA and, ultimately, the Non-Luxury APA represent the best way to maximize the value of the Debtors' businesses.  The Debtors anticipate that they will complete an auction within the next 60 days, and will close the sales of substantially all of their business units and remaining assets pursuant to the Luxury APA and Non-Luxury APA, or otherwise higher and better bids, within the next 75 days.  I believe that implementing these transactions, following additional market-testing during the Chapter 11 Cases, will maximize the value of the Debtors' estates for the benefit of all of their stakeholders.

## Part V

### SUPPORT FOR RELIEF REQUESTED IN FIRST DAY MOTIONS

53.     Concurrently with the filing of their chapter 11 petitions, the Debtors filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to maximize the value of their estates while the Chapter 11 Cases are pending.  The facts set forth in the First Day Motions are incorporated herein in their entirety.  The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring that value is preserved as they transition into chapter 11.

54.     I have reviewed each of the First Day Motions, and the facts stated therein are true and correct to the best of my belief with appropriate reliance on corporate officers and advisors.  The relief sought in each of the First Day Motions constitutes a critical element in the

successful implementation of the Debtors' efforts to maximize creditor recoveries.  To this end,

Debtors have filed the following First Day Motions:

    i.           *Debtors' Motion for an Order, Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases*

    ii.          *Debtors' Application for Entry of an Order Appointing Kurtzman Carson Consultants LLC as Claims Agent Effective as of the Petition Date*

    iii.         *Debtors' Motion for Interim and Final Orders Pursuant to Section 366 of the Bankruptcy Code (i) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (ii) Deeming Utility Companies Adequately Assured of Future Performance, (iii) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (iv) Setting a Final Hearing Related Hereto*

    iv.         *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 541, and 507(a)(8) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004: (i) Authorizing Debtors to Pay Prepetition Taxes and Fees; and (ii) Authorizing and Directing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations*

    v.          *Debtors' Motion for Interim and Final Orders Authorizing (i) the Debtors to (a) Continue Prepetition Insurance Policies, (b) Pay All Prepetition Obligations in Respect Thereof, and (c) Continue Insurance Premium Financing Program, (ii) Debtors to Continue Surety Bond Program and Pay All Prepetition Obligations In Respect Thereof, and (iii) Banks to Honor and Process Related Checks And Transfers*

    vi.         *Debtors' Motion for Entry of Order, Pursuant to Sections 105(a), 362, 363(b), 503(b)(1), 1107(a), and 1108 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004: (a) Authorizing Debtors to Continue (i) Customer Programs and Practices and (ii) Certain Prepetition Credit Card Obligations in the Ordinary Course of Business; and (b) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations*

    vii.        *Debtors' Motion for Entry of Interim and Final Orders Authorizing (i) Continued Use of Existing Cash Management*

> System, (ii) Continuation of Intercompany Transactions, and (iii) Continued Use of Existing Bank Accounts and Check Stock

> viii.    *Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to (a) Pay Prepetition Workforce Obligations and (b) Maintain and Continue Employee Wages and Benefits and Pay Related Obligations and (ii) Authorizing Banks and Financial Institutions to Honor and Process Related Checks and Electronic Transfers*

> ix.    *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363, 503(b)(9), 1107(a) and 1108 of the Bankruptcy Code: (i) Authorizing the Debtors to Pay Certain Prepetition Claims of Lien Vendors, Foreign Vendors, Import Claimants, and 503(b)(9) Claimants; (ii) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (iii) Granting Certain Related Relief*

> x.    *Debtors' Motion for Interim and Final Orders (i) Authorizing the Debtors to (a) Obtain Post-Petition Financing and (b) Utilize Cash Collateral of Secured Parties, (ii) Granting Adequate Protection, (iii) Modifying the Automatic Stay, and (iv) Granting Related Relief, Pursuant to 11 U.S.C. Sections 105, 361, 362, 363(c), (d) & (e), 364(c), 364(d)(1), 364(e) and 507(b)*

55.    It is my belief that the relief sought in each of the First Day Motions is necessary for a successful sale process and to maximize creditor recoveries. It is my further belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims or continue selected prepetition programs, i.e. the First Day Motions seeking relief related to the Debtors' obligations to their employees, taxing authorities, vendors, service providers, customers, banks, and insurers, the relief requested is essential to the Debtors' sale efforts and necessary to avoid immediate and irreparable harm to the Debtors' estates. The success of the Chapter 11 Cases depends upon the Debtors' ability to maintain their operations and maximize estate value. The relief requested in the First Day Motions is a critical component of maintaining uninterrupted business operations and the confidence of key constituencies necessary to implement a successful restructuring.

## CONCLUSION

56.     I believe approval of the relief requested in the First Day Motions is in the best interests of all stakeholders and respectfully request that the Court grant all relief requested in the First Day Motions and such other further relief as may be just.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated:  July 29, 2018                                    */s/ Robert D. Albergotti*
                                                                       Robert D. Albergotti
                                                                       Chief Restructuring Officer

**<u>EXHIBIT A</u>**

Corporate Organizational Chart

# Heritage Home Group
## Global Structure

