**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
----------------------------------------------------------x
                                         :
In re:                                   :    Chapter 11
                                         :
HERITAGE HOME GROUP LLC, et al.,         :    Case No. 18-11736 (____)
                                         :
          Debtors.¹                      :    (Joint Administration Requested)
                                         :
                                         :    Hearing Dates: To Be Determined
                                         :    Objection Deadlines: To Be Determined
----------------------------------------------------------x
```

**DEBTORS' MOTION FOR ORDERS: (I) APPROVING (A) BIDDING PROCEDURES
FOR THE SALE OF DEBTORS' ASSETS RELATED TO THE LUXURY BRANDS
BUSINESS; (B) FORM AND MANNER OF NOTICES; (C) FORM OF ASSET
PURCHASE AGREEMENT, INCLUDING BID PROTECTIONS; (II) SCHEDULING
DATES TO CONDUCT AUCTION AND HEARING TO CONSIDER FINAL
APPROVAL OF SALE, INCLUDING TREATMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF; AND
(IV)(A) APPROVING THE SALE OF THE ACQUIRED ASSETS; (B) AUTHORIZING
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, "Debtors"),[2] hereby

move (the "Motion"), pursuant to 105(a), 363, 365, 503, and 507 of title 11 of the United States

Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 3007, 6004, 6006, 9007,

and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are:  Heritage Home Group LLC (9506); HH Global II B.V. (0165); HH Group Holdings US, Inc. (7206); HHG Real Property LLC (3221); and HHG Global Designs LLC (1150).  The Debtors' corporate headquarters is located at 1925 Eastchester Drive, High Point, North Carolina 27265.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in that certain Asset Purchase Agreement among Heritage Home Group LLC, HHG Real Property LLC and HHG Global Designs LLC (as Sellers) and Hickory Chair, LLC (as Buyer) (the "Stalking Horse Bidder") dated as of July 29, 2018, a copy of which is attached as Exhibit 1 to **Exhibit A** attached hereto, and the exhibits and schedules thereto (each as may be amended or supplemented from time to time, collectively, the "Asset Purchase Agreement" or "APA"), the Bidding Procedures Order (defined herein), or the Bidding Procedures (defined herein), as applicable.  In the event of any inconsistencies between the Asset Purchase Agreement, the Bidding Procedures Order, or the Bidding Procedures, and the terms of this Motion, the terms of the Asset Purchase Agreement, the Bidding Procedures Order, or the Bidding Procedures, as applicable, shall govern.

6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for the entry of an order (the "Bidding Procedures Order"), substantially in the form attached hereto as **Exhibit A**: (a) approving bidding procedures substantially in the form attached to the Bidding Procedures Order as Exhibit 2 (the "Bidding Procedures") to govern the sale of substantially all of the assets related to the Debtors' going-concern business of designing, manufacturing, sourcing, licensing, and selling home furnishings under the Hickory Chair, Pearson, Maitland-Smith, and La Barge brands (the "Luxury Brands Business" or the "Acquired Assets"); (b) approving the form and manner of notices in connection with Bidding Procedures; (c) scheduling dates to conduct an auction to sell the Luxury Brands Business (the "Auction") and a hearing (the "Sale Hearing") to consider final approval of the sale of the Luxury Brands Business (the "Sale"), including treatment of executory contracts and unexpired leases; and (d) granting related relief.  By this Motion, the Debtors also seek, pursuant to sections 105, 363, 365, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006, entry of an order (the "Sale Order")[3] at the Sale Hearing: (a) approving the Sale free and clear of all liens, claims, encumbrances, and interests; (b) authorizing the assumption and assignment of executory contracts and unexpired leases; and (c) granting related relief.  In support of this Motion, the Debtors rely upon the *Declaration of Robert D. Albergotti in Support of Chapter 11 Petitions and First-Day Motions* (the "First Day Declaration").  In further support of the Motion, the Debtors respectfully state as follows:

---

[3] The proposed form of Sale Order will be filed with the Court on the date that is two business days prior to the Sale Hearing.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157

and 1334 and the *Amended Standing Order of Reference* from the United States District Court

for the District of Delaware dated as of February 29, 2012.  This is a core proceeding within the

meaning of 28 U.S.C. § 157(b), and, pursuant to Local Rule 9013-1(f), the Debtors consent to the

entry of a final order by the Court in connection with this Motion to the extent it is later

determined that the Court, absent consent of the parties, cannot enter final orders or judgments in

connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 363, and 365

of the Bankruptcy Code, Bankruptcy Rules 2002, 3007, 6004, 6006, 9007, and 9014, and Local

Rule 6004-1.

## BACKGROUND

4.      On the date hereof (the "Petition Date"), the Debtors commenced voluntary cases

(the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code.  The Debtors continue to

operate their businesses and manage their properties as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or

examiner has been made in the chapter 11 cases and no committees have been appointed or

designated.

5.      The Debtors have requested that the Chapter 11 Cases be consolidated for

procedural purposes only, and jointly administered pursuant to Bankruptcy Rule 1015(b).

6.      Information regarding the Debtors' business, capital structure, and the

circumstances leading to the Chapter 11 Cases is set forth in the First Day Declaration, which is

incorporated herein by reference and filed contemporaneously herewith.

## **PREPETITION MARKETING AND SALES EFFORTS**

7.      The Debtors' paramount goal is to maximize the value of their estates for the benefit of the Debtors' creditor constituencies and other stakeholders through a sale of the Debtors' business units and remaining assets.  To this end, over eight months ago, the Debtors commenced a search, in concert with its advisors, to identify those entities most likely to provide the Debtors with a certain, feasible strategy for achieving this goal.  After exhaustive analysis, the Debtors have concluded that the best course of action is to pursue a sale of the Luxury Brands Business as a going concern pursuant to an offer tendered by Hickory Chair, LLC, a newly formed entity of RHF Investments Inc., owner of well-known furniture brands such as Century, Hancock & Moore, and Highland House.[4]

8.      In November 2017, the Debtors engaged Houlihan Lokey Capital, Inc. ("Houlihan") as an investment banker primarily to conduct a marketing process for the sale of the Debtors' business lines.  Houlihan spent a number of months investigating market receptivity to a potential out-of-court sale, contacting approximately 168 potential strategic and financial candidates.  Of these entities, approximately 90 executed confidentiality agreements and received confidential information memorandums, with those parties who expressed continued interest receiving access to a virtual data room and the opportunity to meet with the Debtors' management to conduct additional due diligence.  The Debtors commenced negotiations in the months leading up to the Petition Date with various parties seeking to consummate a transaction that maximized the value of the Debtors' businesses in the timeframe required under the Debtors' tightening liquidity situation.

---

[4] By separate motion, the Debtors intend to seek to sell their remaining business lines and assets through an auction process conducted pursuant to section 363 of the Bankruptcy Code.

9.    These negotiations generated fifteen preliminary offers, including four related to the Luxury Brands Business.  Each of these offers was evaluated by the Debtors' management and advisors.  Ultimately, the Debtors determined to proceed with the sale of the Luxury Brands Business to the Stalking Horse Bidder.  The Debtors and their advisors are confident that the prepetition marketing efforts were sufficient to reasonably identify those entities possessing the desire and financial ability to put forward bids worthy of consideration under the circumstances and timeframe required given the Debtors' situation, subject to ongoing postpetition efforts as set forth herein, and the Debtors submit that the process employed will maximize the recovery for all the Debtors' stakeholders.

## THE ASSET PURCHASE AGREEMENT AND THE BIDDING PROCEDURES

10.    A summary of the Asset Purchase Agreement, including the terms that are required to be highlighted pursuant to Local Rule 6004-1(b), is set forth as follows:

| | |
|---|---|
| **Purchase Price**<br>APA § 2.05(a) | The aggregate purchase price for the Acquired Assets will be $17,450,000 (the "Base Amount"), plus the Net Working Capital Surplus, minus the Net Working Capital Deficit, plus the assumption of Assumed Liabilities (collectively, the "Purchase Price"). |
| **Acquired Assets**<br>APA § 2.01 | Acquired Assets include substantially all of the assets primarily used for, held for use primarily in connection with, or related primarily to the Luxury Brands Business, other than the Excluded Assets. |
| **Excluded Assets**<br>APA § 2.02 | Excluded Assets" under the Asset Purchase Agreement include:<br><br>(a)    except as set forth in Section 2.01 of the APA, all assets of any kind not used primarily in the Business;<br><br>(b)    all cash, including the Purchase Price, cash equivalents, bank accounts and securities of Sellers;<br><br>(c)    all Contracts other than the Assigned Contracts;<br><br>(d)    Intentionally Omitted;<br><br>(e)    Intentionally Omitted;<br><br>(f)    all Benefit Plans and assets attributable thereto;<br><br>(g)    the assets, properties and rights specifically listed on Section 2.02(g) of the Disclosure Schedules; |

|  | (h)    all Intellectual Property other than the Intellectual Property Assets; |
|--|--|
|  | (i)    the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Sellers, and any books and records which any Seller is prohibited from disclosing or transferring to Buyer under applicable Law and is required by applicable Law to retain; |
|  | (j)    all insurance policies of Sellers and all rights to applicable claims and proceeds thereunder; |
|  | (k)    all Tax assets (including duty and Tax refunds and prepayments) of any Seller or any of its Affiliates together with any interest due thereon or penalty rebate arising therefrom, to the extent received or receivable from a Governmental Authority for any Pre-Closing Tax Period; |
|  | (l)    except as set forth in Section 2.01(h) of the APA, all rights to any Action, including all claims and causes of action arising under Sections 542 through 553 of the Bankruptcy Code, available to or being pursued by any Seller, whether arising by way of counterclaim or otherwise; and |
|  | (m)    the rights that accrue or will accrue to any Seller under the Transaction Documents. |
| **Sale to Insider** | The Asset Purchase Agreement does not contemplate the sale of the Acquired Assets to an insider as defined in section 101(31) of the Bankruptcy Code.  The Asset Purchase Agreement is the product of arms'-length negotiations. |
| **Agreements with Management** | The Asset Purchase Agreement does not contain any agreements or representations with respect to individual members of the Debtors' management team. |
| **Releases** | Any releases to be provided to the Stalking Horse Bidder will be included in the Sale Order. |
| **Private Sale/No Competitive Bidding** | The Debtors intend to execute a public auction process for the assets subject to the Motion. |
| **Closing Deadlines and Milestones**<br><br>APA § 6.21 | The Asset Purchase Agreement provides for the following closing and related deadlines:<br><br>• Bidding Procedures Order Deadline: August 28, 2018<br><br>• Sale Order Deadline:  September 27, 2018<br><br>• Closing Date Deadline:  October 5, 2018 |

| | |
|---|---|
| **Good Faith Deposit**<br>APA § 2.05(b); Bidding Procedures § 5.d | The Stalking Horse Bidder has submitted a good-faith deposit of $1,310,000.  Entities seeking to submit a "Qualified Bid" are required to submit a deposit of 7.5% of the total purchase price of their Bid. |
| **Interim Arrangement with Proposed Buyer**<br>APA § 3.02(b)(6) | The Debtors will provide for the provision to the Stalking Horse Bidder of certain goods and services after Closing pursuant to the Transition Services Agreements. |
| **Use of Proceeds**<br>APA § 2.09 | No later than fifteen (15) days following Buyer's delivery of the Buyer Closing Net Working Capital Statement in accordance with Section 2.06(b) of the APA, the Sellers Representative shall prepare and deliver to Buyer a schedule allocating the sum of the Purchase Price and the Assumed Liabilities among the Purchased Assets, in such amounts reasonably determined by the Sellers to be consistent with Section 1060 of the Code, as amended, and the regulations thereunder. |
| **Tax Exemptions Under 1146(a) of the Bankruptcy Code** | Not Applicable. |
| **Record Retention**<br>APA § 6.06 | The Buyer will provide Seller's Representative access to all Books and Records for periods prior to Closing for a period of seven years. |
| **Sale of Avoidance Actions**<br>APA § 2.02(l) | Excluded Assets include, "except as set forth in Section 2.01(h) of the APA, all rights to any Action, including all claims and causes of action arising under Sections 542 through 553 of the Bankruptcy Code, available to or being pursued by any Seller, whether arising by way of counterclaim or otherwise."<br><br>Section 2.01(h) of the APA provides that the Purchased Assets include, "subject to Section 2.02(k), all prepaid expenses, credits, advance payments, claims, deposits, refunds, rights of recovery, rights of set-off, rights of recoupment, charges, sums and fees in connection with the Purchased Assets or the Assumed Liabilities." |
| **Requested Findings as to Successor Liability** | The Sale Order will provide that the that the Acquired Assets are being sold free and clear of all liens, claims, encumbrances, and interests, except as set forth in the Asset Purchase Agreement. |
| **Sale Free and Clear of Unexpired Leases**<br>APA § 2.05(d) | The Asset Purchase Agreement allows the Stalking Horse Bidder to select which, if any, unexpired leases to assume and for the Stalking Horse Bidder to take assignment of the same.  Any such assumption and assignment will be pursuant to section 365 of the Bankruptcy Code. |
| **Credit Bid**<br>Bidding Procedures § 6 | The Bidding Procedures permit a Secured Creditor to "credit bid" all or a portion of value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code. |

| | |
|---|---|
| **Relief from Bankruptcy Rule 6004(h)** | The Sale Order will provide for a waiver of the 14-day stay thereof, arising under Bankruptcy Rules 6004(h) and 6006(d), including the parties' ability to close the Sale and assign the Assigned Contracts in connection therewith. |

11.    A summary of the following provisions set forth in the Bidding Procedures Order and the accompanying Bidding Procedures is set forth below, pursuant to Local Rule 6004-1(c):

| | |
|---|---|
| **Provisions Governing the Qualification of Bidders**<br><br>Bidding Procedures §§ 2–3 | A "Qualified Bidder" is a Potential Bidder:  (i) who has delivered (a) an executed confidentiality agreement on terms acceptable to the Debtors; and (b) proof by the Potential Bidder of its financial capacity to close a competing transaction, including payment of any cure amount with respect to any contract that may be assigned, which may include current unaudited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach), the adequacy of which the Debtors and their advisors will determine in consultation with any official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "Committee"); and (ii) whose Bid is a Qualified Bid. |
| **Provisions Governing Qualified Bids:**<br><br>Bidding Procedures § 5 | A proposal, solicitation, or offer (each, a "Bid") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (collectively, the "Bid Requirements"), as determined by the Debtors in their reasonable business judgment, in consultation with the Committee, shall constitute a "Qualified Bid."  For the avoidance of doubt, the Bid of the Stalking Horse Bidder as set forth in the Stalking Horse Purchase Agreement will be deemed a Qualified Bid for all purposes.<br><br>a.    **Assets**.  Each Bid must clearly state which Assets the Qualified Bidder is agreeing to purchase, and which liabilities of the Debtors the Qualified Bidder is agreeing to assume ("Assumed Liabilities").<br><br>b.    **Purchase Price**.  Each Bid must clearly set forth the purchase price to be paid, including and identifying separately any cash and non-cash components (the "Purchase Price").<br><br>c.    **Minimum Bid**.  The aggregate consideration proposed by each Bid must equal or exceed the sum of the following (a "Minimum Bid") provided that in determining the value of the Bid, the Debtors will not be limited to evaluating the dollar amount of the Bid, but also may consider factors including the proposed revisions to the Stalking Horse Purchase Agreement and other factors affecting the speed, certainty, and value of the proposed transactions:<br><br>(i)        the Base Amount of $17,450,000; ***plus***<br><br>(ii)       an assumption of the Assumed Liabilities set forth in the Stalking Horse Purchase Agreement on terms no less |

favorable to the Debtors than the Stalking Horse Purchase Agreement, and/or the dollar value of any such liabilities that are not "Assumed Liabilities" in such Bid, each as determined in the Debtors' business judgment, in consultation with the Committee; ***plus***

    (iii)    $540,000, the maximum dollar value of the Bid Protections (as defined below); ***plus***

    (iv)    a minimum bid increment of $500,000.

d.   **Deposit**.  With its Bid, each Potential Bidder must submit by wire transfer of immediately available funds, a cash deposit in the amount equal to 7.5% of the aggregate cash and non-cash Purchase Price set forth in the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Deposit").

e.   **Same or Better Terms**.  Each Bid must be on terms that are not more burdensome than the terms of the Stalking Horse Purchase Agreement, as determined by the Debtors, in consultation with the Committee.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the Sale and shall include a schedule of assumed contracts to the extent applicable to the Bid, and a copy of the Stalking Horse Purchase Agreement clearly marked to show all changes requested by the Potential Bidder, including those related to the respective Purchase Price and Assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such Bid (the "Qualified Bid Documents").

f.   **Contingencies; No Financing or Diligence Outs**.  A Bid shall not be conditioned on: (i) obtaining financing; (ii) shareholder, board of directors, or other internal approval; or (iii) the outcome or completion of a due diligence review by the Potential Bidder.  Notwithstanding the foregoing, a Bid may be subject to (i) the accuracy at the closing of the Sale of specified representations and warranties and (ii) the satisfaction at the closing of the Sale of specified conditions, which shall not be more burdensome than those set forth in the Stalking Horse Purchase Agreement, as determined in the Debtors' business judgment, in consultation with the Committee.

g.   **Identity**.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the Sale), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific persons and counsel whom the Debtors and their advisors should contact regarding such Bid.

h.   **Demonstrated Financial Capacity**.  A Qualified Bidder must have, in the Debtors' business judgment, in consultation with the Committee, the necessary financial capacity to consummate the

proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.

i.  **Committed Financing**.  To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include committed financing documented to the satisfaction of the Debtors, in consultation with the Committee, which demonstrates that the Potential Bidder has received sufficient debt or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid.

j.  **Binding and Irrevocable**.  A Qualified Bid must be irrevocable unless and until the Debtors accept a higher or otherwise better Bid and such Qualified Bidder is not selected as the Backup Bidder (as defined herein).

k.  **Expenses; Disclaimer of Fees**.  Each Bid (other than that set forth in the Stalking Horse Purchase Agreement) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Potential Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is waiving any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

l.  **Authorization**.  Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

m.  **As-Is, Where-Is**.  Each Bid must include a written acknowledgement and representation that the Potential Bidder:  (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to submitting the Bid; (ii) has relied solely upon its own independent review, investigation, and inspection of any documents and the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Qualified Bid Documents.

n.  **Adherence to Bid Procedures**.  By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

| | |
|---|---|
| | o.   **Consent to Jurisdiction**.  Each Potential Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the development and enforcement of these Bidding Procedures, the Sale documents, and the closing of the Sale, as applicable.<br><br>p.   **Bid Deadline**.  Each Bid must be transmitted by email (in pdf or similar format) so as to be **actually** **received** on or before 5:00 p.m. (prevailing Eastern Time) on September [12], 2018 (the "Bid Deadline") by the Notice Parties. |
| **Stalking Horse Bid Protections**<br><br>Bidding Procedures §§ 7.b, 11 | The Debtors have agreed to provide the Stalking Horse Bidder with Bid Protections of (i) a Breakup Fee, in the amount of $540,000 and (ii) an Expense Reimbursement, in an amount up to $360,000.  The Bid Protections are payable pursuant to the terms and conditions of, and under certain circumstances as set forth in, the Stalking Horse Purchase Agreement.  Payment of the Bid Protections shall be governed by the Stalking Horse Purchase Agreement and the Bidding Procedures Order.  The Bid Protections will be an allowed super-priority administrative expense claim in accordance with the terms of the Stalking Horse Purchase Agreement and pursuant to the Bidding Procedures Order, senior to all other administrative expense claims against the Debtors' estates.<br><br>The initial Overbid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration provided for by the Baseline Bid by an incremental amount that is not less than the sum of $500,000 (a "Minimum Overbid Increment").  Upon the solicitation of each subsequent round of Overbids, the Debtors may, in their business judgment, in consultation with the Committee, modify the amount or structure of the applicable Minimum Overbid Increment.<br><br>The Stalking Horse Bidder will be entitled, but not obligated, to submit Overbids and will be entitled in any such Overbids to include the full amount of the Bid Protections in lieu of cash, and such amount shall be equal to cash for purposes of evaluating the Overbid. |
| **Modifications of Bidding Qualifications or Auction Procedures**<br><br>Bidding Procedures § 9. | Without prejudice to the rights of the Stalking Horse Bidder under the terms the Stalking Horse Purchase Agreement, the Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment, in consultation with the Committee, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (i) extending the deadlines set forth in these Bidding Procedures; (ii) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (iii) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (iv) canceling the Auction; and (v) rejecting |

| | |
|---|---|
| | any or all Bids. |
| **Closing with Alternative Backup-Bidders**<br><br>Bidding Procedures § 8(c). | If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may, in consultation with the Committee, select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Backup Bid without further order of the Court or notice to any party.  In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors.  The Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance. |

## RELIEF REQUESTED

12.     By this Motion, the Debtors request entry of the Bidding Procedures Order and, at the Sale Hearing, entry of the Sale Order that will (i) designate the Stalking Horse Bidder or such other entity or entities submitting the highest or otherwise best Qualified Bid (the "Successful Bid") as the successful bidder ("Successful Bidder") and approve the Sale in accordance with the asset purchase agreement between the Debtors and the Successful Bidder, which Sale shall be free and clear of all liens, claims, encumbrances, and other interests (other than expressly specified permitted encumbrances and assumed liabilities, all as more specifically set forth in the Successful Bid), (ii) approve the assumption and assignment of certain executory contracts and unexpired leases related to the Acquired Assets and the Sale, and (iii) grant related relief.

## BASIS FOR RELIEF

### A.    Necessity of the Sale

13.     The Debtors' primary goal is the maximization of the value of their estates for the benefit of all creditor constituencies and stakeholders.   The Bidding Procedures allow the Debtors to continue a thorough prepetition sale process to further this goal.  The Debtors, in concert with its advisors, have examined thoughtfully and thoroughly a range of viable alternatives, including potential out-of-court solutions and strategies for executing a meaningful,

feasible restructuring of the Debtors' extant obligations. Ultimately, the Debtors and their advisors have concluded that the sale strategy outlined herein is the best available strategy for realizing the full value for the Luxury Brands Business, while maximizing certainty of an orderly sale process.

14.     The Debtors submits that the significant duration of the prepetition and postpetition marketing window will provide ample opportunity for third parties to conduct diligence and obtain financing to put forward Qualified Bids.

15.     Without the process described in the Motion and Bidding Procedures, the Debtors believe, in the exercise of their business judgment, that their creditors and stakeholders are unlikely to receive maximum value for the Luxury Brands Business.

**B.     Approval of the Bidding Procedures**

16.     The Bidding Procedures are designed to maximize the value of the Luxury Brands Business, while ensuring an orderly sale process. The Bidding Procedures describe, among other things, the procedures for interested parties to access and conduct due diligence, the manner in which bidders will become "qualified," the conduct of the Auction, selection and approval of the Successful Bidder and Backup Bidder, and key deadlines. The Debtors believe that the Bidding Procedures afford it the best possible opportunity to maximize the amount received through the Sale by setting the baseline for additional bids, while facilitating robust bidding by qualified entities.

**C.     Expense Reimbursement and Breakup Fee**

17.     Following significant arms'-length negotiations with multiple interested parties, the Debtors and the Stalking Horse Bidder executed the Asset Purchase Agreement, and the Debtors agreed to provide the Stalking Horse Bidder with the Bid Protections payable under the circumstances described below and as described more fully in the Asset Purchase Agreement.

18.     Under section 9.02 of the Asset Purchase Agreement, the Stalking Horse Bidder is entitled to be paid the Breakup Fee if the Debtors consummate (i) an Alternate Transaction; or (ii) a Chapter 11 Plan that contemplates or results in an Alternate Transaction or achieves a comparable result under the Bankruptcy Code.   The Stalking Horse Bidder is entitled to the Expense Reimbursement if the Asset Purchase Agreement is terminated for any reason other than as a result of the Stalking Horse Bidder being in material breach under the Asset Purchase Agreement.   In addition, provided that the Stalking Horse Bidder is entitled to receive the Bid Protections in accordance with the Asset Purchase Agreement, the Debtors have agreed that the Bid Protections shall constitute a super-priority administrative claim within the meaning of sections 364(c)(1) and 503(b)(1) of the Bankruptcy Code, subject to allowance by the Court.

19.     The Debtors believe that the Bid Protections are fair and reasonable and were necessary inducements to convince the Stalking Horse Bidder to enter into the Asset Purchase Agreement and subject its offer to higher or otherwise better offers.   Without these inducements, the Debtors believe that it would not have been possible to obtain an initial bid of similar quality, certainty, and amount to the bid embodied in the Asset Purchase Agreement.

**D.     Assumption and Assignment Procedures**

20.     As contemplated in the Asset Purchase Agreement, at the closing of the Sale, the Debtors intend to assume certain executory contracts and unexpired leases designated by the Stalking Horse Bidder (or other Successful Bidder) (the "Assigned Contracts") pursuant to section 365(b) of the Bankruptcy Code and assign such Assigned Contracts to the Stalking Horse Bidder (or other Successful Bidder) pursuant to section 365(f) of the Bankruptcy Code.   The Debtors accordingly are seeking approval of proposed procedures to govern the assumption and assignment of all Assigned Contracts (the "Assumption and Assignment Procedures").   Because the Assumption and Assignment Procedures are set forth in detail in the attached Bidding

01:23397702.1

Procedures Order, they are not restated herein. Generally speaking, however, the Assumption and Assignment Procedures: (i) outline the process by which the Debtors will serve notice, in substantially the form attached as Exhibit 4 to the Bidding Procedures Order, to all non-Debtor counterparties to the potential Assigned Contracts regarding the proposed assumption and assignment and related cure amounts, if any; and (ii) establish objection and other relevant deadlines and the manner for resolving disputes relating to assumption and assignment of Assigned Contracts.

E.    **Notice Provisions**

21.    On or before five days after entry of the Bidding Procedures Order, the Debtors propose to serve the sale notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 3 (the "Sale Notice"), on all Notice Parties (as defined in the Bidding Procedures Order) and creditors appearing on the Debtors' creditor matrix.

22.    The Debtors also propose, pursuant to Bankruptcy Rules 2002 and 6004, to publish a version of the Sale Notice once in the national edition of *The New York Times*, *USA Today*, or the *Wall Street Journal* as soon as practicable after entry of the Bidding Procedures Order.

F.    **Appointment of Consumer Privacy Ombudsman Is Not Required**

23.    No Debtor has, in connection with offering a product or a service, disclosed to any individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the Debtors, and no such policy is in place on the Petition Date. *See* 11 U.S.C. § 363(b)(1)(B). As such, there is no need for the Court to appoint a consumer privacy ombudsman in accordance with section 332 of the Bankruptcy Code.

## APPLICABLE AUTHORITY

**A.     Approval of the Sale is Appropriate
        Under Section 363 of the Bankruptcy Code.**

24.     The Sale should be approved as a sound exercise of the Debtors' business judgment.  Section 363 of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  *See, e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991).  Once a court determines that a valid business justification exists for a sale outside of the ordinary course of business, the court must determine whether (i) adequate and reasonable notice of the sale was given to interested parties, (ii) the sale will produce a fair and reasonable price for the property, and (iii) the parties have acted in good faith.  *See In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012); *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008).  As described below, the proposed Sale meets each of these requirements.

**1.     The Sale Represents a Sound Exercise
        of the Debtors' Business Judgment.**

25.     Here, a strong business justification exists for the Sale.  As described above, the Debtors have concluded that an expedited sale of the Luxury Brands Business to the Stalking Horse Bidder, or any other Successful Bidder, represents the best value-maximizing opportunity for these assets.  As a result, an expeditious sale of the Debtors' assets is a reasonable exercise of the Debtors' business judgment and is in the best interests of all of the Debtors' stakeholders.

2.      **The Bidding Procedures are Fair and Designed to**
        **Maximize the Value Received for the Acquired Assets.**

26.      The Debtors believe that the Bidding Procedures satisfy each of the remaining requirements for approval of a sale under section 363 of the Bankruptcy Code by (i) providing sufficient notice of each element of the proposed sale process, (ii) facilitating a value-maximizing sale, and (iii) ensuring an unbiased and good-faith sale process. The detailed Bidding Procedures provide notice designed to fully inform all parties with a stake in the sale process regarding the portions of the sale process most relevant to their interests. For example, the Bidding Procedures ensure that any entities asserting an interest in the Debtors' assets and parties to the Assigned Contracts will receive notice of the proposed Sale, the procedures for objecting to the Sale, and the proposed assumption and assignment of their respective contracts or leases. Similarly, the Bidding Procedures outline all material aspects of the potential purchaser notification, bid qualification, due diligence, bid submission, bid selection, and Auction process, including the timing for each. Thus, the Bidding Procedures provide assurance to each entity potentially interested in purchasing the Acquired Assets that their respective rights will be protected and the Sale process will be fair and reasonable.

27.      Further, the Bidding Procedures provide the Debtors with the opportunity to consider all competing offers and to select, in their reasonable business judgment, and after consultation with any creditors' committee appointed in the Chapter 11 Cases, the best offer for the Luxury Brands Business. Moreover, the Bidding Procedures provide the Debtors with the flexibility to modify the Bidding Procedures, if necessary, to maximize value for the Debtors' estates. Accordingly, the Debtors believe the Court should approve the Bidding Procedures.

**3.      The Bid Protections are Necessary to Preserve the
Value of the Debtors' Estates.**

28.      The Debtors believe that granting the Bid Protections to the Stalking Horse
Bidder will ensure the Debtors' ability to maximize the realizable value of the Luxury Brands
Business for the benefit of the Debtors' estates, their creditors, and other parties in interest.  The
Stalking Horse Bidder conditioned their willingness to serve as a stalking horse bidder on the
inclusion of these provisions in the Asset Purchase Agreement.  If approved by the Court, the
Debtors would be required to pay the Stalking Horse Bidder a Breakup Fee of $540,000 and up to
$360,000 in Expense Reimbursement in the event that the Bid Protections are payable under the
terms of the Asset Purchase Agreement.

29.      The United States Court of Appeals for the Third Circuit has held that bid
protections must meet the standards applicable to the allowance of administrative expenses under
section 503(b) of the Bankruptcy Code.  *See In re Reliant Energy Channelview LP*, 594 F.3d
200, 206 (3d Cir. 2010) (citing *Calpine Corp. v. O'Brien Envt'l Energy, Inc. (In re O'Brien
Envt'l. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999)).  The Third Circuit has identified at least two
instances in which bidding incentives may benefit the estate.  First, a bid protection may be
necessary to preserve the value of the estate if the assurance of the fee "promote[s] more
competitive bidding, such as by inducing a bid that otherwise would not have been made and
without which bidding would have been limited."  *O'Brien*, 181 F.3d at 537.  Second, "if the
availability of break-up fees and expense [reimbursements] were to induce a bidder to research
the value of the debtor and convert that value to a dollar figure on which other bidders can rely,
the bidder may have provided a benefit to the estate by increasing the likelihood that the price at
which the debtor is sold will reflect its true worth."  *Id.*

30.     The Bid Protections should be approved and afforded super-priority administrative expense status under sections 503(b) and 507(a)(2) of the Bankruptcy Code because they provide a clear benefit to the Debtors' estates.  By conducting due diligence, participating in negotiations for a potential transaction and entering into the Asset Purchase Agreement, the Stalking Horse Bidder has established a bid standard, including a price floor, and initiated a sales process that will serve as a catalyst for other bidders to submit higher and better bids.  The Debtors submit that the amount of the Bid Protections is reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Stalking Horse Bidder, including conducting the legal and financial diligence necessary to negotiate and enter into the Stalking Horse Purchase Agreement, which will serve as the baseline for other bids for the Acquired Assets.

31.     Moreover, the Debtors believe that the execution of the Asset Purchase Agreement by the Stalking Horse Bidder provides an incentive for others who expressed interest initially, but did not take efforts to negotiate definitive documents or submit competitive bids, to consider expending the time and effort to do so now.  To the extent that the Asset Purchase Agreement entices other potentially interested purchasers to participate in the bidding and auction process, the Bid Protections will provide a material benefit to the Debtors' estates in the form of an increased sale price.  On the other hand, in the event that others are not encouraged by the Asset Purchase Agreement to undertake additional efforts and participate in the Auction, the Bid Protections will not be paid and, thus, should not affect the value received by the Debtors for the Acquired Assets.  As such, the Debtors submit that it is appropriate to enter into the Asset Purchase Agreement containing the Bid Protections pursuant to the Bidding Procedures.

32.     Here, the Stalking Horse Bidder has conditioned its willingness to enter into the Asset Purchase Agreement on the Court's approval of, among other things, the Bid Protections. The proposed Bid Protections were the result of arms'-length negotiations between representatives of the Debtors and the Stalking Horse Bidder, which is not an insider of the Debtors.  The Debtors submit that the Bid Protections are justified to induce the Stalking Horse Bidder to enter into the Asset Purchase Agreement and to adequately compensate it for the risks it is taking.

33.     The Debtors further submit that the Stalking Horse Bidder may terminate the Asset Purchase Agreement if the Court fails to approve the Bid Protections.  The proposed transaction with the Stalking Horse Bidder ensures that the Debtors will have at least one substantial offer for the Luxury Brands Business.  The Stalking Horse Bidder has agreed to keep their bid open during the solicitation and marketing process only if the Bid Protections are approved by the Court.

**B.      The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Interests.**

34.     The Sale also meets the requirements to be a sale free and clear of liens, claims, interests, and encumbrances.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable
proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

35.     A sale that meets the requirements for a sale free and clear of liens, claims,

interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code also bars

claimants from asserting successor liability against the successful purchaser.  *See, e.g.*, *In re*

*Trans World Airlines, Inc.*, 322 F.3d 283, 288–90 (3d Cir. 2003) (holding that sale of assets

pursuant to section 363(f) barred successor liability claims for employment  discrimination and

rights under travel voucher program ); *Amphenol Corp. v. Shandler (In re Insilco Techs., Inc.)*,

351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take

ownership of property without concern that a creditor will file suit based  on a successor liability

theory).

36.     The Debtors request that any creditor that receives notice of the Sale Hearing and

who fails to timely file an objection to the Sale be deemed to have consented under section

363(f)(2) of the Bankruptcy Code to a sale free and clear of such creditor's interests, if any.

**C.      A Successful Bidder Should Be Afforded the Protections
of Section 363(m) of the Bankruptcy Code.**

37.     Pursuant to section 363(m) of the Bankruptcy Code, a good-faith  purchaser is one

who purchases assets for value, in good faith, and without notice of adverse  claims.  *See In re*

*Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *Mark Bell Furniture Warehouse,*

*Inc. v. D.M. Reid Assocs., Ltd.* (*In re Mark Bell Furniture Warehouse, Inc.*), 992 F.2d 7, 8 (1st

Cir. 1993).

38.     The Debtors will present facts at the Sale Hearing to demonstrate that the Asset

Purchase Agreement was negotiated at arm's length, with both parties represented by their  own

counsel.  Accordingly, the Debtors request that the Sale Order include a provision concluding

that the Successful Bidder is a "good-faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtors believe that providing the Successful Bidder with such protection will ensure that the maximum price will be received by the Debtors and the closing of the same will occur promptly.

**D.     Assumption and Assignment of the
        Assigned Contracts Should be Authorized.**

39.     Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Further, section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance . . . is provided." 11 U.S.C. § 365(f)(2). Assumption and assignment of the Assigned Contracts in connection with the Sale is appropriate.

**1.     Assumption of the Assigned Contracts is a
        Reasonable Exercise of the Debtors' Business Judgment.**

40.     Assumption or rejection of a contract is a matter of the debtor's business judgment. *See Nat'l Labor Relations Bd. v. Bildisco and Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd sub nom.*, *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513 (1984) ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test."); *In re Physiotherapy Holdings, Inc.*, 506 B.R. 619, 622 (Bankr. D. Del. 2014) (citing *In re Federal Mogul Global, Inc.*, 293 B.R. 124, 126 (D. Del. 2003)). A debtor's decision in this regard is "entitled to great deference from the Court." *See In re Armstrong World Indus.*, 348 B.R. 136, 162 (Bankr. D. Del. 2006). To satisfy the business judgment test, a debtor must only show that assumption or rejection of an executory contract will benefit the estate. *See Bildisco*, 682 F.2d at 79; *see also In re HQ Glob. Holdings, Inc.*, 290 B.R.

507, 511 (Bankr. D. Del. 2003) ("Under the business judgment standard, the sole issue is whether the rejection benefits the estate.").

41.    To facilitate the Sale and to maximize the value received for the Luxury Brands Business, the Debtors request approval under section 365 of the Bankruptcy Code of the Debtors' assumption and assignment of the Assigned Contracts to the Successful Bidder. Certain of the Debtors' executory contracts and unexpired leases will be necessary for the Successful Bidder's continued operation of the Luxury Brands Business.

42.    The Debtors further request that the Sale Order provide that the Assigned Contracts will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder, notwithstanding any provisions in the Assigned Contracts, including those described in sections 365(b)(2), 365(f)(1), and 365(f)(3) of the Bankruptcy Code that prohibit such assignment.

43.    The Debtors also request that the Sale Order provide that to the extent any provision in any Assigned Contract assumed and assigned (i) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, such assumption or assignment (including, without limitation, any "change of control" provision), or (ii) is modified, breached, or terminated, or deemed modified, breached, or terminated by any of the following: (a) the commencement of the Chapter 11 Cases; (b) the insolvency or financial condition of the Debtors at any time before the closing of the Chapter 11 Cases; (c) the Debtors' assumption or assumption and assignment (as applicable) of such Assigned Contract; or (d) the consummation of the Sale, then such provisions shall be deemed modified so as to not entitle the non-Debtor party thereto to prohibit, restrict or condition such assumption or assignment, to modify, terminate, or declare a breach or default under such Assigned Contract, or to exercise any other default-related rights or remedies with

respect thereto, including, without limitation, any such provision that purports to allow the non-Debtor party thereto to recapture such Assigned Contract, impose any penalty thereunder, condition any renewal or extension thereof, impose any rent acceleration or assignment fee, or increase or otherwise impose any other fees or other charges in connection therewith.   The Debtors request that all such provisions be deemed to constitute unenforceable anti-assignment provisions that are void and of no force and effect pursuant to sections 365(b), 365(e), and 365(f) of the Bankruptcy Code.

**2.      Any Defaults Under the Assigned Contracts Will be Cured and Evidence of Adequate Assurance of Future Performance by the Successful Bidder Will be Provided.**

44.      Once an executory contract or unexpired lease is assumed, the trustee or debtor in possession  may generally elect to assign such contract, so long as it cures any defaults and provides adequate assurance of future performance.  *See* 11 U.S.C. § 365(f)(2)(B) (stating that a debtor may assign an executory contract or unexpired lease of nonresidential property if "adequate  assurance  of  future  performance  by  the  assignee  of  such  contract  or  lease  is provided").  The requirements to show "adequate  assurance of future performance" will depend on  the  facts  and  circumstances  of  each  case,  but   should  be  given  a  "practical,  pragmatic construction."  *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n.10 (3d Cir. 2001); *In re Decora Indus.*, No. 00-4459 (JJF), 2002 WL 32332749, at *8 (D. Del. May 20, 2002) ("[A]dequate assurance falls short of an absolute  guaranty of payment.").  Adequate assurance may be provided by demonstrating the assignee's  financial  health  and  experience  in  managing  the  type  of  enterprise  or  property assigned.  *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from

the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

45.    The Debtors contemplate that the Successful Bidder will be able to provide adequate assurance of future performance in connection with any Assigned Contracts because such Successful Bidder must submit evidence sufficient to demonstrate its financial wherewithal and ability to consummate the Sale.    The Debtors will present facts at the Sale Hearing to show the financial credibility, willingness, and ability of the Successful Bidder to perform under the Assigned Contracts.    The Sale Hearing will afford the Court and other interested parties the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance under the Assigned Contracts, as required under section 365(f)(2)(B) of the Bankruptcy Code.

46.    Moreover, the Debtors have proposed to file a notice containing a list of the proposed Assigned Contracts and the Cure Amounts that the Debtors believes are due under each such proposed Assigned Contract.    The Debtors will serve a Cure Notice on all Contract Notice Parties and provide them with an opportunity to be heard.    In the absence of an objection by a non-Debtor party to a proposed Assigned Contract, the Contract Notice Party will receive the specified Cure Amount, if any, at the closing of the Sale with funds paid by the Stalking Horse Bidders or other Successful Bidder as required under the Successful Bid.

47.    Accordingly, the Debtors submit that implementation of the Assumption and Assignment Procedures regarding assumption and assignment of the Assigned Contracts is appropriate in this case.    The Court, therefore, will have a sufficient basis to authorize the Debtors to assume and assign the Assigned Contracts as will be set forth in the Successful Bid.

## SATISFACTION OF BANKRUPTCY RULE 6003

48.     Bankruptcy Rule 6003 provides that the relief requested in the Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." *See* Fed. R. Bankr. P. 6003.  As described herein, a rapid sale process is critical to the Debtors' ability to preserve the going-concern value of the Luxury Brands Business and maximize the value of their estates. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## WAIVER OF BANKRUPTCY RULE 6004(h) AND 6006(d); AUTOMATIC STAY

49.     To implement the foregoing immediately, the Debtors seeks a waiver of the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) and the assumption and assignment of the Assigned under Bankruptcy Rule 6006(d).

50.     Here, a waiver of the stay is appropriate because the Luxury Brands Business will have been extensively marketed and notice of the Sale will be adequately provided to all parties-in-interest.  Likewise, the non-Debtor parties to the Assigned will be provided with adequate notice of, and opportunity to object to, the assumption and assignment of the Assigned Contracts.

## NOTICE

51.     Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel: (i) the Office of the United States Trustee for the District of Delaware; (ii) PNC Bank, National Association, in its capacity as Pre-Petition Agent and DIP Agent; (iii) KPS Special Situations Fund III (A), L.P., in its capacity as Pre-Petition Term Agent; (iv) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors, as filed with the Debtors' chapter 11 petitions; (v) the Stalking Horse Bidder; (vi) the Securities & Exchange Commission; (vii) the Office of the United States Attorney General for the District of Delaware;

(viii) the Internal Revenue Service; (ix) the U.S. Department of Justice; (x) the offices of the attorneys general for the states in which the Debtors operate; and (xi) those parties who have filed formal requests for notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the Bidding Procedures Order and the Sale Order granting the relief requested herein and such other and further relief as is just.

Dated: July 29, 2018
      Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Jaime Luton Chapman*
Pauline K. Morgan (No. 3650)
Kenneth J. Enos (No. 4544)
Jaime Luton Chapman (No. 4936)
Ashley E. Jacobs (No. 5635)
Shane M. Reil (No. 6195)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

01:23397702.1

**<u>EXHIBIT A</u>**

**Proposed Bidding Procedures Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------------x
                                            :
In re:                                      :   Chapter 11
                                            :
HERITAGE HOME GROUP LLC, et al.,            :   Case No. 18-11736 (____)
                                            :
           Debtors.¹                        :   Jointly Administered
                                            :
                                            :   RE: Docket No. ___
------------------------------------------------------------x
```

**ORDER (I) APPROVING (A) BIDDING PROCEDURES FOR THE SALE OF
DEBTORS' ASSETS RELATED TO THE LUXURY BRANDS BUSINESS; (B) FORM
AND MANNER OF NOTICES RELATED THERETO; (C) FORM OF ASSET
PURCHASE AGREEMENT, INCLUDING BID PROTECTIONS; AND
(II) SCHEDULING DATES TO CONDUCT AUCTION AND HEARING TO
CONSIDER FINAL APPROVAL OF SALE, INCLUDING TREATMENT OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Upon consideration of the motion (the "Motion")² of the above-captioned debtors and

debtors in possession (the "Debtors") for the entry of (i) an order (this "Bidding Procedures

Order"):  (a) approving the proposed bidding procedures attached as **Exhibit 2** to this Bidding

Procedures Order (the "Bidding Procedures"), to govern the sale (the "Sale") of substantially all

of the assets related to the Debtors' going-concern business of designing, manufacturing,

sourcing, licensing, and selling home furnishings under the Hickory Chair, Pearson, Maitland-

Smith, and La Barge brands (the "Acquired Assets"); (b) establishing procedures for the

assumption and assignment of executory contracts and unexpired leases, including notice of

proposed cure amounts (the "Assumption and Assignment Procedures"); (c) approving the form

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as
applicable, are:  Heritage Home Group LLC (9506); HH Global II B.V. (0165); HH Group Holdings US, Inc.
(7206); HHG Real Property LLC (3221); and HHG Global Designs LLC (1150).  The Debtors' corporate
headquarters is located at 1925 Eastchester Drive, High Point, North Carolina 27265.

[2]  Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Motion or
the Bidding Procedures, as applicable.

and manner of notice with respect to certain procedures, protections, schedules, and agreement described herein and attached hereto; (d) approving the Debtors' selection of Hickory Chair, LLC ("Hickory Chair") as the stalking horse bidder (the "Stalking Horse Bidder"), the Bid Protections (as defined below) for the Stalking Horse Bidder, and that certain asset purchase agreement (the "Asset Purchase Agreement") among the Debtors and the Stalking Horse Bidder; (e) scheduling a final hearing (the "Sale Hearing") to approve the Sale; and (f) granting related relief, and (ii) at the Sale Hearing, an order (a "Sale Order"), a proposed form of which will be filed on the date that is two (2) business days prior to the Sale Hearing, (x) authorizing the sale of the Acquired Assets free and clear of liens, claims, interests, and encumbrances (collectively, the "Interests") with any such Interests to attach to the proceeds thereof with the same validity, extent and priority (under the Bankruptcy Code) as such Interests had immediately prior to the consummation of the Sale; (y) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (z) granting related relief, all as more fully described in the Motion; and this Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before this Court; and this Court having determined that the legal and factual bases set forth in the Motion and at the hearing, if

any, establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, **THE COURT HEREBY FINDS THAT**:

A.     The findings of fact and conclusions of law herein constitute this Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of facts are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

B.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     The statutory bases for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014, and Local Rule 6004-1.  The legal and factual bases set forth in the Motion establish just cause for the relief granted herein.  Entry of this Bidding Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties-in-interest.

D.     Notice of the Motion, the Bidding Procedures hearing, and the proposed entry of this Bidding Procedures Order was adequate and sufficient under the circumstances of these chapter 11 cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Notice of the Motion has been given to: (i) all entities known to have expressed an interest in a transaction with respect to some or all of the Debtors' assets during the past six (6) months; (ii) all entities known to have asserted any Interest in or upon any of the Acquired Assets; (iii) all federal, state, and local regulatory or taxing

authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (iv) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to the Successful Bidder; (v) the Office of the United States Trustee; (vi) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis, excluding insiders); (vii) PNC Bank, National Association, in its capacity as Pre-Petition Agent and DIP Agent; (viii) KPS Special Situations Fund III (A), L.P., in its capacity as Pre-Petition Term Agent; (ix) the Securities & Exchange Commission; (x) the Office of the United States Attorney General for the District of Delaware; (xi) the Internal Revenue Service; (xii) the U.S. Department of Justice; (xiii) the offices of the attorneys general for the states in which the Debtors operate; (xiv) the Stalking Horse Bidder; and (xv) all parties entitled to notice pursuant to Local Rule 2002-1(b) (collectively, the "Notice Parties").  Accordingly, no further notice of the Motion or this Bidding Procedures Order is necessary or required.

E.     The Debtors have demonstrated a compelling and sound business justification for this Court to grant the relief requested in the Motion, including, without limitation:  (i) approval of the Bidding Procedures; (ii) approval of the selection of Hickory Chair as the Stalking Horse Bidder; (iii) approval of the Assumption and Assignment Procedures; (iv) approval of the form and manner of notice of all procedures, protections, schedules, and agreement described in the Motion and attached thereto; (v) the scheduling of a date for the Sale Hearing; and (vi) all related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the hearing for such Motion, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

F.      Entry into the Asset Purchase Agreement, which is attached hereto as **Exhibit 1**, with the Stalking Horse Bidder, is in the best interests of the Debtors and the Debtors' estates and creditors, and it reflects a sound exercise of the Debtors' business judgment.[3]  The Asset Purchase Agreement provides the Debtors with the opportunity to sell the Acquired Assets to preserve and realize their optimal value.

G.      The Bidding Procedures, in the form attached hereto as **Exhibit 2** and incorporated herein by reference as if fully set forth in this Bidding Procedures Order, are fair, reasonable, and appropriate and represent the best method for maximizing the value of the Debtors' estates.  The Bid Protections:  (i) shall, if triggered, be deemed an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code in accordance with the Asset Purchase Agreement; (ii) are commensurate to the real and substantial benefit conferred upon the Debtors' estates by the Stalking Horse Bidder; (iii) are reasonable and appropriate, including in light of the size and nature of the Sale and comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Bidder, notwithstanding that the Sale is subject to higher or better offers; and (iv) were necessary for the Stalking Horse Bidder to pursue the Sale and to be bound by the Asset Purchase Agreement.

H.      The Bidding Procedures and the Bid Protections were a material inducement to, and express condition of, the willingness of the Stalking Horse Bidder to submit bids through execution of the Asset Purchase Agreement that will serve as a minimum or floor bid on which the Debtors, their creditors, suppliers, vendors, and other bidders may rely.

---

[3]  To the extent there are any conflicts between any specific terms of this Bidding Procedures Order and any specific terms of the Asset Purchase Agreement, the terms of this Bidding Procedures Order shall govern.

I.      The Bidding Procedures and the Asset Purchase Agreement were negotiated by the parties at arms' length and in good faith by the Debtors and the Stalking Horse Bidder.

J.      The Motion and the Assumption and Assignment Notice are reasonably calculated to provide counterparties to the Assigned Contracts with proper notice of the intended assumption and assignment of their executory contracts or unexpired leases, any cure amounts relating thereto, and the Assumption and Assignment Procedures.

K.      The sale notice (the "Sale Notice") attached hereto as **Exhibit 3** is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of the Acquired Assets, including, without limitation:  (i) the date, time, and place of the Auction (if one is held); (ii) the Bidding Procedures; (iii) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing; (iv) reasonably specific identification of the assets to be sold; (v) instructions for promptly obtaining copies of the Asset Purchase Agreement; (vi) a description of the Sale as being free and clear of liens, claims, encumbrances, and other interests (except as set forth in the Sale Order and Asset Purchase Agreement), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the Sale proceeds; and (vii) notice of the proposed assumption and assignment of Assigned Contracts to the Stalking Horse Bidder pursuant to the Asset Purchase Agreement (or to another Successful Bidder arising from the Auction, if any), and no other or further notice of the Sale shall be required.

L.      The Debtors' marketing process has been reasonably calculated to maximize value for the benefit of all stakeholders.

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as provided herein.[4]

2.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to this Court at the hearing on the Motion or by stipulation filed with this Court, are overruled.

3.      The record establishes that the Debtors' prior actions in connection with the marketing process, as it relates to the Acquired Assets, were appropriate and reasonably calculated to lead to the highest and best offer for the Sale.

**I.      Timeline for the Sale**

4.      The Debtors are authorized to perform any obligations of the Debtors set forth in the Asset Purchase Agreement attached to this Order as **Exhibit 1** that are intended to be performed prior to the Sale Hearing or entry of the Sale Order.  The Debtors are authorized to proceed with the Sale in accordance with the Bidding Procedures and are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

---

[4]    Notwithstanding anything to the contrary herein, the consummation of the Sale is subject to entry of the Sale Order.

| Action | Deadline |
|---|---|
| Sale Objection Deadline | 4:00 p.m. (prevailing Eastern Time) on September [17], 2018 |
| Bid Deadline | 5:00 p.m. (prevailing Eastern Time) on September [12], 2018 |
| Auction | 10:00 a.m. (prevailing Eastern Time) on September [18], 2018, if needed, at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, Delaware 19801 (or such other place and time as the Debtors timely communicate to all entities entitled to attend the Auction) |
| Deadline to Object to conduct of the Auction and Sale to a Successful Bidder Other than the Stalking Horse Bidder (the "Auction Objection Deadline") | 4:00 p.m. (prevailing Eastern Time) on September 21, 2018 |
| Sale Hearing | [●] (prevailing Eastern Time) on September [25], 2018 |

5.      For the avoidance of doubt, the Debtors reserve the right, and are authorized, to modify the above timeline and the Bidding Procedures, in consultation with the Stalking Horse Bidder and the consent of the DIP Agent, which consent shall not be unreasonably withheld, in accordance with the provisions of the Bidding Procedures, subject to the terms of the Asset Purchase Agreement.

## II.      The Bidding Procedures

6.      The Bidding Procedures are approved in their entirety.    The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures, in accordance therewith and the Asset Purchase Agreement.    The failure to specifically include or reference a particular provision of the Bidding Procedures in this Bidding Procedures Order shall not diminish or impair the effectiveness of such provision.    The Bidding Procedures shall not be modified without the DIP Agent's consent, which consent shall not be unreasonably withheld.

7.      The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate, and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest.  As further described in the Bidding Procedures, the Bid Deadline shall be 5:00 p.m. (prevailing Eastern Time) on September [12], 2018.  Any disputes or objections to the selection of Qualified Bids, Successful Bids, or Backup Bids (all as defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

8.      The Stalking Horse Bidder is deemed a Qualified Bidder, and the Stalking Horse Bid as set forth in the Asset Purchase Agreement is deemed a Qualified Bid.

9.      The Debtors are authorized to conduct the Auction in accordance with the Bidding Procedures.  The Auction, to the extent that an Auction is necessary under the Bidding Procedures, shall take place at 10:00 a.m. (prevailing Eastern Time) on September [18], 2018 at the offices of the proposed counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, Delaware 19801 (or such other place and time as the Debtors timely communicate to all entities entitled to attend the Auction).  Any objections to the conduct of the Auction must be filed by the Auction Deadline and served on the Objection Recipients (as defined below).

10.     Any creditor with a valid and perfected lien on any of the Acquired Assets (each, a "Secured Creditor") shall have the right, subject in all respects to the Bankruptcy Code and other applicable law, to credit bid all or any portion of such Secured Creditor's allowed secured claims to the extent that such secured claims are valid and undisputed pursuant to section 363(k) of the Bankruptcy Code or other applicable law, and any such credit bid shall be deemed a Qualified Bid, and any such Secured Creditor a Qualified Bidder, for all purposes hereof.

11.     Further, in the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit Overbids and will be entitled in any such Overbids to include the full amount of the Bid Protections in lieu of cash and, for purposes of evaluating the Overbid, such amount shall be equal to cash in the same amount.  Notwithstanding the preceding sentence, the inclusion in any Overbid of the Bid Protections shall not be deemed to create a secured claim or constitute an offset against any such claim under section 363(k) of the Bankruptcy Code.

**III.     Stalking Horse Bidder, Bid Protections, and Asset Purchase Agreement**

12.     The Debtors are authorized to enter into the Asset Purchase Agreement, subject to higher or otherwise better offers at the Auction.  The Bid Protections contained in the Asset Purchase Agreement are approved in their entirety, and shall survive termination of the Asset Purchase Agreement.  The Debtors are authorized to pay any and all amounts owing to the Stalking Horse Bidder on account of the Stalking Horse Bidder's Bid Protections upon the Debtors' consummation of the Sale with a purchaser other than the Stalking Horse Bidder.  If triggered, the Bid Protections shall be allowed super-priority administrative expenses under sections 503(b) and 507(a)(2) of the Bankruptcy Code, in accordance with the terms of the Asset Purchase Agreement.

**IV.     Notice Procedures**

13.     The Sale Notice attached hereto as **<u>Exhibit 3</u>** is hereby approved.

14.     On or before five (5) business days after entry of this Bidding Procedures Order, the Debtors will cause the Sale Notice to be sent by first-class mail postage prepaid to the Notice Parties and all known creditors of the Debtors.

15.     In addition to the foregoing, as soon as practicable, but in any event no later than seven (7) business days after the entry of this Bidding Procedures Order, the Debtors shall

publish the Sale Notice (modified for publication, as necessary) once in the national edition of *The New York Times, USA Today*, or the *Wall Street Journal*.

16.     Service of the Sale Notice as described herein shall be sufficient and proper notice of the Sale with respect to known interested parties.  Publication of the Sale Notice as described herein shall be sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

17.     As soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file on the docket and post on the following website, http://www.kccllc.net/heritagehome (the "Case Website"), but not serve, a notice identifying the Successful Bidder.

**V.     Assumption and Assignment Procedures**

18.     The Assumption and Assignment Procedures, which are set forth below, regarding the assumption and assignment of the executory contracts proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder (or other Successful Bidder, following the Auction, if any) pursuant to section 365(f) of the Bankruptcy Code and in accordance with the Asset Purchase Agreement are hereby approved to the extent set forth herein.

*A.     Notice of Assumption and Assignment.*

19.     As soon as practicable following entry of this Bidding Procedures Order, (any such date, the "Assumption and Assignment Service Date") the Debtors shall file with this Court, and post on the Case Website, the Notice of Assumption and Assignment and, included therewith, a list (the "Assigned Contracts List") that specifies:  (i) each of the Debtors' executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale (the "Assigned Contracts"), including the name of each non-Debtor counterparty to such Assigned Contract (the "Assigned Contract Counterparty"); and (ii) the proposed amount

necessary, if any, to cure all monetary defaults, if any, under the proposed Assigned Contract (the "Cure Costs").  The Debtors shall serve, by first class mail, the Notice of Assumption and Assignment, in substantially the form attached hereto as **Exhibit 4**, without the Assigned Contracts List, which will include:  (i) instructions regarding how to view that list on the Case Website (the "ACL Instructions"); (ii) information necessary and appropriate to provide notice of the relevant proposed assumption and assignment of Assigned Contracts and rights thereunder; (iii) Cure Costs, if any; and (iv) the procedures for objecting thereto ((ii)–(iv) collectively, the "Necessary Notice Information") on all Assigned Contract Counterparties.  The Debtors shall serve on all parties that have requested notice pursuant to Bankruptcy Rule 2002, by first class mail, a modified version of the Notice of Assumption and Assignment that contains the ACL Instructions and Necessary Notice Information.  Service as set forth herein shall be deemed proper, due, timely, good, and sufficient notice and no other or further notice is necessary.

20.     An Assigned Contract Counterparty listed on the Notice of Assumption and Assignment may file an objection (an "Assigned Contract Objection") to the proposed assumption and assignment of the applicable Assigned Contract or the proposed Cure Costs, if any.  All Assigned Contract Objections must (i) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any, (ii) include appropriate documentation in support thereof, and (iii) be filed and served on the Objection Recipients no later than 4:00 p.m. (prevailing Eastern Time) fourteen (14) days following the Assumption and Assignment Service Date (the "Assumption and Assignment Objection Deadline").

21.     If an Assigned Contract Counterparty files an Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with

respect to such objection will be determined at the Sale Hearing, such later hearing date that the Debtors determine in their discretion, or such other date determined by this Court.

     *B.     Supplemental Notice of Assumption and Assignment.*

     22.     The Stalking Horse Bidder may modify the list of Assigned Contracts until the opening of business on the date of the Auction.  Following the conclusion of the Auction, if any, and the selection of the Successful Bidder, the Debtors reserve the right, but only in accordance with the Asset Purchase Agreement, or as otherwise agreed by the Debtors and the Successful Bidder, at any time after the Assumption and Assignment Service Date, before or after the closing of the Sale, to:   (i) supplement the list of Assigned Contracts on the Notice of Assumption and Assignment with previously omitted Assigned Contracts; (ii) remove an Assigned Contract from the list of executory contracts and unexpired leases ultimately selected as an Assigned Contract that the Successful Bidder proposes be assumed and assigned to it in connection with the Sale or add to such list; and (iii) modify the previously stated Cure Cost associated with any Assigned Contract.

     23.     In the event that the Stalking Horse Bidder or Debtors exercise any of the rights reserved above, the Debtors will promptly serve a supplemental notice of assumption and assignment by electronic transmission, hand delivery, or overnight mail on the Assigned Contract Counterparty, and its attorney, if known, to each impacted Assigned Contract at the last known address available to the Debtors (a "Supplemental Notice of Assumption and Assignment").  Each Supplemental Notice of Assumption and Assignment will include the same information with respect to listed proposed Assigned Contracts as was included in the Notice of Assumption and Assignment.

     24.     Any Assigned Counterparty listed on a Supplemental Notice of Assumption and Assignment may file an objection (a "Supplemental Assigned Contract Objection") to the

proposed assumption and assignment of the applicable Assigned Contract or the proposed Cure Costs, if any.  All Supplemental Assigned Contract Objections must:  (i) state, with specificity, the legal and factual basis thereof as well as what Cure Costs the objecting party believes are required, if any; (ii) include appropriate documentation in support of the objection; and (iii) be filed and served on the Objection Recipients no later than fourteen (14) days from the date of service of such Supplemental Notice of Assumption and Assignment (the "Supplemental Assumption and Assignment Deadline"), which date will be set forth in the Supplemental Notice of Assumption and Assignment.

25.    If an Assigned Contract Counterparty files a Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors will seek an expedited hearing before this Court (a "Supplemental Assigned Contract Hearing") to determine the Cure Costs, if any, and approve the assumption of the relevant Assigned Contracts.  If there is no such objection, then the Debtors will obtain an order of this Court, including by filing a certification of no objection, (a "Supplemental Assigned Contract Order") fixing the Cure Costs and approving the assumption of any Assigned Contract listed on a Supplemental Notice of Assumption and Assignment.

C.    *Additional Notice of Assumption and Assignment Procedures.*

26.    If the Assigned Contract Counterparty does not file and serve a Assigned Contract Objection or Supplemental Assigned Contract Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of this Court in connection with such objection establishing an alternative Cure Cost, (i) the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling, notwithstanding anything to the contrary in any Assigned Contract or any other

01:23456742.2

document, and (ii) the Assigned Contract Counterparty will be deemed to have consented to the assumption and assignment of the Assigned Contract and the Cure Costs, if any, and will be forever barred from asserting any other claims related to such Assigned Contract against the Debtors or the Successful Bidder, or the property of any of them.

27.     Any objections to the Successful Bidder's proposed form of adequate assurance of future performance must be filed and served on the Objection Recipients by the later of (i) the Auction Objection Deadline, which is 4:00 p.m. (prevailing Eastern Time) on September [21], 2018, and (ii) the Supplemental Assumption and Assignment Deadline, and will be resolved at the Sale Hearing or Supplemental Assigned Contract Hearing, as applicable, or, in the Debtors' discretion, adjourned to a later hearing.

28.     The inclusion of an Assigned Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not:  (i) obligate the Debtors to assume any Assigned Contract listed thereon or the Successful Bidder to take assignment of such Assigned Contract; or (ii) constitute any admission or agreement of the Debtors that such Assigned Contract is an executory contract.  Only those Assigned Contracts that are included on a schedule of assumed and acquired contracts attached to the final asset purchase agreement with the Successful Bidder (including amendments or modifications to such schedules in accordance with such asset purchase agreement) will be assumed and assigned to the Successful Bidder.

## VI.     Sale Hearing.

29.     A Sale Hearing to (i) approve the sale of the Acquired Assets to the Successful Bidder and (ii) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held at [●] (prevailing Eastern Time) on September [25], 2018, and may be adjourned or rescheduled without notice.  At the Sale Hearing, the Debtors will seek

Bankruptcy Court approval of the Successful Bid and the Backup Bid.  The Sale Hearing shall be an evidentiary hearing on matters relating to the Sale and there will be no further bidding at the Sale Hearing.  In the event that the Successful Bidder cannot or refuses to consummate the Sale, the Debtors may, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors shall be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court.

30.    Any and all objections, if any, to the Sale to the Stalking Horse Bidder and entry of the Sale Order (a "Sale Objection") must be filed by 4:00 p.m. (prevailing Eastern Time) on September [17], 2018 (the "Sale Objection Deadline") and served on:  (i) proposed counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Pauline K. Morgan, Esq. (pmorgan@ycst.com), Kenneth J. Enos, Esq. (kenos@ycst.com) and Jaime Luton Chapman, Esq. (jchapman@ycst.com); (ii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware, 19801, Attn: Linda Richenderfer, Esq. (Linda.richenderfer@usdoj.gov); (iii) counsel to the Pre-Petition Agent and DIP Agent, Blank Rome LLP, 1201 North Market Street #800, Wilmington, Delaware 19801, Attn: Regina Kelbon, Esq. (kelbon@BlankRome.com) and Stanley B. Tarr, Esq. (Tarr@BlankRome.com); (iv) counsel to the Pre-Petition Term Agent, Cozen O'Connor, 1201 North Market Street, Suite 1001, Wilmington, Delaware 19801, Attn: Mark Felger, Esq. (mfelger@cozen.com) and Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Attn: Jeffrey D. Saferstein, Esq. (JSaferstein@paulweiss.com), Jacob A. Adlerstein, Esq. (JAdlerstein@paulweiss.com), and Sarah Harnett, Esq. (SHarnett@paulweiss.com); (v) counsel

to the Stalking Horse Bidder, McGuireWoods LLP, 201 North Tryon Street, Suite 3000, Charlotte, North Carolina 28202, Harrison L. Marshall, Jr. (hmarshall@mcguirewoods.com); and (vi) counsel to any statutory committee appointed in the Chapter 11 Cases (collectively (i)–(vi), the "Objection Recipients").  Any party failing to timely file a Sale Objection will be forever barred from objecting to the Sale and will be deemed to have consented to the Sale, including the transfer of the Debtors' right, title and interest in, to, and under the Acquired Assets free and clear of any and all Interests in accordance with the definitive agreement for the Sale.

**VII.    Miscellaneous.**

31.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Bidding Procedures Order in accordance with the Motion.

32.    This Bidding Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

33.    To the extent any of the deadlines set forth in this Bidding Procedures Order do not comply with the Local Rules, such Local Rules are waived and the terms of this Bidding Procedures Order shall govern.

34.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Bidding Procedures Order shall be immediately effective and enforceable upon its entry.

01:23456742.2

17

35.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bidding Procedures Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures, any Asset Purchase Agreement, and the implementation of this Bidding Procedures Order.

Dated: August _____, 2018
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**Asset Purchase Agreement**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

among

**HERITAGE HOME GROUP LLC,**

**HHG REAL PROPERTY LLC**

and

**HHG GLOBAL DESIGNS LLC**

(as Sellers) and

**HICKORY CHAIR, LLC**

(as Buyer)

dated as of

***July 29, 2018***

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ............................................................................................... 1

ARTICLE II PURCHASE AND SALE ........................................................................... 13
    Section 2.01.  Purchase and Sale of Assets.................................................. 13
    Section 2.02.  Excluded Assets .................................................................... 15
    Section 2.03.  Assumed Liabilities .............................................................. 16
    Section 2.04.  Excluded Liabilities .............................................................. 16
    Section 2.05.  Purchase Price and Deposit; Cure Amounts ....................... 17
    Section 2.06.  Purchase Price Adjustment .................................................. 18
    Section 2.07.  Withholding Tax ................................................................... 20
    Section 2.08.  Third Party Consents............................................................ 21
    Section 2.09.  Allocation of Purchase Price ............................................... 21

ARTICLE III CLOSING .................................................................................................. 22
    Section 3.01.  Closing ................................................................................. 22
    Section 3.02.  Closing Deliverables ............................................................ 22
    Section 3.03.  Prorations ............................................................................. 23
    Section 3.04.  Transfer Taxes ..................................................................... 24

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS ............................ 24
    Section 4.01.  Organization and Qualification of Sellers............................ 24
    Section 4.02.  Authority of Sellers.............................................................. 24
    Section 4.03.  No Conflicts; Consents ......................................................... 24
    Section 4.04.  Financial Statements ............................................................ 25
    Section 4.05.  Absence of Certain Changes, Events and Conditions........... 25
    Section 4.06.  Contracts .............................................................................. 27
    Section 4.07.  Title to Purchased Assets ..................................................... 27
    Section 4.08.  Condition of Purchased Assets ............................................ 27
    Section 4.09.  Leased Real Property ........................................................... 27
    Section 4.10.  Owned Real Property ........................................................... 28
    Section 4.11.  Intellectual Property ............................................................ 28
    Section 4.12.  Customers and Suppliers...................................................... 28
    Section 4.13.  Legal Proceedings; Governmental Orders ........................... 28
    Section 4.14.  Permits; Compliance With Laws .......................................... 29
    Section 4.15.  Employee Benefit Matters ................................................... 29
    Section 4.16.  Employment Matters............................................................ 29
    Section 4.17.  Environmental Matters......................................................... 30
    Section 4.18.  Taxes ................................................................................... 31
    Section 4.19.  Inventory ............................................................................. 32
    Section 4.20.  Accounts Receivable and Payable ....................................... 32
    Section 4.21.  Intentionally Omitted........................................................... 32
    Section 4.22.  Insurance ............................................................................. 32
    Section 4.23.  Brokers ................................................................................ 32

i

Section 4.24.  Disclaimer of Warranties as to Purchased Assets ........................................... 32
Section 4.25.  Exclusivity of Representations and Warranties ............................................. 33
Section 4.26.  "As Is" Transaction ............................................................................. 33

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER ................................ 34
Section 5.01.  Organization of Buyer .......................................................................... 34
Section 5.02.  Authority of Buyer .............................................................................. 34
Section 5.03.  No Conflicts; Consents ......................................................................... 34
Section 5.04.  Financing ........................................................................................ 34
Section 5.05.  Brokers .......................................................................................... 34
Section 5.06.  Legal Proceedings ............................................................................... 35
Section 5.07.  Reliance by Buyer .............................................................................. 35

ARTICLE VI COVENANTS .................................................................................... 35
Section 6.01.  Confidentiality .................................................................................. 35
Section 6.02.  Intentionally Omitted ........................................................................... 35
Section 6.03.  Received Payments .............................................................................. 35
Section 6.04.  Intentionally Omitted ........................................................................... 35
Section 6.05.  Employee Matters ............................................................................... 35
Section 6.06.  Availability of Books and Records ............................................................. 37
Section 6.07.  Bulk Sales/Tax Clearance Waiver .............................................................. 38
Section 6.08.  Intentionally Omitted ........................................................................... 38
Section 6.09.  Cooperation on Tax Matters .................................................................... 38
Section 6.10.  Retention of Tax Records ....................................................................... 38
Section 6.11.  Financial Information ........................................................................... 39
Section 6.12.  Further Assurances .............................................................................. 39
Section 6.13.  Conduct of Business Prior to the Closing ...................................................... 39
Section 6.14.  Insurance ........................................................................................ 41
Section 6.15.  Access to Information ........................................................................... 42
Section 6.16.  Notice of Certain Events ....................................................................... 42
Section 6.17.  Governmental Approvals and Consents ......................................................... 43
Section 6.18.  Efforts to Consummate .......................................................................... 43
Section 6.19.  Shared Business Contracts ...................................................................... 43
Section 6.20.  Intentionally Omitted ........................................................................... 44
Section 6.21.  Bankruptcy Court Matters ...................................................................... 44

ARTICLE VII CONDITIONS TO CLOSING .................................................................. 45
Section 7.01.  Conditions to Obligations of All Parties ....................................................... 45
Section 7.02.  Conditions to Obligations of Buyer ............................................................ 46
Section 7.03.  Conditions to Obligations of Sellers ........................................................... 47

ARTICLE VIII NON-SURVIVAL .............................................................................. 48
Section 8.01.  Non-Survival .................................................................................... 48

ARTICLE IX TERMINATION ................................................................................. 48
Section 9.01.  Termination ..................................................................................... 48
Section 9.02.  Breakup Fee and Expense Reimbursement ..................................................... 49

Section 9.03.  Effect of Termination ....................................................................... 50
Section 9.04.  Specific Performance ...................................................................... 50

ARTICLE X MISCELLANEOUS ............................................................................... 51
Section 10.01. Expenses ......................................................................................... 51
Section 10.02. Sellers Representative ..................................................................... 51
Section 10.03. Notices ........................................................................................... 52
Section 10.04. Interpretation .................................................................................. 53
Section 10.05. Disclosure Schedules ..................................................................... 53
Section 10.06. Headings ......................................................................................... 53
Section 10.07. Severability ..................................................................................... 53
Section 10.08. Entire Agreement ............................................................................ 54
Section 10.09. Successors and Assigns ................................................................... 54
Section 10.10. No Third-Party Beneficiaries ........................................................ 54
Section 10.11. Amendment and Modification; Waiver ........................................... 54
Section 10.12. Governing Law; Submission to Jurisdiction; Waiver of Jury Trial ............... 54
Section 10.13. Counterparts .................................................................................... 55

Exhibits

Exhibit A – Assignment and Assumption Agreement
Exhibit B – Bidding Procedures Order
Exhibit C – Bill of Sale
Exhibit D – Intellectual Property Assignment Agreements
        D-1: Intellectual Property Assignment
        D-2: Patent Assignment Agreement
        D-3: Trademark Assignment and Assumption Agreement
Exhibit E – Lease Assignment and Assumption Agreement
Exhibit F – Services to be provided under Transition Services Agreements

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "<u>Agreement</u>"), dated July 29, 2018 (the "<u>Effective Date</u>") entered into among HERITAGE HOME GROUP LLC, a Delaware limited liability company ("<u>HHG</u>"), HHG REAL PROPERTY LLC, a Delaware limited liability company ("<u>HHG-RP</u>"), HHG GLOBAL DESIGNS LLC, a Delaware limited liability company ("<u>HHG-GD</u>" and together with  HHG and HHG-RP, collectively, the "<u>Sellers</u>") and HICKORY CHAIR, LLC, a North Carolina limited liability company ("<u>Buyer</u>").

## RECITALS

**WHEREAS**, Sellers are engaged in the business of designing, manufacturing, sourcing, licensing and selling home furnishings under the Hickory Chair, Pearson, Maitland-Smith and La Barge brands (the "<u>Business</u>");

**WHEREAS**, Sellers wish to sell and assign to Buyer and Buyer wishes to purchase and assume from Sellers, substantially all the assets and liabilities of the Business, subject to the terms and conditions set forth herein;

**WHEREAS**, promptly and in no event later than two (2) business days after the Effective Date (such date, the "<u>Petition Date</u>"), Sellers shall commence administratively consolidated cases (collectively, the "<u>Bankruptcy Cases</u>") under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") and will continue in the possession of their respective assets and in the management of their respective businesses under Sections 1107 and 1108 of the Bankruptcy Code; and

**WHEREAS**, Sellers, subject to the receipt of any higher or better offer received by Sellers for the Purchased Assets (as hereinafter defined), desire to sell the Purchased Assets to Buyer pursuant to the terms and conditions of this Agreement and Buyer desires to so purchase and acquire the Purchased Assets from Seller in accordance with Sections 105, 363 and 365 of the Bankruptcy Code..

**NOW, THEREFORE**, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings throughout this Agreement as are specified or referred to in this <u>ARTICLE I</u>:

"<u>Accounting Policies</u>" means those certain accounting policies as described on <u>Section 2.06</u> of the Disclosure Schedules.

"<u>Accounts Payable</u>" means any amounts that would be classified as an account payable on the liability side of the balance sheet of the Business prepared in accordance with GAAP, but shall exclude, for the avoidance of doubt, any Liability in respect of Taxes.

"Accounts Receivable" means any amounts that would be classified as an account receivable on the asset side of the balance sheet of the Business prepared in accordance with GAAP, but shall exclude, for the avoidance of doubt, any receivables in respect of Taxes.

"Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"Active Employee" has the meaning set forth in Section 4.16.

"Affiliate" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person; provided, that all other portfolio companies of investment funds affiliated with or managed by KPS Capital Partners, LP are deemed to not be an Affiliate of any of the Sellers hereunder.  The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble of this Agreement.

"Allocation Schedule" has the meaning set forth in Section 2.09.

"Annual Financial Statements" has the meaning set forth in Section 4.04.

"Antitrust Laws" means any applicable Law that is designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"Assigned Contracts" means the written Contracts, Leases, and other agreements related primarily to the Business (other than Benefit Plans) listed on Section 4.06(a) of the Disclosure Schedules.  For the avoidance of doubt, Assigned Contracts include Reverse Shared Business Contracts but do not include Forward Shared Business Contracts.

"Assigned Real Property Leases" has the meaning set forth in Section 2.01(d).

"Assignment and Assumption Agreement" means the assignment and assumption agreement in the form of Exhibit A hereto effecting the assignment to and assumption by Buyer of the Assigned Contracts and the Assumed Liabilities.

"Assumed Liabilities" has the meaning set forth in Section 2.03.

"Auction" means an auction conducted by Sellers in accordance with the Bid Procedures.

"Avoidance Actions" means all avoidance claims, causes of action or rights or recovery under Chapter 5 of the Bankruptcy Code or similar state laws.

"Bank Card Reserves" means all amounts receivable from any financial institution, credit card issuer, or credit card processor in connection with credit card sales made by the Business prior to the Closing.

"Bankruptcy Cases" has the meaning set forth in the recitals of this Agreement.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended.

"Bankruptcy Court" has the meaning set forth in the recitals of this Agreement.

"Base Amount" has the meaning set forth in Section 2.05.

"Benefit Plans" has the meaning set forth in Section 4.15.

"Bid Procedures" means the bidding procedures approved by the Bankruptcy Court for purposes of seeking bids for the purchase of Sellers' assets at the Auction.

"Bid Procedures Motion" means a motion filed by Sellers with the Bankruptcy Court to seek approval of the Bid Procedures, which may be made as part of the Sales Motion.

"Bidding Procedures Order" means an Order of the Bankruptcy Court, in the form attached hereto as Exhibit B or such other form consented to by Buyer in its reasonable discretion.

"Bidding Procedures Order Deadline" means the date that is thirty (30) days following the Petition Date.

"Bill of Sale" means a bill of sale in the form of Exhibit C hereto and duly executed by Sellers, transferring to Buyer the Tangible Personal Property, Inventory, and Accounts Receivable included in the Purchased Assets.

"Books and Records" has the meaning set forth in Section 2.01(k).

"Breakup Fee" has the meaning set forth in Section 9.02.

"Business" has the meaning set forth in the recitals of this Agreement.

"Business Contracts" means the Contracts used by Sellers in the conduct of the Business.

"Business Day" means any day except Saturday, Sunday or any other day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"Buyer" has the meaning set forth in the preamble of this Agreement.

"Buyer Default Termination" has the meaning set forth in Section 2.05(b).

"Buyer End Date Breach" has the meaning set forth in Section 9.03(b).

"Closing" and "Closing Date" have the meanings set forth in Section 3.01.

"Closing Date Deadline" means October 5, 2018.

"Closing Net Working Capital" has the meaning set forth in Section 2.06(b).

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidential Information" has the meaning set forth in Section 6.01.

"Contracts" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral, including as they relate to Intellectual Property.

"Cure Claims" has the meaning set forth in Section 2.05(c).

"Current Assets" means those current assets of the Business that are required by the methodology set forth in Section 2.06 of the Disclosure Schedules to be included in "Current Assets" for purposes of this Agreement.

"Current Liabilities" means those current liabilities of the Business that are required by the methodology set forth in Section 2.06 of the Disclosure Schedules to be included in "Current Liabilities" for purposes of this Agreement.

"Default" means (a) a violation, breach, or default, (b) the occurrence of an event that, with the passage of time, the giving of notice or both, would constitute a violation, breach, or default, or (c) the occurrence of an event that, with or without the passage of time, the giving of notice or both, would give rise to a right of damages, specific performance, termination, cancellation, renegotiation, or acceleration (including the acceleration of payment).

"Deposit" has the meaning set forth in Section 2.05(b).

"Designer Agreements" means all agreements pursuant to which any designer provides home furnishing or other product designs to the Business.

"Disclosure Schedules" means the Disclosure Schedules delivered by Sellers concurrently with the execution and delivery of this Agreement.

"Disabled Employee" has the meaning set forth in Section 6.05(b).

"Disputed Items" has the meaning set forth in Section 2.06(c)(3).

"Effective Date" has the meaning set forth in the opening paragraph of this Agreement.

4

"Encumbrance" means any charge, claim (as defined in Section 101(5) of the Bankruptcy Code), pledge, condition, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, transfer restriction or other similar encumbrance.

"Environmental Law" means any applicable Law (a) relating to pollution (or the cleanup thereof) or the protection of natural resources or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata) or (b) concerning the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials.

"Environmental Permit" means any Permit required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"Escrow" has the meaning set forth in Section 2.05(b).

"Escrow Holder" has the meaning set forth in Section 2.05(b).

"Estimated Net Working Capital" has the meaning set forth in Section 2.06(a).

"Estimated Net Working Capital Deficit" means the amount by which the Target Net Working Capital exceeds the Estimated Net Working Capital; provided, that the Estimated Net Working Capital Deficit shall be $0 if the Estimated Net Working Capital is equal to or greater than the Target Net Working Capital.

"Estimated Net Working Capital Statement" has the meaning set forth in Section 2.06(a).

"Estimated Net Working Capital Surplus" means the amount by which the Estimated Net Working Capital exceeds the Target Net Working Capital; provided, that the Estimated Net Working Capital Surplus shall be $0 if the Target Net Working Capital is equal to or greater than the Estimated Net Working Capital.

"Estimated Purchase Price" has the meaning set forth in Section 2.05.

"Excluded Assets" has the meaning set forth in Section 2.02.

"Excluded Liabilities" has the meaning set forth in Section 2.04.

"Financial Statements" has the meaning set forth in Section 4.04.

"FIRPTA Certificate" means a certificate duly executed by each Seller pursuant to Treasury Regulations Section 1.1445-2(b), in form and substance reasonably satisfactory to Buyer, that such Seller (or such Seller's owner for U.S. federal income tax purposes if such

Seller is a disregarded entity for U.S. federal income tax purposes) is not a foreign person within the meaning of Section 1445 of the Code.

"Forward Shared Business Contracts" means the Contracts set forth on Section 6.19 of the Disclosure Schedules under "Forward Shared Business Contracts."

"Forward Sharing Arrangements" has the meaning set forth in Section 6.19(a).

"GAAP" means United States generally accepted accounting principles in effect from time to time.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Hazardous Materials" means (a) any material, substance, chemical or waste that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws and (b) any petroleum or petroleum-derived products, radioactive materials or wastes, urea formaldehyde foam insulation and polychlorinated biphenyls.

"HCPM" means the Hickory Chair, Pearson, Maitland-Smith and La Barge brands that are part of the Business.

"HHG Lease" has the meaning set forth in Section 3.02(a)(9).

"HHG Lease Amendment" has the meaning set forth in Section 3.02(a)(9).

"Hired Employee" has the meaning set forth in Section 6.05.

"IDC" has the meaning set forth in Section 3.02(a)(9).

"Income Tax" (and, with the correlative meaning, "Income Taxes") shall mean any Tax that is based on, or computed with respect to income or earning, capital or net worth (and any franchise Tax or other Tax in connection with doing business imposed in lieu thereof) and any related penalties, interest and additions to Tax.

"Independent Accountants" has the meaning set forth in Section 2.06(c)(3).

"Insurance Policies" has the meaning set forth in Section 4.22.

"Intellectual Property" means all intellectual property and industrial property rights and assets, and all rights, interests and protections that are associated with, similar to, or

required for the exercise of, any of the foregoing, however arising, pursuant to the Laws of any jurisdiction throughout the world, whether registered or unregistered, including any and all: (a) trademarks, service marks, trade names, brand names, logos, trade dress, design rights and other similar designations of source, sponsorship, association or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications and renewals for, any of the foregoing; (b) internet domain names, web addresses, web pages, websites and related content, accounts with Twitter, Facebook and other social media companies, and URLs; (c) works of authorship, expressions, designs and design registrations, whether or not copyrightable, including copyrights, author, performer, moral and neighboring rights, and all registrations, applications for registration and renewals of such copyrights; (d) inventions, discoveries, trade secrets, business and technical information and know-how, databases, data collections and other confidential and proprietary information and all rights therein; (e) patents (including all reissues, divisionals, provisionals, continuations and continuations-in-part, re-examinations, renewals, substitutions and extensions thereof), patent applications, and other patent rights and any other Governmental Authority-issued indicia of invention ownership (including inventor's certificates, petty patents and patent utility models); (f) software and firmware, including data files, source code, object code, application programming interfaces, architecture, files, records, schematics, computerized databases and other related specifications and documentation; (g) semiconductor chips and mask works; (h) advertising materials, catalogs and photographs; (i) patterns, forms, molds, and carving masters; (j) royalties, fees, income, payments and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and (k) all rights to any Actions of any nature available to or being pursued by Sellers to the extent related to the foregoing, whether accruing before, on or after the date hereof, including all rights to and claims for damages, restitution and injunctive relief for infringement, dilution, misappropriation, violation, misuse, breach or default, with the right but no obligation to sue for such legal and equitable relief, and to collect, or otherwise recover, any such damages.

"Intellectual Property Agreements" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions and other Contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to any Intellectual Property that is used in or necessary for the conduct of the Business as currently conducted and to which any Seller is a party, a beneficiary, or is otherwise bound.

"Intellectual Property Assets" means all Intellectual Property that is owned by any Seller or its Affiliate wherever located, including any patterns, forms, molds, and carving masters in the possession of any supplier, that is used primarily in the conduct of the Business as currently conducted including, without limitation, the "Hickory Chair", "Pearson", "Maitland-Smith" and "La Barge" names and all rights and marks associated therewith, all patents and, to the extent used primarily in the conduct of the Business, all furniture designs, drawings, or diagrams and all internet domain names, web addresses, web pages, websites and related content, accounts with Twitter, Facebook and other social media companies, and URLs including, without limitation, www.HickoryChair.com, www.PearsonCo.com, www.Maitland-Smith.com and www.LaBargeInc.com, and all rights and content associated with, contained on or located at www.HickoryChair.com,          www.PearsonCo.com,          www.Maitland-Smith.com          and www.LaBargeInc.com.  For the avoidance of doubt, excluded from the definition of "Intellectual Property Assets" is all Intellectual Property owned or used by such Seller or its Affiliates that is

used primarily in the conduct of business associated with one or more of such Seller's furniture brands other than HCPM, including Broyhill, Thomasville, Drexel Heritage, Drexel, Henredon, and former businesses Lane and Lane Venture.

"Intellectual Property Assignment Agreements" means the Intellectual Property Assignment Agreements in the form of Exhibit D-1 (Intellectual Property Assignment); Exhibit D-2 (Patent Assignment); and Exhibit D-3 (Trademark Assignment and Assumption Agreement).

"Intellectual Property Registrations" means, as to any Intellectual Property Assets, any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered trademarks, domain names and copyrights, issued and reissued patents and pending applications for any of the foregoing.

"Interim Financial Statements" has the meaning set forth in Section 4.04.

"Interim Statement" has the meaning set forth in Section 4.04.

"Interim Statement Date" has the meaning set forth in Section 4.04.

"Inventory" has the meaning set forth in Section 2.01(a).

"Knowledge of Sellers" or any other similar knowledge qualification, means the actual knowledge of Pierre de Villemejane, Blair Hawley, Rob Allen, Brian Buchanan, Chris Litras, Kevin Bowman, Clarita Rickert, and Tim Atkins in relation to the Business, after due inquiry.

"Law" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law or rule of law of any Governmental Authority.

"Lease Assignment and Assumption Agreement" means the assignment and assumption agreement in the form of Exhibit E hereto effecting the assignment to and assumption by Buyer of the Leases.

"Leased Real Property" means the real property leased for use by the Business pursuant to the Leases set forth on Section 4.09 of the Disclosure Schedules.

"Leases" has the meaning set forth in Section 4.09.

"Liabilities" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, accrued or unaccrued, matured or unmatured or otherwise.

"Losses" means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and diminution in value; provided, however, that "Losses" will not include, except in the case of fraud or to the extent actually awarded to a Governmental Authority or

8

other third party, punitive damages, exemplary or special damages, lost profits, lost expectations, consequential damages that were not reasonably foreseeable as a result of the applicable claim giving rise to such damages (other than, for the avoidance of doubt, any loss or damage calculated based on a multiplier, or other enhancing measure, of actual damages), or any loss or damage that is calculated based on a multiple, or other enhancing measurement, of actual damages.

"Mailing Lists" has the meaning set forth in Section 2.01(m).

"Management Bonuses" mean the bonuses payable pursuant to the Sellers' 2018 Management Incentive Plan.

"Material Adverse Effect" means any event, occurrence, fact, condition or change that is, or would reasonably be expected to become, individually or in the aggregate, materially adverse to the Business, its results of operations, condition (financial or otherwise) or assets (including the Purchased Assets); provided, however, that none of the following, either alone or in combination, will constitute, or be considered in determining whether there has been, a Material Adverse Effect: any event, occurrence, fact, condition or change, resulting from or related to (i) any outbreak or escalation of war or major hostilities or any act of terrorism, (ii) changes in laws, GAAP or enforcement or interpretation thereof, provided such changes do not have a disproportionate impact on the Business in relation to other Persons in the same industry as the Business, (iii) changes that generally affect the industries and markets in which the Business operates, provided such changes do not have a disproportionate impact on the Business in relation to other Persons in the same industry as the Business, (iv) changes in financial markets, general economic conditions or political conditions, provided such changes do not have a disproportionate impact on the Business in relation to other Persons in the same industry as the Business, (v) any failure, in and of itself, of the Business to meet any published or internally prepared projections, budgets, plans or forecasts of revenues, earnings or other financial performance measures or operating statistics (it being understood that the facts and circumstances underlying any such failure that are not otherwise excluded from the definition of a "Material Adverse Effect" may be considered in determining whether there has been a Material Adverse Effect), (vi) the execution or delivery of this Agreement, the consummation of the transactions contemplated by this Agreement or the public announcement or other publicity with respect to any of the foregoing, or (vii) the filing of the Bankruptcy Cases or Sellers operation of the Business as debtors-in-possession under the Bankruptcy Code.

"Material Contract" means any Contract that (i) represents an annual obligation to pay to the Business or receive from the Business an amount equal to or greater than one hundred fifty thousand dollars ($150,000), (ii) limits or purports to limit the ability of the Business to compete in any line of business or with any Person or in any geographic area or during any period of time, or (iii) termination of such Contract would be material to the Business.

"Material Customers" has the meaning set forth in Section 4.12(a).

"Material Designer Agreement" means the Designer Agreements designated by an asterisk (*) in Section 2.01(d) of the Disclosure Schedules.

"Material Suppliers" has the meaning set forth in Section 4.12(b).

"Net Working Capital" means the aggregate amount of Current Assets, minus the aggregate amount of Current Liabilities, in each case, calculated using the methodology set forth in Section 2.06 of the Disclosure Schedules and in accordance with the Accounting Policies.

"Net Working Capital Deficit" means the amount by which the Target Net Working Capital exceeds the Closing Net Working Capital; provided, that the Net Working Capital Deficit shall be $0 if the Closing Net Working Capital is equal to or greater than the Target Net Working Capital.

"Net Working Capital Escrow" has the meaning set forth in Section 2.05(c).

"Net Working Capital Surplus" means the amount by which the Closing Net Working Capital exceeds the Target Net Working Capital; provided, that the Net Working Capital Surplus shall be $0 if the Target Net Working Capital is equal to or greater than the Closing Net Working Capital.

"Order" means any judgment, order, writ, decree, injunction or other determination whatsoever of any Governmental Authority or any other entity or body whose finding, ruling or holding is legally binding or is enforceable as a matter of right (in any case, whether preliminary or final).

"Owned Real Property" means the real property owned by any Seller and used in the conduct of the Business set forth on Section 4.10 of the Disclosure Schedules.

"Permits" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities, to own and operate the Business.

"Permitted Encumbrances" means (i) mechanics', carriers', workmen's, repairmen's or other like liens for amounts that are not delinquent or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established on the Financial Statements; (ii) liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business consistent with past practice which are not, individually or in the aggregate, material to the Business or the Purchased Assets; (iii) Taxes and Tax assessments that are not yet due or payable, or which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established on the Financial Statements and included on Schedule 4.04; (iv) all defects, exceptions, restrictions, easements, rights of way, covenants, conditions, exclusions or other Encumbrances that do not, individually or in the aggregate, materially interfere with the use of the Real Property; (v) easements or other grants to any one or more utility companies and public or quasi-public entities to facilitate the delivery of utilities to the Real Property, or for road, water, sewer, or other public purposes, regardless of whether they are for the benefit of the Real Property; (vi) all liens, encumbrances, ordinances, statutes, and other matters whether recorded or unrecorded that would be disclosed by an accurate survey, title search or physical inspection of the Real Property; (vii) zoning, building codes, entitlement and other land use and environmental Laws regulating the use or occupancy of the Real Property or

10

the activities conducted thereon that are imposed by any Governmental Authority having jurisdiction over such Real Property; (viii) with respect to the Leased Real Property, Encumbrances to which the fee simple interest (or any superior leasehold or similar interest) in the Leased Real Property is subject; (ix) liens which will be released at or prior to the Closing; or (x) those items set forth in <u>Section 4.07</u> of the Disclosure Schedules.

"<u>Person</u>" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"<u>Pre-Closing Compensation</u>" has the meaning set forth in <u>Section 2.04</u>.

"<u>Petition Date</u>" has the meaning set forth in the Recitals.

"<u>Post-Closing Tax Period</u>" means any taxable period beginning after the Closing Date and, with respect to any Straddle Period, the portion of such taxable period beginning after the Closing Date.

"<u>Pre-Closing Tax Period</u>" means any taxable period ending on or before the Closing Date and, with respect to any Straddle Period, the portion of such taxable period ending on and including the Closing Date.

"<u>Property Taxes</u>" has the meaning set forth in <u>Section 3.03</u>; <u>provided</u>, <u>however</u>, the term "Property Tax" shall not include any Income Tax or any Transfer Tax.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.05</u>.

"<u>Purchased Assets</u>" has the meaning set forth in <u>Section 2.01</u>.

"<u>Real Property</u>" means, collectively, the Leased Real Property and the Owned Real Property.

"<u>Release</u>" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, dumping, abandonment or disposing into the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"<u>Representative</u>" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"<u>Resolution Period</u>" has the meaning set forth in <u>Section 2.06(c)(2)</u>.

"<u>Reverse Shared Business Contracts</u>" means the Assigned Contracts set forth on <u>Section 6.19</u> of the Disclosure Schedules under "Reverse Shared Business Contracts."

"<u>Reverse Sharing Arrangements</u>" has the meaning set forth in <u>Section 6.19(a)</u>.

11

"Review Period" has the meaning set forth in Section 2.06(c)(1).

"Sale Order" has the meaning set forth in Section 6.21(c).

"Sale Order Deadline" means the date that is sixty (60) days after the Petition Date.

"Sale Motion" means the motion, in form and substance reasonably acceptable to Buyer, filed by Sellers with the Bankruptcy Court seeking authority to sell the Purchased Assets that may be made as a part of the Bid Procedures Motion.

"Seller Straddle Period Property Taxes" has the meaning set forth in Section 3.03

"Sellers" has the meaning set forth in the preamble of this Agreement, and "Seller" means one of the Sellers.

"Sellers Representative" has the meaning set forth in Section 10.02.

"Shared Business Contracts" means, collectively, the Forward Shared Business Contracts and the Reverse Shared Business Contracts.

"Sites" means the, warehouses, offices, manufacturing facilities, showrooms and design facilities identified on Section 2.01(a) of the Disclosure Schedules.

"Statement of Objections" has the meaning set forth in Section 2.06(c)(2).

"Straddle Period" means any taxable period beginning on or before the Closing Date and ending after the Closing Date.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, joint venture or partnership of which such Person (a) beneficially owns, either directly or indirectly, more than fifty percent (50%) of (i) the total combined voting power of all classes of voting securities of such entity, (ii) the total combined equity interests, or (iii) the capital or profit interests, in the case of a partnership; or (b) otherwise has the power to vote or to direct the voting of sufficient securities to elect a majority of the board of directors or similar governing body.

"Successful Bidder" has the meaning set forth in the Bidding Procedures Order.

"Tangible Personal Property" has the meaning set forth in Section 2.01(c).

"Target Net Working Capital" means $16,433,000.

"Tax or Taxes" means all federal, state, local, foreign, and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, value added, windfall profits, customs, duties or other taxes of any

kind whatsoever imposed by or payable to a Governmental Authority, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"Tax Return" means any return, declaration, election, report, claim for refund, information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transaction Documents" means this Agreement, the Bill of Sale (see Section 3.02(a)(1)), the Assignment and Assumption Agreement (see Section 3.02(a)(3)), the Lease Assignment and Assumption Agreement (see Section 3.02(a)(5)), the Intellectual Property Assignment Agreements (see Section 3.02(a)(6)), the Transition Services Agreements (see Section 3.02(a)(7)), and the other agreements, instruments and documents required to be delivered at the Closing.

"Transfer Date" has the meaning set forth in Section 6.05.

"Transfer Taxes" has the meaning set forth in Section 3.04; provided, however, the term "Transfer Taxes" shall not include any Income Taxes.

"Transition Services Agreements" means the agreements, in the form and substance reasonably acceptable to Buyer, that, collectively, will provide for the provision to Buyer (and, if applicable, its Affiliates) of the goods and services listed on Exhibit F hereto at the prices and for the time periods set forth thereon.

## ARTICLE II
## PURCHASE AND SALE

Section 2.01.   Purchase and Sale of Assets.   Subject to the terms and conditions set forth herein and pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, at the Closing, but subject to Section 2.08, Sellers will sell, assign, transfer, convey, and deliver to Buyer, and Buyer will purchase from Sellers, free and clear of any Encumbrances other than Permitted Encumbrances, all of Sellers' right, title and interest in, to and under all of the assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), that are primarily used for, held for use primarily in connection with, or related primarily to the Business (collectively, the "Purchased Assets"), including, without limitation, the following:

(a)      (i) all inventory, finished goods, raw materials, work in progress, swatches, packaging, supplies, parts and other inventories used or held for use primarily in connection with the Business whether located at one of the Sites, each of which is listed on Section 2.01(a) of the Disclosure Schedules, in transit to or from one of the Sites, but, without regard to location, and (ii) all other finished goods inventory held for sale and accessories located at the Showrooms listed on Section 2.01(a) of the Disclosure Schedules  ("Inventory");

(b)      all Intellectual Property Assets;

(c)     all furniture, fixtures, equipment, machinery, tools, vehicles, security devices, office equipment, office supplies, computers, telephones and other tangible personal property primarily related to or primarily used in connection with the Business, including those items identified on Section 2.01(c) of the Disclosure Schedules (the "Tangible Personal Property");

(d)     all Contracts set forth on Section 2.01(d) of the Disclosure Schedules, including the Leases set forth therein (the "Assigned Real Property Leases"), and all rights and benefits under all such Contracts;

(e)     all Accounts Receivable and all Actions specifically pertaining to the collection of the Accounts Receivable;

(f)     the Owned Real Property, including the buildings, parking lots and other improvements or movable assets considered real property as a matter of Law located on or attached to such Owned Real Property;

(g)     all transferable Permits, including Environmental Permits, which are held by any Seller primarily for the conduct of the Business as currently conducted or primarily for the ownership and use of the Purchased Assets, as set forth in Section 4.14 of the Disclosure Schedules;

(h)     all rights to any Actions of any nature available to or being pursued by any Seller, including Avoidance Actions (which, for the avoidance of doubt, shall be deemed waived and not pursued by Buyer), to the extent related primarily to the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise;

(i)     subject to Section 2.02(k), all prepaid expenses, credits, advance payments, claims, deposits, refunds, rights of recovery, rights of set-off, rights of recoupment, charges, sums and fees in connection with the Purchased Assets or the Assumed Liabilities;

(j)     all of Sellers' rights under warranties (including warranties with manufacturers, suppliers and vendors), indemnities and all similar rights against third parties to the extent related primarily to any Purchased Assets;

(k)     originals or copies, of all books and records, including, but not limited to, books of account, ledgers and general, financial and accounting records, employee-related or employee benefit-related files or records of Hired Employees to the extent the conveyance of such documents to Buyer is permitted by applicable Law, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), internal financial statements, marketing and promotional surveys, material and research and files relating to the Intellectual Property Assets and the Intellectual Property Agreements, terms and conditions with suppliers, standard terms of supply, standard form

14

documents used primarily in the Business (such as purchase order terms, terms of sale and order acceptance documentation) ("Books and Records");

(l)     all goodwill and going concern value of the Business and the Purchased Assets (to the extent transferable); and

(m)     all mailing lists (including names, mailing and email addresses), whether in the possession of the Sellers or third party service providers (the "Mailing Lists").

Section 2.02.    Excluded Assets.    Notwithstanding the foregoing, the Purchased Assets will not include the following assets (collectively, the "Excluded Assets"):

(a)     except as set forth in Section 2.01, all assets of any kind not used primarily in the Business;

(b)     all cash, including the Purchase Price, cash equivalents, bank accounts and securities of Sellers;

(c)     all Contracts other than the Assigned Contracts;

(d)     Intentionally Omitted;

(e)     Intentionally Omitted;

(f)     all Benefit Plans and assets attributable thereto;

(g)     the assets, properties and rights specifically listed on Section 2.02(g) of the Disclosure Schedules;

(h)     all Intellectual Property other than the Intellectual Property Assets;

(i)     the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Sellers, and any books and records which any Seller is prohibited from disclosing or transferring to Buyer under applicable Law and is required by applicable Law to retain;

(j)     all insurance policies of Sellers and all rights to applicable claims and proceeds thereunder;

(k)     all Tax assets (including duty and Tax refunds and prepayments) of any Seller or any of its Affiliates together with any interest due thereon or penalty rebate arising therefrom, to the extent received or receivable from a Governmental Authority for any Pre-Closing Tax Period;

(l)     except as set forth in Section 2.01(i), all rights to any Action, including all claims and causes of action arising under Sections 542 through 553 of the

Bankruptcy Code, available to or being pursued by any Seller, whether arising by way of counterclaim or otherwise; and

        (m)    the rights that accrue or will accrue to any Seller under the Transaction Documents.

Buyer shall have the right, exercisable in Buyer's sole discretion at any time prior to the Bankruptcy Court hearing to consider the Sale Order, to designate any of the Purchased Assets as Excluded Assets. Any such designation of Purchase Assets as Excluded Assets shall not reduce the Purchase Price.

        Section 2.03.  <u>Assumed Liabilities</u>. Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge when due only the following Liabilities and obligations of Sellers arising out of or relating to the Business or the Purchased Assets after the Closing, which for the avoidance of doubt shall not include the Excluded Liabilities and any other Liabilities and obligations that relate to any failure to perform, improper performance, warranty or other breach, default or violation by any Seller (collectively, the "<u>Assumed Liabilities</u>"):

        (a)    all Accounts Payable, accrued expenses that would become Accounts Payable when an invoice for such accrued expenses is received, purchases clearing liabilities, all commissions payable (other than those owed to Active Employees), royalties payable, customer deposits, Management Bonuses, expense reimbursements to any Active Employees and accrued vacation time payable to any Active Employees, in each case to the extent that such Liabilities are included in the calculation of Closing Net Working Capital;

        (b)    all Liabilities and obligations arising under or relating to the Assigned Contracts, but solely to the extent such Liabilities and obligations are to be performed on or after the Closing;

        (c)    the Cure Claims;

        (d)    all other Liabilities and obligations arising out of or relating to Buyer's ownership or operation of the Business and the Purchased Assets on or after the Closing;

        (e)    all other liabilities and obligations of Seller set forth on <u>Section 2.03(e)</u> of the Disclosure Schedules.

        Section 2.04.  <u>Excluded Liabilities</u>. Buyer will not assume and will not be responsible to pay, perform or discharge any Liabilities of any Sellers or any of their respective Affiliates of any kind or nature whatsoever except to the extent included as a Current Liability in the calculation of Closing Net Working Capital as finally determined pursuant to <u>Section 2.06</u>, and except to the extent such Liabilities are Assumed Liabilities (the "<u>Excluded Liabilities</u>"). For the avoidance of doubt, the term "<u>Excluded Liabilities</u>" shall include (a) all Liabilities for any and all Taxes for which a Seller or any of its Affiliates or direct or indirect partners, shareholders or members is or may be liable, regardless of the taxable period to which Taxes

relate, and any and all Taxes relating to or imposed or payable in connection with the Business or any of the Purchased Assets to the extent attributable to (or payable in respect of) any Pre-Closing Tax Periods, in each instance regardless of whether such Taxes are assessed or determined to be due or payable before or after the Closing; (b) any Liabilities under any Benefits Plans and (c) compensation due or payable to or earned by any Active Employee on or before Closing, including but not limited to wages, salaries, bonuses (other than Management Bonuses), incentives, commissions (other than commissions payable with respect to goods shipped post-Closing), expense reimbursement (except to the extent that expense reimbursements are included in the calculation of Closing Net Working Capital), retention payments, and severance payments (collectively, "Pre-Closing Compensation").

Section 2.05.   Purchase Price and Deposit; Cure Amounts.

(a)     The aggregate purchase price for the Purchased Assets is seventeen million four hundred fifty thousand dollars ($17,450,000) (the "Base Amount"), plus the Net Working Capital Surplus, minus the Net Working Capital Deficit, as determined pursuant to Section 2.06, plus the assumption of Assumed Liabilities (collectively, the "Purchase Price"). At the Closing, Buyer shall (i) pay to the Sellers Representative an amount equal to the Base Amount, plus the Estimated Net Working Capital Surplus, minus the Estimated Net Working Capital Deficit, as set forth on the Estimated Net Working Capital Statement delivered by Buyer pursuant to Section 2.06(a), minus the Deposit, minus the Net Working Capital Escrow, minus the amount of the Seller Straddle Period Property Taxes and (ii) direct the Escrow Holder to disburse the Deposit to Sellers (collectively, the "Estimated Purchase Price"). The Estimated Purchase Price shall be paid at the Closing by Buyer to the Sellers Representative by wire transfer of immediately available funds to an account designated in writing by the Sellers Representative to Buyer no later than two (2) Business Days prior to the Closing Date.

(b)     Concurrently with Buyer's delivery of this Agreement, Buyer shall deliver into a segregated account (the "Escrow") maintained by an escrow holder mutually agreed to by the parties (the "Escrow Holder") the sum of one million three hundred ten thousand dollars ($1,310,000) (the "Deposit") in immediately available funds. Upon receipt of the Deposit, the Escrow Holder shall immediately place the Deposit into a non-interest-bearing account. The Deposit shall become nonrefundable upon the earlier of (i) the entry of a final and non-appealable Order of the Bankruptcy Court approving Buyer as the Successful Bidder at the hearing on the Sale Motion and satisfaction by all parties of all conditions set forth in ARTICLE VII, and the absence of any restriction, limitation, or prohibition on Buyer's right to acquire the Purchased Assets in the manner, and under the terms and conditions, set forth in this Agreement except where any such restriction, limitation, or prohibition solely caused by an act or omission of Buyer, and (ii) Sellers' termination of the transaction contemplated by this Agreement in accordance with Section 9.01(c) or upon a Buyer End Date Breach (each a "Buyer Default Termination"). At the Closing, the Deposit shall be delivered to Sellers and credited toward payment of the Purchase Price. In the event the Deposit becomes non-refundable by reason of a Buyer Default Termination and Sellers are not then in Default of this Agreement, Escrow Holder shall immediately disburse the Deposit to Sellers to be retained by Sellers for Sellers' own account as liquidated damages. If this Agreement is terminated in accordance with Section

9.01 for any other reason and Buyer is not then in Default of this Agreement, the Escrow Holder shall return the Deposit to Buyer within two (2) Business Days.

(c)  At the Closing, Buyer shall deliver into the Escrow maintained by the Escrow Holder the sum of one million dollars ($1,000,000) (the "Net Working Capital Escrow") in immediately available funds.  Upon receipt of the Net Working Capital Escrow, the Escrow Holder shall immediately place the Net Working Capital Escrow into a non-interest-bearing account.  The Net Working Capital Escrow shall be released in accordance with Section 2.06(c)(6).

(d)  With respect to each of the Assigned Contracts, Buyer shall satisfy on the Closing Date, all Liabilities thereunder (as distinct from curing all defaults or failures to comply with provisions thereunder that may not be cured by the mere payment of money) (i) accruing or arising at any time prior to or after the Petition Date, or (ii) arising from or relating to any act, event, or occurrence prior to the Petition Date that are required to be paid pursuant to §365 of the Bankruptcy Code in order to assume and assign the Assumed Contracts to Buyer, but only to the extent such Liabilities are Current Liabilities included in the determination of Closing Net Working Capital (collectively, "Cure Claims").

Section 2.06.  Purchase Price Adjustment.

(a)  Estimated Purchase Price.  The Sellers Representative shall, at least two (2) Business Days prior to the Closing, prepare and deliver to Buyer (i) an Excel file prepared in accordance with the Accounting Policies and in the form of the methodology set forth in Section 2.06 of the Disclosure Schedules, containing Sellers' good faith estimate of Closing Net Working Capital (the "Estimated Net Working Capital"), (ii) a calculation of Estimated Net Working Capital and the resulting Estimated Net Working Capital Deficit or Estimated Net Working Capital Surplus (the "Estimated Net Working Capital Statement"), (iii) an updated Section 4.19 of the Disclosure Schedules (with respect to the amount of Inventory as of the most recent date practicable, but in no event earlier than seven (7) days prior to the Closing), and (iv) an updated Section 4.20 of the Disclosure Schedules (with respect to the amount of Accounts Receivable and Accounts Payable, each as of the most recent date practicable, but in no event earlier than seven (7) days prior to the Closing).

(b)  Post-Closing Adjustment.  Not later than sixty (60) days following the Closing Date, Buyer shall prepare and deliver to the Sellers Representative an Excel file prepared in accordance with the Accounting Policies and in the form of the methodology set forth in Section 2.06 of the Disclosure Schedules, certified by a duly authorized officer of Buyer (the "Buyer Closing Net Working Capital Statement"), containing Buyer's calculation of the Net Working Capital of the Business at Closing (the "Closing Net Working Capital").

(c)  Examination and Review.

(1)  Examination.  After receipt of the Buyer Closing Net Working Capital Statement, the Sellers Representative shall have fifteen (15) days (the "Review Period") to review the Buyer Closing Net Working Capital Statement.  During the Review Period, the Sellers Representative (and its Representatives) shall have full access to the books

18

and records of the Business, the personnel of, and work papers prepared by, Buyer and Buyer's Representatives, to the extent that they relate to the Buyer Closing Net Working Capital Statement and to such historical financial information (to the extent in Buyer's possession) relating to the Buyer Closing Net Working Capital Statement as Sellers may reasonably request for the purpose of reviewing the Buyer Closing Net Working Capital Statement and to prepare a Statement of Objections (defined below).

(2)     *Objection*.  On or prior to the last day of the Review Period, the Sellers Representative may object to the Buyer Closing Net Working Capital Statement by delivering to Buyer a written statement setting forth Sellers' objections in reasonable detail, indicating each disputed item or amount and the basis for Sellers' disagreement therewith (the "Statement of Objections").  If the Sellers Representative fails to deliver the Statement of Objections before the expiration of the Review Period, the Buyer Closing Net Working Capital Statement and the Closing Net Working Capital reflected in the Buyer Closing Net Working Capital Statement shall be deemed to have been accepted by Sellers.  If the Sellers Representative delivers the Statement of Objections before the expiration of the Review Period, the Sellers Representative and Buyer shall negotiate in good faith to resolve such objections within thirty (30) days after the delivery of the Statement of Objections (the "Resolution Period"), and, if any or all of such objections are so resolved within the Resolution Period, the Buyer Closing Net Working Capital Statement shall be amended to reflect the resolution so obtained.  If all such objections have been resolved during the Resolution Period, the Buyer Closing Net Working Capital Statement, as amended to reflect the resolution of all items set forth in the Statement of Objections, shall be final and binding and shall be used to determine the Closing Net Working Capital.

(3)     *Resolution of Disputes*.  If the Sellers Representative and Buyer fail to reach an agreement with respect to all of the matters set forth in the Statement of Objections before expiration of the Resolution Period, then any items or amounts remaining in dispute (and only such items and amounts) ("Disputed Items") shall be submitted for resolution to the office of Dixon Hughes Goodman LLP or, if Dixon Hughes Goodman LLP is unable or unwilling to serve, the Sellers Representative and Buyer shall appoint by mutual agreement the office of an impartial nationally or regionally recognized firm of independent certified public accountants other than Sellers' Accountants or Buyer's Accountants (the "Independent Accountants") who, acting as experts and not arbitrators, shall resolve the Disputed Items only and order the Buyer Net Working Capital Statement (as the same may theretofore have been amended pursuant to Section 2.06(c)(2)) be amended to reflect its resolution of the Disputed Items, and the Buyer Net Working Capital Statement, as so amended, shall be used to determine the Closing Net Working Capital.  The parties hereto agree that all adjustments shall be made without regard to materiality.  The Independent Accountants shall only decide the specific items under dispute by the parties and their decision for each Disputed Items must be within the range of values assigned to each such item in the Buyer Closing Net Working Capital Statement and the Statement of Objections, respectively.

(4)     *Fees of the Independent Accountants*.  The fees and expenses of the Independent Accountant shall be paid by Sellers, on the one hand, and by Buyer, on the other hand, based upon the percentage that the amount actually contested but not awarded

to Sellers, on the one hand, or Buyer, on the other hand, respectively, bears to the aggregate amount actually contested by Sellers and Buyer.

(5)     *Determination by Independent Accountants.*     The Independent Accountants shall be instructed by Buyer and the Sellers Representative to make its determination as soon as practicable within thirty (30) days (or such other time as the parties hereto shall agree in writing) after their engagement, and their resolution of the Disputed Items and their adjustments to the Buyer Closing Net Working Capital Statement and/or the post-closing adjustment shall be conclusive and binding upon the parties hereto.  The determinations of the Independent Accountants shall be final and binding on Buyer and Sellers.

(6)     *Payments of Post-Closing Adjustment.*  If the Closing Net Working Capital as finally determined (A) (i) is less than the Estimated Net Working Capital and (ii) the difference between Estimated Net Working Capital and Closing Net Working Capital is less than the amount then in Escrow, the Escrow Holder shall disburse from Escrow to the Buyer an amount equal to such difference and shall disburse the remaining amount in Escrow to the Sellers Representative, (B) (i) is less than the Estimated Net Working Capital and (ii) the difference between Estimated Net Working Capital and Closing Net Working Capital is greater than the amount then in Escrow, the Escrow Holder shall disburse the entire amount in Escrow to the Buyer and the Sellers shall pay the remaining amount of the difference to Buyer, or (C) is more than the Estimated Net Working Capital, Buyer shall pay to the Sellers Representative an amount equal to such excess and concurrently therewith the Escrow Holder shall disburse the entire amount of the Net Working Capital Escrow to the Sellers Representative.  Except as otherwise provided herein, any payment of the post-closing adjustment shall (A) be due (x) within five (5) Business Days of acceptance of the applicable Buyer Closing Net Working Capital Statement or (y) if there are Disputed Items, then within five (5) Business Days of the final resolution of the final Disputed Items as described in clauses (ii) or (v) above; and (B) be paid by wire transfer of immediately available funds to such account as is directed by the Sellers Representative or Buyer, as the case may be.  To the extent that Sellers do not pay all or any portion of the amount required to be paid by them pursuant to clause (B) of the first sentence of this Section 2.06(c)(3), such unpaid amount shall constitute a super-priority administrative expense of Sellers, which shall be senior to all other administrative expense claims and payable out of Sellers' cash or other collateral of Sellers under Section 364(c)(1) of the Bankruptcy Code.

(d)     Adjustments for Tax Purposes.  Any payments made pursuant to Section 2.06 shall be treated as an adjustment to the Purchase Price by the parties for Tax purposes, unless otherwise required by Law.

Section 2.07.   Withholding Tax.  Buyer shall be entitled to deduct and withhold from the Purchase Price all Taxes that Buyer may be required to deduct and withhold under any provision of Tax Law.   All such withheld amounts that are paid over to the relevant Governmental Authority will be treated as delivered to Sellers hereunder.  In the event Buyer determines that it is required to withhold and pay Taxes, Buyer shall notify the Sellers Representative of such requirement and the basis for such requirement prior to any withholding.  Buyer and Sellers shall cooperate, as reasonably requested by the Sellers Representative, to reduce the amount of withholding Taxes imposed on the Purchase Price.

Section 2.08.  Third Party Consents.  If the assignment by a Seller to Buyer of such Seller's rights under any Contract or Permit constituting a Purchased Asset, or any other Purchased Asset, would be a violation of applicable Law or require the consent of, or prior notification to, another Person, this Agreement will not constitute an agreement to assign such Contract, Permit, or other Purchased Asset if an attempted assignment would constitute a breach thereof or be unlawful, and subject to Section 7.02(h), such Seller and Buyer shall use commercially reasonable efforts to obtain any such required consent(s) or notification(s) as promptly as possible for any Designer Agreements and Material Contracts included in Assigned Contracts, in each instance, to the extent that the Sale Order does not eliminate the requirement to obtain the prior consent of or notification to any one or more counterparties to any such Contract.  Except to the extent that the Sale Order eliminates the requirement to obtain the prior consent of or notification to any one or more counterparties to a Contract, no Business Contract set forth on Section 4.06(a) of the Disclosure Schedules that requires the consent of, or prior notification to, another Person for the applicable Seller to assign such Business Contract to Buyer shall constitute an Assigned Contract pursuant to this Agreement until such consent shall be obtained or notification shall be made.  If any such consent shall not be obtained or notification made, or if any attempted assignment would be ineffective or would impair Buyer's rights under the Purchased Asset in question so that Buyer would not in effect acquire the benefit of all such rights: (i) for a period of up to three (3) months following the Closing Date, the applicable Seller, as permitted by Law, shall, to the extent Seller is able, cooperate, as permitted by Law, with Buyer in any commercially reasonable arrangement designed to provide such benefits to Buyer, and (ii) Buyer shall reimburse such Seller for any out-of-pocket costs actually paid by such Seller to the other party to such Material Contract or in respect of such material Permit.

Section 2.09.  Allocation of Purchase Price.  No later than fifteen (15) days following Buyer's delivery of the Buyer Closing Net Working Capital Statement in accordance with Section 2.06(b), the Sellers Representative shall prepare and deliver to Buyer a schedule (an "Allocation Schedule") allocating the sum of the Purchase Price and the Assumed Liabilities among the Purchased Assets, in such amounts reasonably determined by the Sellers to be consistent with Section 1060 of the Code, as amended, and the regulations thereunder.  Buyer shall have a period of thirty (30) business days after the delivery of the Allocation Schedule to notify the Sellers Representative of any objections Buyer may have to the allocations set forth therein.  Unless Buyer timely objects, such Allocation Schedule shall be binding on the parties without further adjustment, absent manifest error.  If Buyer timely objects, then Buyer and the Sellers Representative shall negotiate in good faith and use their reasonable best efforts to resolve such dispute.  If the parties fail to agree within fifteen (15) days of Buyer's objection, then the Buyer will not be bound by the Allocation Schedule prepared by the Sellers Representative, and Buyer and each Seller may independently determine its own allocation of the Purchase Price and the Assumed Liabilities among the Purchased Assets and may file its Tax Returns (and Tax Returns of its Affiliates) using alternative allocations as it determines in its sole discretion, provided that Buyer and Sellers shall file, and to the extent required by applicable law require their Affiliates to file, IRS Form 8594 with any such Tax Returns.  If the Buyer and the Sellers Representative ultimately agree in writing on the Allocation Schedule, then (i) any adjustments to the Purchase Price pursuant to Section 2.06(d) herein shall be allocated in a manner consistent with the Allocation Schedule, and (ii) the Sellers and Buyer shall (and shall

21

cause their Affiliates to) report consistently with the Allocation Schedule on all applicable Tax Returns, and none of the Sellers or Buyer shall (or shall permit their Affiliates to) take any position inconsistent with the Allocation Schedule (except as otherwise required pursuant to a determination, as defined in Section 1313 of the Code), provided, however, that none of the Sellers or Buyer (nor any of their Affiliates) shall be required to litigate or challenge before any court or administrative agency any proposed deficiency or adjustment by any Governmental Authority challenging such allocation, and (iii) Buyer and the Sellers shall exchange completed copies of IRS Form 8594, any required schedules thereto, and any similar state, local and foreign forms, not later than 30 days prior to the applicable filing date.

## ARTICLE III
## CLOSING

Section 3.01.  <u>Closing</u>.  Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "<u>Closing</u>") will take place through the electronic exchange of documents and signatures, which process will be coordinated by Young Conaway Stargatt & Taylor, LLP, at 10:00 am prevailing Eastern Time, on the earlier of (i) the fourth (4th) Business Day following the satisfaction or waiver of each of the conditions set forth in <u>ARTICLE VII</u> hereof (other than those conditions which can be satisfied only at the Closing, but subject to the satisfaction or waiver of such conditions at Closing) and (ii) the Closing Date Deadline, or at such other time, date or place as the Sellers Representative and Buyer may mutually agree upon in writing.  The date on which the Closing is to occur is herein referred to as the "<u>Closing Date</u>," and the Closing shall be deemed to have occurred at 11:59 pm prevailing Eastern Time on the Closing Date.

Section 3.02.  <u>Closing Deliverables</u>.

(a)    At the Closing, Sellers will deliver or cause to be delivered to Buyer the following, each of which shall be duly executed by the applicable Seller (or an Affiliate thereof):

(1)    a copy of the Sale Order entered by the Bankruptcy Court;

(2)    the Bill of Sale;

(3)    the state and county transfer forms that are required to be executed by the applicable Seller to effectuate the real property transfers;

(4)    the Assignment and Assumption Agreement;

(5)    the Lease Assignment and Assumption Agreement;

(6)    the Intellectual Property Assignment Agreements;

(7)    the Transition Services Agreements;

(8)    the FIRPTA Certificate;

(9)     evidence that HHG and International Design Center, LLC ("IDC") have entered into a Fourth Lease Amendment to that certain lease agreement dated as of March 18, 2011 (the "HHG Lease Amendment") by and between IDC and HHG (as successor-in-interest to HDM Retail, Inc.) (the "HHG Lease"), so that the HHG Lease contains those terms and conditions that are reasonably requested by Buyer;

(10)     all instruments of transfer, including, as applicable, any affidavits of lost title certificates, necessary to transfer title to Buyer to any motor vehicles that are Purchased Assets;

(11)     the Mailing Lists; and

(12)     such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be reasonably required to give effect to this Agreement.

(b)     At the Closing, Buyer will deliver to the Sellers Representative the following, each of which shall be duly executed by Buyer (if applicable):

(1)     the Estimated Purchase Price less the Deposit;

(2)     instructions to the Escrow Holder to deliver the Deposit to Sellers;

(3)     the Assignment and Assumption Agreement;

(4)     the Lease Assignment and Assumption Agreement;

(5)     the Intellectual Property Assignment Agreements;

(6)     the Transition Services Agreements; and

(7)     a certificate of the Secretary of Buyer certifying Buyer is authorized to execute, deliver and perform this Agreement and the other Transaction Documents and consummate the transactions contemplated hereby and thereby.

Section 3.03.    Prorations.  Any property, ad valorem or similar real and personal property Taxes assessed or payable in respect of any of the Purchased Assets ("Property Taxes") shall be prorated between the Sellers and Buyer in accordance with the following method:  (i) the Sellers shall bear the cost of (and be solely responsible for the timely payment of) all Property Taxes assessed or payable with respect to all taxable periods ending before the Closing Date, and (ii) with respect to any Property Taxes assessed or payable with respect to any Straddle Period, each party's share of Property Taxes for such Straddle Period shall be determined on a per diem basis that reflects the total number of days in such Straddle Period that such party owned the applicable Purchased Asset, with Sellers responsible for all such Property Taxes attributable to the portion of the Straddle Period that ends on and includes the Closing Date (the "Seller Straddle Period Property Taxes") and with Buyer responsible for all such Property Taxes attributable to the portion of the Straddle Period that begins immediately after the Closing Date.

23

Notwithstanding clause (i) of this <u>Section 3.03</u>, the Buyer shall be responsible for the timely payment of all Seller Straddle Period Property Taxes to the extent deducted from the amount paid at Closing to the Sellers pursuant to <u>Section 2.05(a)</u>.

Section 3.04.   <u>Transfer Taxes</u>.  Any transfer, sales, use, stamp, conveyance, recording, registration, documentary, filing or other similar Taxes payable in connection with the sale of the Purchased Assets under this Agreement or the transactions contemplated herein (collectively, "<u>Transfer Taxes</u>") shall be borne and timely paid by one-half by Sellers and one-half by Buyer. Each of Buyer and Sellers shall cooperate with each other and timely sign and deliver such certificates or forms as may be necessary or appropriate to file any Tax Returns required to be filed in connection with Transfer Taxes or to establish an exemption from (or otherwise reduce) such Transfer Taxes.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Sellers, jointly and severally, represent and warrant to Buyer, only with respect to the Business, as of the date hereof, the representations and warranties in the following <u>Sections 4.01</u> through <u>4.23</u>:

Section 4.01.   <u>Organization and Qualification of Sellers</u>.   Each Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.  Each Seller has full power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted by it.  Each Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership by it of the Purchased Assets or the operation of the Business as currently conducted by it makes such licensing or qualification necessary.  No Seller has any Subsidiaries or holds any equity interest in any Person.

Section 4.02.   <u>Authority of Sellers</u>.  Subject to the entry of the Sale Order in the Bankruptcy Cases, (i) each Seller has full power and authority to, enter into this Agreement and the other Transaction Documents to which such Seller is a party, to carry out, and to cause any of its Affiliates to carry out, their obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby; (ii) the execution and delivery by each Seller of this Agreement and any other Transaction Document to which it is a party, the performance by such Seller of its obligations hereunder and thereunder and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly authorized by any necessary action on the part of such Seller; and (iii) this Agreement has been duly executed and delivered by each Seller, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of each Seller enforceable against each Seller in accordance with its terms, subject to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or effecting creditors' rights and to general principles of equity.

Section 4.03.   <u>No Conflicts; Consents</u>.   To the Knowledge of each Seller and subject to the entry of the Sale Order in the Bankruptcy Cases, the execution, delivery and

performance by such Seller, and the execution, delivery and performance by any of such Seller's Affiliates, of the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of formation, operating agreements or other organizational documents of such Seller or any of its Affiliates; (b) conflict with or result in a violation or breach of any provision of any Law applicable to such Seller, any of its Affiliates or the Business; (c) except as set forth in Section 4.03(c) of the Disclosure Schedules, require the consent, notice or other action by any Person under, or conflict with, result in a violation or breach of, constitute a default or an event that would constitute a default under any Material Designer Agreement or Material Contract to which such Seller or any of its Affiliates is a party; (d) result in the creation or imposition of any Encumbrance on the Purchased Assets; or (e) except as set forth in Section 4.03(e) of the Disclosure Schedules, require the consent of, or filing with, any Governmental Authority except for (i) such filings as may be required under applicable Antitrust Laws, (ii) Permits required in connection with the conduct of the Business the failure to obtain or make which would not reasonably be expected to have a Material Adverse Effect or (iii) such consents or filings, the failure to obtain or make which would not reasonably be expected to have a Material Adverse Effect.

Section 4.04.   Financial Statements.   Complete copies of the financial statements consisting of the statement of net assets of the Business as of December 31 in each of the years 2016 and 2017 and the related statements of income for the years then ended (the "Annual Financial Statements"), and the financial statements consisting of the statement of net assets of the Business as of May 31, 2018 and the related statement of income for the five-month period then ended (the "Interim Financial Statements" and together with the Annual Financial Statements, the "Financial Statements") are included in Section 4.04 of the Disclosure Schedules.  The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved, subject, (i) in the case of all Financial Statements to the fact that such statements of net assets and related statements of income for the Business have been prepared on a pro-forma basis that segregates the assets and operations of the Business from the remainder of Sellers' respective assets and business operations; and (ii) in the case of the Interim Financial Statements, to normal and recurring year-end adjustments (the effect of which would not reasonably be expected to be materially adverse to the Business) and the absence of notes.  The Financial Statements are based on the books and records of the Business, and fairly present in all material respects the financial condition of the Business as of the respective dates they were prepared and the results of the operations of the Business for the periods indicated.  The statement of net assets of the Business as of May 31, 2018 is referred to herein as the "Interim Statement" and the date thereof as the "Interim Statement Date".

Section 4.05.   Absence of Certain Changes, Events and Conditions.   Since the Interim Statement Date and except as may have occurred as a result of the filing of the Bankruptcy Cases, (i) the Business has been operated in the ordinary course of business consistent with past practices (including, without limitation, with respect to the purchase and sale of Inventory, management, collection, settlement, writing off, and disposition of Accounts Receivable and payment of Current Liabilities), and (ii) other than in the ordinary course of business consistent with past practice, there has not been, except as noted on Section 4.05 of the Disclosure Schedules, any:

25

(a)     event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)     entry into any Contract that would constitute a Material Contract;

(c)     transfer, assignment, sale or other disposition of any of the Purchased Assets shown or reflected in the statement of net assets as of the Interim Statement Date, except for the sale of Inventory in the ordinary course of business;

(d)     cancellation of any debts or claims or amendment, termination or waiver of any rights constituting Purchased Assets;

(e)     transfer, assignment or grant of any license or sublicense of any rights under or with respect to any Intellectual Property Assets or Intellectual Property Agreements;

(f)     material damage, destruction or loss, or any material interruption in use, of any Purchased Assets, whether or not covered by insurance;

(g)     acceleration, termination, material modification to or cancellation of any Assigned Contract or Permit;

(h)     commitments for capital expenditures that exceed fifty thousand dollars ($50,000) in the aggregate and which would constitute Assumed Liabilities;

(i)     imposition of any Encumbrance other than a Permitted Encumbrance upon any of the Purchased Assets;

(j)     increase in the compensation of any Employees of the Business, other than as provided for in any written agreements listed on Section 4.05 of the Disclosure Schedules or in the ordinary course of business;

(k)     any loan to (or forgiveness of any loan to), or entry into any other transaction with, any current or former directors, officers or employees of the Business;

(l)     adoption of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy Law or consent to the filing of any bankruptcy petition against it under any similar Law;

(m)     purchase or other acquisition of the right to own, use or lease any personal property or assets in connection with the Business for an amount in excess of fifty thousand dollars ($50,000), individually (in the case of a lease of personal property, per annum) or two hundred thousand dollars ($200,000) in the aggregate (in the case of a lease of personal property, for the entire term of the lease, not including any option term), except for purchases of Inventory or supplies, or renewals of a personal property lease, each in the ordinary course of business consistent with past practice;

(n)      additional Leases or extension of any existing Leases;

(o)      any Contract to do any of the foregoing, or any action or omission that would result in any of the foregoing.

Section 4.06.   <u>Contracts</u>.

(a)      <u>Section 4.06(a)</u> of the Disclosure Schedules lists each of the Business Contracts as of the date hereof, including each Material Contract.  For each Contract and other agreement listed in <u>Section 4.06(a)</u> of the Disclosure Schedules, Sellers have delivered or made available to Buyer a correct and complete copy of each written Contract and other agreements, including all modifications, amendments and supplements thereto and waivers thereunder.

(b)      To the Knowledge of Sellers, each Material Contract is valid and binding on the applicable Seller party thereto (or, where applicable, its Affiliate) in accordance with its terms and is in full force and effect.  No Seller or, to the Knowledge of any Seller, any other party thereto is in breach of or default under, or has provided or received any notice of any intention to terminate, any Material Contract.

(c)      <u>Section 4.06(c)</u> of the Disclosure Schedules lists each lease of personal property that is a Business Contract.

Section 4.07.   <u>Title to Purchased Assets</u>.  Sellers and their Affiliates have good and valid title to, or a valid leasehold interest in, all of the Purchased Assets.  All such Purchased Assets (including leasehold interests) are free and clear of Encumbrances except for Permitted Encumbrances.

Section 4.08.   <u>Condition of Purchased Assets</u>. Except as set forth on <u>Section 4.08</u> of the Disclosure Schedules, the machinery, equipment, vehicles and other items of tangible personal property included in the Purchased Assets are in good operating condition and repair subject to normal wear and tear and ordinary, routine maintenance and repairs.  Subject to any assets specifically excluded by Buyer, the Purchased Assets, together with services to be provided pursuant to the Transition Services Agreements and any Shared Business Contracts, constitute substantially all of the rights, property, and assets necessary used by Sellers to conduct the Business as currently conducted.

Section 4.09.   <u>Leased Real Property</u>.  <u>Section 4.09</u> of the Disclosure Schedules sets forth a true and complete list of all leases and other agreements, including all amendments thereto, pursuant to which any Seller holds any interest in any Leased Real Property (collectively, the "<u>Leases</u>").  With respect to each Lease, the applicable Seller has not (a) received any written notice of any action that would reasonably be expected to materially and adversely affect the ability to operate the Leased Real Property as currently operated, (b) granted to any Person the right to use or occupy any portion of such Leased Real Property or (c) become aware of a Default by either party under any Lease.

27

Section 4.10.   Owned Real Property.   Section 4.10 of the Disclosure Schedules sets forth a true and complete list of each Owned Real Property. With respect to each Owned Real Property (a) the applicable Seller has good and valid fee simple title free and clear of all Encumbrances except Permitted Encumbrances; and (b) there are no leases, subleases, licenses, concessions, or other agreements, written or oral, granting to any Person the right of use or occupancy of any portion of such Owned Real Property; and (c) the improvements thereon are in good working order and repair subject to normal wear and tear and ordinary, routine maintenance and repairs.   The applicable Seller has not received written notice of any pending condemnation proceeding with respect to any parcel of Owned Real Property nor, to such Seller's Knowledge, is there any threatened condemnation that would preclude or impair the use of any Owned Real Property by Buyer for the purposes for which it is currently used.   Other than the right of Buyer pursuant to this Agreement, there are no other options or rights of first offer or rights of first refusal or similar rights or options to purchase, lease or otherwise acquire any interest in any of the Owned Real Property that have been granted by the Sellers to any Person (other than Buyer) that are enforceable.

Section 4.11.   Intellectual Property.   Section 4.11(a) of the Disclosure Schedules lists all Intellectual Property Registrations of any Seller or its Affiliates used in the Business and all Designer Agreements that are currently in effect with respect to the Business.   Except (i) for Permitted Encumbrances; and (ii) subject to the terms of the Designer Agreements identified in Section 4.11(b) of the Disclosure Schedules, Sellers or their Affiliates own or possess all necessary legal and other rights to all Intellectual Property Assets, and at Closing will deliver all such Intellectual Property Assets free and clear of all Encumbrances.

Section 4.12.   Customers and Suppliers.

(a)     Section 4.12(a) of the Disclosure Schedules sets forth with respect to the Business (i) each customer who has paid aggregate consideration to Sellers for goods or services rendered in an amount greater than or equal to five hundred thousand dollars ($500,000) in either of the two most recent fiscal years (collectively, the "Material Customers"); and (ii) the amount of consideration paid by each Material Customer during such periods.   To the Knowledge of Sellers, no Material Customer has given notice that it intends to cease after the Closing to use the goods or services of the Business or intends to otherwise terminate or materially reduce its relationship with the Business.

(b)     Section 4.12(b) of the Disclosure Schedules sets forth with respect to the Business (i) each supplier to whom Sellers have paid consideration for goods or services rendered in an amount greater than or equal to five hundred thousand dollars ($500,000) in either of the two most recent fiscal years (collectively, the "Material Suppliers"); and (ii) the amount of purchases from each Material Supplier during such periods.   To the Knowledge of Sellers, no Material Supplier has given notice that it intends to cease after the Closing, to provide goods or services to the Business or intends to otherwise terminate or materially reduce its relationship with the Business.

Section 4.13.   Legal Proceedings; Governmental Orders.   There are no Actions pending or, to the Knowledge of Sellers, threatened in writing against or by any Seller (i) relating to or affecting the Business, the Purchased Assets or the Assumed Liabilities; or (ii) that

28

challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. There are no outstanding Governmental Orders against, relating to or affecting the Business. The United States Consumer Product Safety Commission has not brought and, to the Knowledge of Sellers, is not expected to bring, any Action relating to the Business, the Purchased Assets or the Assumed Liabilities. No Governmental Authority has brought and, to the Knowledge of Sellers, is not expected to bring, any Action relating to the Business, the Purchased Assets or the Assumed Liabilities that arises out of the failure to pay or the imposition of any customs, duties, tariffs or other import or export-related fees or charges.

Section 4.14. <u>Permits; Compliance With Laws</u>. All material Permits required for Sellers to conduct the Business as currently conducted or for the ownership and use of the Purchased Assets have been obtained by the applicable Seller and are valid and in full force and effect. <u>Section 4.14</u> of the Disclosure Schedules lists all current Permits issued to any Seller which are related to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets. To the Knowledge of Sellers, no event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Permit set forth in <u>Section 4.14</u> of the Disclosure Schedules. Sellers are, and have been at all times since December 31, 2015, in compliance in all material respects with (a) all Laws applicable to the conduct of the Business or the ownership and use of the Purchased Assets and (b) all Permits. Since December 31, 2015, Sellers have not received any notice or other communication from any Governmental Authority regarding (i) any actual failure to comply with, any Law applicable to the conduct of the Business or the ownership and use of the Purchased Assets or any Permit or Environmental Permit, or (ii) any actual revocation, withdrawal, suspension, cancellation, termination or modification of any Permit.

Section 4.15. <u>Employee Benefit Matters</u>. <u>Section 4.15</u> of the Disclosure Schedules contains a true and complete list of each pension, benefit, retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, performance award, phantom equity, stock or stock-based, change in control, retention, severance, vacation, paid time off, welfare, fringe-benefit and other similar agreement, plan, policy, program or arrangement (and any amendments thereto), in each case whether or not reduced to writing and whether funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not tax-qualified and whether or not subject to ERISA, which is or has been maintained, sponsored, contributed to, or required to be contributed to by the applicable Seller for the benefit of any current or former employee, officer, director, retiree, or independent contractor of the Business or any spouse or dependent of such individual (collectively, the "<u>Benefit Plans</u>").

Section 4.16. <u>Employment Matters</u>. Sellers have provided to Buyer a list of all persons who are employees or independent contractors of the Business as of the date hereof (each an "<u>Active Employee</u>"), and sets forth for each such individual the following: (i) name; (ii) title or position (including whether full or part time); (iii) hire date; (iv) current annual base compensation rate; (v) commission, bonus or other incentive-based compensation; (vi) a description of the fringe benefits provided to each such individual as of the date hereof; (vii) Sellers' classification of the worker as an employee or an independent contractor; and (viii) for

each employee, Sellers' classification of the employee as exempt or non-exempt from federal and state overtime laws.  Section 4.16 of the Disclosure Schedules sets forth a list of all written employment agreements in place between the Business and any Active Employee.  Except as set forth in Section 4.16 of the Disclosure Schedules, Sellers are not a party to, or bound by, any collective bargaining or other agreement with a labor organization representing any of the employees of the Business. With respect to the Business, no union, labor organization or group of employees has filed any representation petition to Sellers or made any demand for recognition to Sellers and, to the Knowledge of Sellers, no union organizing efforts are underway or threatened.  With respect to the Business, all workers are and have been properly classified and treated by Sellers in accordance with applicable Laws with respect to including minimum wages and overtime pay and with respect to being either an employee or an independent contractor. Except as set forth in Section 4.16 of the Disclosure Schedules, the Business does not have any federal government contracts or subcontracts creating any affirmative action obligations under any executive order, law or regulation, including, without limitation, Executive Order 11246, the Vietnam Era Veterans' Readjustment Assistance Act of 1974 or Section 503 of the Rehabilitation Act of 1973.  Sellers have fully paid all wages and other compensation due and payable to their employees prior to the date of this Agreement.

Section 4.17.  Environmental Matters.

(a)    With respect to the operation of the Business, to the Knowledge of Sellers, Sellers are, and have been at all times since December 31, 2015, in compliance in all material respects with all Environmental Laws. To the Knowledge of Sellers, all Environmental Permits required to conduct the Business as currently conducted have been obtained and are in full force and effect and the Sellers are, and have been at all times since December 31, 2015, in compliance in all material respects with all such Environmental Permits.  There are no Actions pending or, to the Knowledge of Sellers, threatened in writing against any Seller pursuant to Environmental Laws.

(b)    Sellers have furnished to Buyer complete copies of all reports on inspections of the Business and Purchased Assets, including the Owned Real Property and real property leased pursuant to the Assigned Real Property Leases, made through the date hereof pertaining to environmental matters.

(c)    To the Knowledge of Sellers the Owned Real Property and the real property leased pursuant to the Assigned Real Property Leases have been owned, leased, operated, and maintained in compliance in all material respects with all applicable Environmental Laws and Environmental Permits during Sellers' lease, ownership, operation, and occupancy thereof.

(d)    No Seller has disposed of or released any Hazardous Materials at any Owned Real Property or real property leased pursuant to the Assigned Real Property Leases or any other location.  Except as set forth on Section 4.17 of the Disclosure Schedules and to the Knowledge of Sellers, no Hazardous Materials have been released in violation of any applicable Environmental Law by any other Person or is otherwise present at any Owned Real Property or real property leased pursuant to the Assigned Real Property Leases so as to give rise to any material liability for investigation costs, cleanup costs, response costs, corrective action costs,

30

personal injury, property damage, natural resources damages, or attorney fees under any Environmental Laws, or materially affect the operation of the Business as now conducted.

(e)    Except as set forth on <u>Section 4.17</u> of the Disclosure Schedules, there are no underground storage tanks, above ground storage tanks, fueling stations or pumps, or associated piping at, in, on, or under any Owned Real Property or real property leased pursuant to the Assigned Real Property Leases that could give rise to any liability claims under Environmental Laws against Sellers or the Business.  Except as set forth on <u>Section 4.17</u> of the Disclosure Schedules and to the Knowledge of Sellers, the Purchased Assets are free of Hazardous Materials.

This <u>Section 4.17</u> contains the sole representations and warranties concerning Environmental Laws or Hazardous Materials in the Agreement.

Section 4.18.   <u>Taxes</u>.

(a)    All Income Tax Returns and all other material Tax Returns (including, for the avoidance of doubt, all Tax Returns in respect of sales, use and value added Taxes) required to be filed by or with respect to each of the Sellers have been properly prepared and timely filed in compliance with Applicable Laws, and all such Tax Returns are true, complete and correct in all material respects.

(b)    Sellers have fully and timely collected (to the extent required by applicable Law) and paid when due all Income Taxes and all other material Taxes due or owing by them (whether or not shown on any Tax Return), including all sales, use and value added Taxes, and have made adequate provision in the Financial Statements for any Taxes that are not yet due or payable, for all taxable periods, or portions thereof, ending on or before the Closing Date.

(c)    No audit or other proceeding by any Governmental Authority is pending or, to the Knowledge of the Sellers, threatened in writing with respect to any Taxes due from or with respect to the Sellers, the Business, or the Purchased Assets.  No Governmental Authority has given notice of any intention to assert any deficiency or claim for additional Taxes against the Sellers, and no claim has been made in writing by any Governmental Authority in a jurisdiction where the Sellers do not file Tax Returns that they are or may be subject to taxation by that jurisdiction, and all deficiencies for Taxes asserted or assessed against the Sellers have been fully and timely paid, settled or properly reflected in the Financial Statements.

(d)    There are no outstanding agreements extending or waiving the statutory period of limitations applicable to any claim for, or the period for the collection or assessment or reassessment of, Taxes due from the Sellers for any taxable period and no request for any such waiver or extension is currently pending.

(e)    There are no Encumbrances for Taxes upon the Business or any of the Purchased Assets, other than statutory liens for Taxes not yet due or payable.

(f)      None of the Sellers is a foreign person as defined in section 1445(1)(3) of the Code.

Section 4.19.   <u>Inventory</u>.   <u>Section 4.19</u> of the Disclosure Schedules contains a true, correct and complete listing of all Inventory by location as of May 31, 2018.  For purposes of calculating Current Assets, all such Inventory will have been valued on a first-in, first-out basis in accordance with GAAP, consistently applied, and the Accounting Policies.

Section 4.20.   <u>Accounts Receivable and Payable</u>.

(a)      <u>Section 4.20(a)</u> of the Disclosure Schedules contains a true, correct and complete listing of all Accounts Receivable as of May 31, 2018.  The Accounts Receivable reflected on the Financial Statements and <u>Section 4.20(a)</u> of the Disclosure Schedules and to be reflected on the Estimated Net Working Capital Statement have arisen from bona fide transactions entered into by Sellers involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice.

(b)      <u>Section 4.20(b)</u> of the Disclosure Schedules contains a true, correct and complete listing of all Accounts Payable as of May 31, 2018.  The Accounts Payable reflected on the Financial Statements and <u>Section 4.20(b)</u> of the Disclosure Schedules and to be reflected on the Estimated Net Working Capital Statement represent valid liabilities incurred in the ordinary course of business consistent with past practice (whether or not billed by vendors or suppliers) arising in connection with the operations of the Sellers.

Section 4.21.   <u>Intentionally Omitted</u>.

Section 4.22.   <u>Insurance</u>.  <u>Section 4.22</u> of the Disclosure Schedules sets forth a true, correct and complete list of all material insurance policies maintained by or for the benefit of each Seller for use in or covering the Business (collectively, the "<u>Insurance Policies</u>").  The applicable Seller maintains general liability, product liability, fire, casualty, motor vehicle, workers' compensation and other types of insurance of the types and in the amounts customarily carried by businesses of similar size in the same industry in which such Seller operates.  All of the Insurance Policies are in full force and effect and all premiums due with respect to each such Insurance Policy have been paid, and no notice of cancellation or termination has been received by such Seller.  The applicable Seller is in compliance in all respects with the terms and provisions of the Insurance Policies except where the failure to comply would not reasonably be a Material Adverse Effect.

Section 4.23.   <u>Brokers</u>.  Except to the extent payable solely by Sellers, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Sellers.

Section 4.24.   <u>Disclaimer of Warranties as to Purchased Assets</u>.  Except as specifically provided in <u>Section 4.01</u> through <u>Section 4.23</u> above, Sellers and their Affiliates will convey the Purchased Assets to Buyer on an "As-Is, Where-Is" and "With All Faults" basis, without representations, warranties or covenants, express or implied, of any kind or nature.

Buyer hereby waives and relinquishes all rights and privileges arising out of, or with respect or in relation to, any representations, warranties or covenants, whether express or implied, which may have been made or given, or which may have been deemed to have been made or given, by Sellers or their Representatives, except for those expressly set forth in this Agreement. Upon the Closing Date, Buyer agrees to assume all risk and liability (and agrees that Sellers will not be liable for any special, direct, indirect, consequential or other damages) resulting or arising from or relating to the ownership, use, condition, location, maintenance, repair, or operation of the Purchased Assets.

Section 4.25. <u>Exclusivity of Representations and Warranties</u>. None of the Sellers nor any other Person is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, relating to any Seller (including, but not limited to, any relating to financial condition, results of operations, assets or liabilities of such Seller), except as expressly set forth in this <u>ARTICLE IV</u> and the Disclosure Schedules, and each of the Sellers hereby disclaims any such other representations or warranties.

Section 4.26. <u>"As Is" Transaction</u>. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS ARTICLE IV ABOVE, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS INCLUDING EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS OR WHICH IS THE SUBJECT OF ANY OTHER LEASE OR OTHER CONTRACT TO BE ASSUMED BY BUYER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS THAT ARE THE SUBJECT OF ANY REAL PROPERTY LEASE TO BE ASSUMED BY BUYER AT THE CLOSING, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE ACQUIRED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF PROPERTY, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE ACQUIRED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS ARTICLE IV, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL

FAULTS." FURTHERMORE BUYER HEREBY EXPRESSLY ACKNOWLEDGES THAT THE ASSIGNMENT AND ASSUMPTION OF THE ASSUMED CONTRACTS FORMING PART OF THE PURCHASED ASSETS WILL BE CONSUMMATED IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT NOTWITHSTANDING ANY AND ALL OUTSTANDING DEFAULTS AND OTHER CLAIMS FOR FAILURES TO COMPLY WITH THE PROVISIONS OF SUCH CONTRACTS, CERTAIN OF WHICH DEFAULTS OR CLAIMS MAY NOT BE SUBJECT TO CURE OR WAIVER.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows:

Section 5.01.  Organization of Buyer.  Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of its organization.

Section 5.02.  Authority of Buyer.  Buyer has full limited liability company power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Sellers) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, subject to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or effecting creditors' rights and to general principles of equity.

Section 5.03.  No Conflicts; Consents.  The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not conflict with or result in a violation or breach of, or default under, any provision of the articles or organization, operating agreement or other organizational documents of Buyer or require the consent, notice or other Action by any Person under any Contract to which Buyer is a party.

Section 5.04.  Financing.  Buyer presently has and will have at Closing and at all other relevant times all funds or financing in place necessary to pay and deliver to Sellers the Purchase Price as contemplated hereby and to perform and satisfy any Assumed Liabilities as such Assumed Liabilities come due.  In no event shall the receipt or availability of any funds or financing by Buyer or any other financing or other transactions be a condition to Buyer's obligations hereunder.

Section 5.05.  Brokers.  Except to the extent payable solely by Buyer, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

Section 5.06.  <u>Legal Proceedings</u>.  There are no Actions pending or threatened in writing against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.  No event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

Section 5.07.  <u>Reliance by Buyer</u>.  Buyer and Buyer's Affiliates have conducted and completed such review and investigation of the Business and its assets and liabilities as they deem necessary and appropriate and have had an opportunity to ask questions of and receive satisfactory answers from Sellers, or persons acting on Sellers' behalf, concerning the Business, the Purchased Assets, the Assumed Liabilities, and such other questions as Buyer and Buyer's Affiliates have deemed necessary for their ability to satisfy their obligations under this Agreement, and all such questions have been answered to the full satisfaction of Buyer.  Buyer and Buyer's Affiliates have not relied on any representations or statements by anyone except as explicitly set forth in the Transaction Documents.

# ARTICLE VI
# COVENANTS

Section 6.01.  <u>Confidentiality</u>.  From and after the Closing and subject to any disclosure requirements of Sellers arising in the Bankruptcy Cases, each Seller will, and will cause Sellers' respective Affiliates to, hold, and will use its commercially reasonable efforts to cause its or their respective Representatives to hold, in confidence any and all information, whether written, oral, electronic or otherwise, relating exclusively to either or both the Business and the Purchased Assets including, without limitation, to the extent it relates exclusively to the Business, business, technical and financial information, business plans, methods and prospects, information relating to proposed business plans, current and prospective customer and supplier lists, information concerning current and prospective customers and suppliers, marketing and business plans, specifications, techniques, technical information, know-how and trade secrets (collectively, "<u>Confidential Information</u>"), except to the extent that such Seller can show that such information is generally available to the public through no fault of such Seller, any of its Affiliates or their respective Representatives.

Section 6.02.  <u>Intentionally Omitted</u>.

Section 6.03.  <u>Received Payments</u>.  From and after the Closing, if any Seller or any of its Affiliates receives or collects any funds relating to any Accounts Receivable or any other Purchased Asset, such Seller will remit (or cause to be remitted) such funds to Buyer within ten (10) Business Days after its receipt thereof.  If Buyer or any of its Affiliates receives or collects any funds relating to any Excluded Assets, Buyer or its Affiliate will remit such funds to the Sellers Representative within ten (10) Business Days after its receipt thereof.

Section 6.04.  <u>Intentionally Omitted</u>.

Section 6.05.  <u>Employee Matters</u>.

(a)    Effective as of the Closing, Buyer shall, or shall cause its Affiliates to, make offers of employment (which offers shall be in compliance with Buyer's covenants set

35

forth in this <u>Section 6.05</u>) to or continue the employment of, as applicable, each Active Employee identified on the list provided to Buyer by Sellers pursuant to <u>Section 4.16</u> who remains employed by a Seller immediately prior to the Closing; provided, however, that Buyer shall have no obligation to make offers of employment or to continue the employment of, as applicable, employees described in <u>Section 6.05</u> of the Disclosure Schedules; <u>provided</u>, <u>however</u>, that, in all events, the number of Active Employees who remain employed by a Seller immediately prior to the Closing that do not receive offers of employment shall not exceed twenty-eight (28) Active Employees.

(b)    With respect to each employee of the Business who is not actively at work as of the Closing Date due to short-term or long-term disability leave (each, a "<u>Disabled Employee</u>"), effective as of the date on which such Disabled Employee presents himself or herself to Buyer for active employment following the Closing Date, provided such Disabled Employee is cleared for work and presents himself or herself to Buyer for active employment within 180 days following the Closing Date, Buyer shall, or shall cause its Affiliates to, make an offer of employment (which offer shall be in compliance with Buyer's covenants set forth in this <u>Section 6.05</u>) to such Disabled Employee in each case with job responsibilities that are substantially similar to such Disabled Employee's job responsibilities with the applicable Seller or its Affiliates immediately prior to the date such employee commenced disability leave to the same extent, if any, as such Seller or its Affiliates would have been required to re-employ such Disabled Employee if the transactions contemplated by this Agreement had not occurred, in accordance with applicable Law.   Sellers have provided Buyer with a list of all Disabled Employees.  Employees of the Business, who accept employment with Buyer or one of its Affiliates shall be referred to as "<u>Hired Employees</u>", and the date that such Hired Employee transfers to Buyer or one of its Affiliates shall be referred to as the "<u>Transfer Date</u>".  In the case of any Hired Employee who was employed by the Business immediately prior to the Closing Date, the Transfer Date shall be the Closing Date; <u>provided</u>, however, that, Buyer and its Affiliates shall have no liabilities or obligations with respect to any such Disabled Employee unless and until such employee presents himself or herself to Buyer or its Affiliates for active employment in accordance with this <u>Section 6.05</u>.  In the case of any Disabled Employee who was employed by a Seller or one of its Affiliates immediately prior to the date such employee's disability leave began, the Transfer Date shall be the date such employee commences active employment with Buyer or its Affiliates.   Sellers and Buyer intend that the transactions contemplated by this Agreement, shall not constitute a severance of employment of any Hired Employee prior to or upon the consummation of the transactions contemplated by this Agreement, and that Hired Employees will have continuous and uninterrupted employment immediately before and immediately after the consummation of the transactions contemplated by this Agreement.

(c)    During the period from the Closing Date until the first anniversary of the Closing Date (such period the "<u>Continuation Period</u>"), Buyer or its Affiliates shall provide each Hired Employee with (i) a base salary or rate of base pay that is at least equal to such Hired Employee's base salary or rate of base pay immediately prior to the Closing and (ii) eligibility to receive other compensation and all other employee benefits (including participation in Buyer's 401(k) program) maintained for employees of Buyer on substantially similar terms and conditions in the aggregate as are provided to similarly situated employees of Buyer.

(d)     From and after each Hired Employee's Transfer Date, to the extent permitted by applicable Law and the terms of Buyer's benefit plans, Buyer shall credit service accrued by Hired Employees with, or otherwise recognized for Benefit Plan purposes by, the applicable Seller and its Affiliates (as well as service with any predecessor employer of any Seller or any its Affiliates, to the extent service with the predecessor employer is recognized by such Seller or any of its Affiliates) as of such Hired Employee's Transfer Date ("Pre-Closing Service") for purposes of eligibility to participate, vesting level of benefits and benefit accruals (other than benefit accruals under a defined pension plan of Buyer) for purposes of early retirement eligibility and early retirement subsidies, in each case, under any employee benefit plans and arrangements and employment-related entitlements sponsored maintained or contributed to by Buyer to the same extent recognized by Sellers and their Affiliates immediately prior to such Hired Employee's Transfer Date, except (i) for benefit accrual purposes under any defined benefit pension plan of Buyer, (ii) for eligibility purposes under any post-retirement welfare benefit plan of Buyer, except as required pursuant to the terms of any applicable collective bargaining agreement, or (iii) to the extent such credit would result in duplication of benefits for the same period of service.

(e)     Except as otherwise specifically provided in this Agreement, the active participation and accrual of benefits of the Hired Employees in any Benefit Plan and the other employee compensation, benefit and perquisite plans, programs and arrangements of such Seller and its Affiliates shall terminate effective as of 12:01 a.m. on each Hired Employee's Transfer Date.  Except as required by applicable Law, nothing herein shall (1) guarantee employment of any Hired Employee for any period of time after the Closing Date or preclude the ability of Buyer to terminate the employment of any Hired Employee for any reason or no reason, or (2) require Buyer to continue any particular employee benefit plan or arrangement after the Closing Date.  No provision of this Section 6.05(c) shall create any third party beneficiary or other rights in any current or former employee of a Seller, the Business or Buyer (including any dependent or beneficiary thereof) or any other person or modify or create any employee benefit plan.  Except as set forth in this Section 6.05(c) or as required by applicable Law, Buyer and its Affiliates, as applicable, shall have the right in their sole discretion to amend, modify, terminate or adjust benefit levels under any and all employee benefit plans and arrangements after the Closing Date, and, except as required by applicable Law, nothing in this Section 6.05 shall be construed to limit any rights that Buyer or any of its Affiliates may have under any such plan or arrangement to amend, modify, terminate or adjust any particular plan or arrangement.  No provision of this Section 6.05 is intended to modify, amend or create any employee benefit plan or arrangement of a Seller or Buyer or any Affiliate of Buyer.

(f)     On Sellers' customary payroll schedule on or after the Closing Date, (i) Sellers shall pay all Pre-Closing Compensation and (ii) within the time period required by applicable Law, all withholding taxes relating to any Pre-Closing Compensation.  Seller shall pay when due all Liabilities under the Benefits Plan, including without limitation all payments for medical expenses that are incurred pre-Closing under the Benefit Plans.

Section 6.06.  Availability of Books and Records.  After the Closing Date, Buyer shall provide to the Sellers Representative (after reasonable notice and during normal business hours and without charge to Sellers) access to (a) Buyer's personnel and Hired Employees who have custody of Books and Records for periods prior to the Closing and (b) all Books and

Records for periods prior to the Closing and shall preserve such Books and Records, subject to compliance with applicable Law, until the seventh (7th) anniversary of the Closing.  Such access to Books and Records shall include access to any such information in electronic form to the extent reasonably available.  Buyer acknowledges that Sellers have the right to retain copies of Books and Records for periods prior to the Closing.  For a period of seven (7) years following the Closing, prior to destroying any Books and Records for periods prior to the Closing, Buyer shall notify the Sellers Representative no less than thirty (30) days in advance of any such proposed destruction of its intent to destroy such Books and Records, and Buyer will permit Sellers to retain such Books and Records at Sellers' sole expense.  With respect to any litigation and claims, Buyer shall, at Sellers' sole expense, render all reasonable assistance that any Seller may request in defending such litigation or claim and shall make available to Sellers, for and at reasonable times, Buyer's personnel or Hired Employees most knowledgeable about the matter in question.

Section 6.07.  Bulk Sales/Tax Clearance Waiver.  The parties agree to waive compliance with the provisions of any so-called "bulk transfer law," "bulk sales law," or any similar Tax Law (including any tax clearance or certification of tax compliance Law) of any jurisdiction that may be applicable with respect to the sale of the Purchased Assets as contemplated by this Agreement; it being understood that any Liabilities arising out of the failure of Sellers to comply with the requirements and provisions of any so-called "bulk transfer law," "bulk sales law," or any similar Tax Law (including any tax clearance or certification of tax compliance Law) of any jurisdiction shall not constitute Assumed Liabilities and shall be treated as Excluded Liabilities.

Section 6.08.  Intentionally Omitted.

Section 6.09.  Cooperation on Tax Matters.  Sellers and Buyer shall (and shall cause their respective Affiliates to) cooperate fully with each other and make available or cause to be made available to each other for consultation, inspection, and copying (at such other party's expense) in a timely fashion such personnel, Tax data, relevant Tax Returns or portions thereof, and filings, files, books, records, documents, financial, technical and operating data, computer records, and other information as may be reasonably requested, including (a) for the preparation by such other party of any Tax Returns or (b) in connection with any Tax audit or proceeding including one party (or an Affiliate thereof) to the extent such Tax audit or proceeding relates to or arises from the transactions contemplated by this Agreement.

Section 6.10.  Retention of Tax Records.  From the Closing Date to the earliest of (i) seven years from the Closing Date, (ii) the expiration of the relevant statute of limitations, and (iii) the date on which the Bankruptcy Cases are no longer pending, each of the Sellers and Buyer shall retain possession of all accounting, business, financial, and Tax records and information that (a) relate to the Purchased Assets and are in existence on the Closing Date and (b) come into existence after the Closing Date but relate to the Purchased Assets before the Closing Date, and each of the parties shall give the other parties notice and a reasonable opportunity to retain any such records in the event that the party in possession of such records shall make a determination to destroy or otherwise abandon any such records.  From the Closing Date to the earliest of (x) seven years from the Closing Date, (y) the expiration of the relevant

statute of limitations, and (z) the date on which the Bankruptcy Cases are no longer pending, Sellers shall retain possession of all accounting, business, financial, and Tax records and information that relate to the Excluded Liabilities and shall give Buyer notice and a reasonable opportunity to retain any such records in the event that Sellers shall make a determination to destroy or otherwise abandon any such records.  In addition, from and after the Closing Date, each party shall provide to the other parties (after reasonable notice and during normal business hours and without charge) access to the books, records, documents, and other information relating to the Purchased Assets as the requesting party may reasonably deem necessary to properly prepare for, file, prove, answer, prosecute, and defend any Tax Return, claim, filing, Tax audit, Tax protest, suit, proceeding, or answer.  Such access shall include access to any computerized information systems that contain data regarding the Purchased Assets.  The provisions contained in this Section 6.10 are intended to, and shall, supplement and not limit the generality of the provisions contained in Section 6.06.

Section 6.11.   Financial Information.  Prior to the Closing, Sellers will deliver to Buyer not later than the twenty-first (21st) day of each calendar month financial statements in the form of the Interim Financial Statements provided pursuant to Section 4.04 together with the trial balances used to prepare such Interim Financial Statements.

Section 6.12.   Further Assurances.  Following the Closing, each of the parties hereto will, and will cause its Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

Section 6.13.   Conduct of Business Prior to the Closing.  Subject to limitations imposed upon Sellers as a result of the filing of the Bankruptcy Cases and in accordance with Sellers' operation of the Business as debtors-in-possession in the Bankruptcy Cases, from the Effective Date until the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyer, which consent may not be unreasonably withheld or delayed, Sellers will use reasonable efforts to (a) conduct the Business in the ordinary course of business consistent with past practice; and (b) maintain and preserve intact their current Business organizations, operations and franchises and to preserve the rights, franchises, goodwill and relationships of their employees, customers, lenders, distributors, suppliers, supply chain participants, regulators and others having relationships with the Business.  Sellers shall not license any Intellectual Property Assets after the Effective Date except with the written consent of Buyer.  Without limiting the foregoing, and except as otherwise set forth in Section 6.13 of the Disclosure Schedules from the date hereof until the Closing Date, Sellers shall:

(a)      preserve and maintain all Permits required for the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets;

(b)      not materially increase any bonuses, salaries or other compensation to any Active Employee, except pursuant to applicable Law or to agreements or plans in place on the date hereof (the terms of which such agreements or plans have been disclosed to Buyer prior to the date hereof), or except in the ordinary course of business;

(c)    not adopt, or materially increase the amount of payments or benefits under, any Benefit Plan for or with any Active Employees, except pursuant to agreements or plans in place on the date hereof;

(d)    not hire or terminate (other than for "cause") any employee of the Business with a base salary greater than $75,000;

(e)    not sell any assets, including Inventory, except in the ordinary course of business;

(f)    not acquire additional assets for use in the Business, except in the ordinary course of business;

(g)    to the extent permitted to do so as a result of the filing of the Bankruptcy Cases, pay the debts (including accounts payable), Taxes and other obligations of the Business in a manner consistent with past practice;

(h)    file all Tax Returns in accordance with applicable Laws;

(i)    not change any accounting or tax reporting methods, principles or polies, not make or change any Tax election or file any amended Tax Returns, not enter into any closing agreement or settle or compromise any Tax claim or assessment, or consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment, if such change, filing, agreement, settlement, consent or other action would adversely affect Buyer, the Business or the Purchased Assets after the Closing;

(j)    continue to collect Accounts Receivable in a manner consistent with past practice;

(k)    maintain the properties and assets included in the Purchased Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(l)    defend and protect the properties and assets included in the Purchased Assets from infringement or usurpation;

(m)    not amend, modify or terminate any Assigned Contract or enter into any new Contract in respect of the Business (except as contemplated by this Agreement);

(n)    perform all of their obligations under all Assigned Contracts;

(o)    maintain the Books and Records in accordance with past practice;

(p)    comply in all material respects with all Laws applicable to the conduct of the Business or the ownership and use of the Purchased Assets;

(q)    use commercially reasonable efforts to enter into the HHG Lease Amendment and to work with Buyer to accomplish the same;

40

(r)     not take or permit any action that would cause any of the changes, events or conditions described in <u>Section 4.05</u> to occur.

Section 6.14.   <u>Insurance</u>.

(a)     Sellers shall maintain appropriate levels of insurance on the Business and the assets needed to operate the Business until Closing.  Sellers shall bear the risk of loss for any Purchased Asset until the Closing Date.  If any Purchased Asset is damaged or destroyed prior to Closing, Buyer can elect to (i) remove such asset as a Purchased Asset and reduce the cash portion of the Purchase Price by the fair market value of such asset; (ii) acquire such asset as a Purchased Asset and have the insurance proceeds assigned by Sellers to Buyer; or (iii) if such loss has a Material Adverse Effect on the Business, to terminate this Agreement by written notice to Sellers.

(b)     Buyer acknowledges that the policies and insurance coverage maintained on behalf of the Sellers or the Business are part of the corporate insurance program maintained by Sellers (such policies, the "<u>Policies</u>"), such coverage will not be available or transferred to Buyer (regardless the date of sale or manufacture of any product related to the Business), Buyer shall be responsible for obtaining and maintaining replacement coverage for the Business and none of the Sellers or any of their Affiliates shall, subject to the immediately following sentence, have any liabilities or obligations with respect thereto.  Notwithstanding the foregoing, solely with respect to events or circumstances arising, directly or indirectly, primarily out of the operation or conduct of the Business that occurred prior to the Closing that are covered by or insured under any occurrence based Policies, Buyer may make claims, to the extent such claims existed prior to the Closing, under any such Policies to the extent that such Policies are available, and the Sellers shall, at the sole cost and expense of Buyer, take any actions reasonably requested by Buyer and necessary in connection with tendering such claims to the applicable insurers under such Policies and to provide Buyer with the proceeds it realizes with respect to such claims to the extent arising, directly or indirectly, primarily out of the operation or conduct of the Business; <u>provided</u>, that Buyer shall exclusively bear (and Sellers and their Affiliates shall not have any obligation to repay or reimburse Buyer therefor) the amount of any deductibles, retentions or self-insurance associated with claims under such Policies, whether such claims are made by Buyer, its employees or third parties, and shall be liable for all uninsured, uncovered, unavailable or uncollectible amounts of such claims.

(c)     Sellers and their Affiliates shall retain the exclusive right to control all of their Policies and the benefits and amounts payable thereunder, including the right to exhaust, settle, release, commute, buy-back or otherwise resolve disputes with respect to any of its insurance policies and programs and to amend, modify or waive any rights under any such insurance policies and programs, notwithstanding whether any such policies or programs apply to any claims Sellers have made or could make in the future; <u>provided</u>, that Sellers shall not take any such action unless such action would apply generally to coverage of claims by Sellers and their Affiliates; <u>provided</u>, <u>further</u>, that none of Sellers or their Affiliates shall be obligated to indemnify Buyer for the exhaustion of the limits of liability under the Policies.  It is further understood and agreed that Sellers and their Affiliates may cancel or not renew any of the Policies at any time, without any liability or obligation to Buyer or any of its Affiliates.

(d)     Other than as expressly set forth in this <u>Section 6.14</u>, Buyer covenants and agrees not to seek to assert or to exercise any other rights or claims of the Sellers or the Business under or in respect of any past or current Policy under which any Seller or Affiliate thereof or the Business is an additional insured.

Section 6.15.   <u>Access to Information</u>.

(a)     From the Effective Date until the Closing, Sellers will (i) afford Buyer and its Representatives reasonable access to and the right to inspect all of the properties, assets, premises, Books and Records, Contracts and other documents and data related to the Business; (ii) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Business as Buyer or any of its Representatives may reasonably request; (iii) afford Buyer and its representatives reasonable access to all Active Employees, contractors of the Business and other Representatives of Sellers with knowledge about the operations of the Business; and (iv) instruct the Active Employees and Representatives of Sellers to cooperate with Buyer in its investigation of the Business.  Any investigation pursuant to this <u>Section 6.15</u> will be conducted in such manner as not to interfere unreasonably with the conduct of the Business or any other businesses of Sellers and shall not include any environmental sampling.

(b)     So long as the Bankruptcy Cases are pending, following the Closing, Buyer shall provide Sellers and Sellers' counsel and other professionals employed in the Bankruptcy Cases with reasonable access to all documents relating to the Purchased Assets for the purpose of the continuing administration of the Bankruptcy Cases (including the pursuit of any avoidance, preference or similar actions), which access shall include (i) the right of Sellers' professionals to copy, at Sellers' expense, such documents and records as Sellers or Sellers' may request in furtherance of the purposes described above, and (ii) Buyer's copying and delivering to Sellers or Sellers' professionals such documents or records as Sellers or Sellers' professionals may request, but only to the extent Sellers or Sellers' professionals furnish Buyer with reasonably detailed written descriptions of the materials to be so copied and Sellers reimburse Buyer for the reasonable costs and expenses thereof.

Section 6.16.   <u>Notice of Certain Events</u>.   From the Effective Date until the Closing, Sellers will promptly notify Buyer in writing of:

(a)     any fact, circumstance, event or Action the existence, occurrence or taking of which (i) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Business, (ii) has resulted in, or could reasonably be expected to result in, any representation or warranty made by any Seller hereunder not being true and correct, or (iii) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions in <u>Section 7.02</u> to be satisfied, provided, however, that any such notice delivered pursuant to this <u>Section 6.16</u> shall not be deemed an amendment to any disclosure made on <u>Section 4.05</u> of the Disclosure Schedules;

(b)     any notice or other communication from any Governmental Authority in connection with the Business, Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement; and

(c)     any Actions commenced or, to the Knowledge of Sellers, threatened against, relating to or involving or otherwise affecting the Business (including any material change in the relationship with a Material Customer), the Purchased Assets or the Assumed Liabilities or that relates to the consummation of the transactions contemplated by this Agreement.

Section 6.17.    <u>Governmental Approvals and Consents</u>.  Each party hereto will, as promptly as possible, (a) make, or cause or be made, all filings and submissions required under any Law applicable to such party or any of its Affiliates and (b) use reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that, in either case, may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement and the other Transaction Documents.  Each party will cooperate fully with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals.  The parties hereto will not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

Section 6.18.    <u>Efforts to Consummate</u>.  From the Effective Date until the Closing, each party will use reasonable efforts to take such actions as are necessary to satisfy the closing conditions set forth in <u>ARTICLE VII</u> hereof.

Section 6.19.    <u>Shared Business Contracts</u>.

(a)     <u>Section 6.19(a)</u> of the Disclosure Schedules lists the Forward Shared Business Contracts.  Sellers agree, at Buyer's request, to use commercially reasonable efforts to either (i) cause each Forward Shared Business Contract to be assigned in part to Buyer at the Closing; or (ii) provide reasonable assistance to Buyer, without cost to any Seller, to permit Buyer to enter into a new Contract with a counterparty to the applicable Forward Shared Business Contract that will afford the Buyer with the benefits and  obligations under such Forward Shared Business Contract to the extent related to the Business (each a "<u>Forward Sharing Arrangement</u>").  For the avoidance of doubt, failure to reach any one or more Forward Sharing Arrangements shall not be grounds for termination of this Agreement or any reduction of the Purchase Price.

(b)     <u>Section 6.19(b)</u> of the Disclosure Schedules lists the Reverse Shared Business Contracts.  Following the Closing, Buyer agrees, at any Seller's (or its assignees') request, to use commercially reasonable efforts to either (i) cause each Reverse Shared Business Contract (which is conveyed to Buyer or any of its Affiliates at the Closing) to be assigned in part to such Seller (or its assignee(s), as the case may be) or any of its Affiliates or (ii) to provide reasonable assistance to the applicable Seller (or such Seller's assignee(s), as the case may be) or any of such Seller's Affiliates, without cost to Buyer, to permit such Seller (or such Seller's assignee(s), as the case may be) or any of such Seller's Affiliates to enter into a new Contract with a counterparty to the applicable Reverse Shared Business Contract that will afford such Seller (or such Seller's assignee(s), as the case may be) or any of such Seller's Affiliates with benefits and obligations under such Reverse Shared Business Contract to the extent related to such Seller's (or assignee(s)') or such Seller's Affiliates post-Closing businesses (each a "<u>Reverse Sharing Arrangement</u>")  For the avoidance of doubt, failure to

43

reach any one or more Reverse Sharing Arrangements shall not be grounds for termination of this Agreement or increase the amount payable by Buyer for the purchase of the Purchased Assets.

(c)     If, at any time prior to Closing, Buyer designates any additional Contracts to be included in the Purchased Assets as Assigned Contracts, Seller may designate such Assigned Contracts as Reverse Shared Business Contracts.

Section 6.20.   <u>Intentionally Omitted</u>.

Section 6.21.   <u>Bankruptcy Court Matters</u>.

(a)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids.  From the Effective Date and until the designation of a Successful Bidder, Sellers are permitted to cause its representatives and Affiliates to initiate contact with, solicit, or encourage submission of any inquiries, proposals, or offers by any Person (in addition to Buyer and Buyer's Affiliates, agents, and representatives) in connection with any sale or other disposition of the Purchased Assets.  In addition, Sellers may respond to any inquiries or offers to purchase all or any part of the Purchased Assets or equity interests in Sellers and perform any and all other acts related thereto that are required under the Bankruptcy Code, the Bidding Procedures Order, or other applicable Law, including supplying information relating to the Business and the assets of Sellers or any of their affiliates to prospective purchasers.

(b)     On the Petition Date, Sellers shall file with the Bankruptcy Court the Sale Motion seeking entry of the Bidding Procedures Order.

(c)     Sellers shall deliver or cause to be delivered to Buyer for review and comment, as soon as commercially reasonable and in any event not less than two (2) Business Days prior to filing, all documents to be filed on behalf of Sellers with the Bankruptcy Court that relate to the transactions contemplated by this Agreement, including all motions, applications, schedules and supporting papers prepared by Sellers (including forms of Orders and Notices to interested parties). All motions, applications,  schedules and supporting papers prepared by Sellers relating  to the transactions contemplated by this Agreement that are to be filed on behalf of Sellers after the date hereof must be in form and substance reasonably satisfactory to Buyer.

(d)     Sellers and Buyer agree that they will promptly take such actions as are reasonably requested by the other to assist in obtaining entry of the Sale Order and the Bidding Procedures Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance of their respective obligations under this Agreement and the Transaction Documents and demonstrating that Buyer is a good faith buyer under Section 363(m) of the Bankruptcy Code.

(e)     Sellers shall obtain entry of the Bidding Procedures Order by the Bidding Procedures Order Deadline.

44

(f)    If Buyer is the Successful Bidder, Sellers will seek entry of the Sale Order, which shall be entered in form and substance reasonably acceptable to Buyer no later than the Sale Order Deadline that (a) approves the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement and authorizes Sellers to proceed with the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement, (b) includes a specific finding that Buyer is a good faith purchaser of the Purchased Assets within the meaning of § 363(m) of the Bankruptcy Code and is entitled to the protections of § 363(m) of the Bankruptcy Code, (c) states that the sale of the Purchased Assets to Buyer shall be free and clear of all Encumbrances (except as expressly provided in this Agreement), and (d) approves Sellers' assumption and assignment to Buyer of the Assigned Contracts pursuant to § 365 of the Bankruptcy Code subject to Buyer's ability to demonstrate to the Bankruptcy Court adequate assurance of future performance under the Assigned Contracts (the "Sale Order").  Buyer shall provide a copy of such financial information as may be required by the Bankruptcy Court to demonstrate Buyer's ability to assume, or to take an assignment of, the Assigned Contracts.  Both Buyer's and Sellers' obligations to consummate the transactions contemplated in this Agreement are conditioned upon the Bankruptcy Court's entry of the Sale Order.

(g)    Sellers and Buyer agree that in the event that Buyer is not the Successful Bidder at the Auction, and the Alternative Transaction with the Successful Bidder does not close, if and only if both (x) Buyer participates in the Auction by submitting a bid other than the initial bid set forth in this Agreement and (y) Buyer is the Back-up Bidder, Buyer shall promptly consummate the transactions set forth in this Agreement upon the terms and conditions set forth herein, including the Purchase Price as the same may be modified by Buyer at the Auction; provided, however, that Buyer's obligation to remain as the Back-up Bidder shall terminate thirty (30) days after the completion of the Auction.  For the avoidance of doubt, if Buyer does not participate in the Auction by submitting a bid (other than the bid reflected by this Agreement as set forth in the Sale Motion), then Buyer shall have no obligation to act as the Back-up Bidder.

(h)    Buyer and Sellers acknowledge that time is of the essence in achieving Closing and shall undertake all commercially reasonable efforts to reach Closing in a timely manner.

(i)    Sellers shall not take any action, or fail to take any action, which is intended to or is reasonably likely to result in the stay, voiding, or, without Buyer's consent which may be withheld in its sole discretion, modification of the Bidding Procedures Order or the Sale Order.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.01.  <u>Conditions to Obligations of All Parties</u>.  The obligations of each party to consummate the transactions contemplated by this Agreement are subject to no Governmental Authority having enacted, issued, promulgated, enforced or entered any Governmental Order that is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such

transactions, causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

Section 7.02.  <u>Conditions to Obligations of Buyer</u>.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)     Other than the representations and warranties of Sellers contained in <u>Section 4.01</u>, <u>Section 4.02</u> and <u>Section 4.23</u>, the representations and warranties of Sellers contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the Closing Date with the same effect as though made at and as of such date (except for those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on the Business.  The representations and warranties of Sellers contained in <u>Section 4.01</u>, <u>Section 4.02</u> and <u>Section 4.23</u> shall be true and correct in all respects on and as of the Effective Date and on and as of the Closing Date with the same effect as though made at and as of such date (except for those representations and warranties that address matters only as of a specified date, the accuracy of which will be determined as of that specified date in all respects).

(b)     Sellers will have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)     From the Effective Date, there shall not have occurred any Material Adverse Effect, nor will any event or events have occurred since the Effective Date that, individually or in the aggregate, with or without the lapse of time, will result in a Material Adverse Effect.

(d)     The applicable Sellers or their Associates shall have delivered to Buyer duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in <u>Section 3.02(a)</u>.

(e)     The Bankruptcy Court shall have entered the Bidding Procedures Order approving, among other things, the Breakup Fee and Expense Reimbursement as super-priority administrative expenses.

(f)     The Bankruptcy Court shall have entered the Sale Order in accordance with <u>Section 6.22</u> on or before the Sale Order Deadline, and the Sale Order shall not have been stayed, vacated, reversed, or modified as of the Closing Date.

(g)    Buyer shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of the Sellers Representative that each of the conditions set forth only in <u>Section 7.02(a)</u> and <u>Section 7.02(b)</u> have been satisfied (the "<u>Sellers Closing Certificate</u>").

(h)    To the extent that the Sale Order does not eliminate the requirement to obtain prior consent of one or more counterparties to any Assigned Contracts listed in <u>Section 7.02(h)</u> of the Disclosure Schedule, Sellers shall have obtained all consents of assignment to Buyer of with respect to such Assigned Contracts.

Section 7.03.    <u>Conditions to Obligations of Sellers</u>.    The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment or Sellers' waiver, at or prior to the Closing, of each of the following conditions:

(a)    Other than the representations and warranties of Buyer contained in <u>Section 5.01</u>, <u>Section 5.02</u> and <u>Section 5.05</u>, the representations and warranties of Buyer contained in this Agreement, the other Transaction Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the Closing Date with the same effect as though made at and as of such date (except for those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except where the failure of such representations and warranties to be true and correct would not, individually or in the aggregate, reasonably be expected to have a material adverse effect.  The representations and warranties of Buyer contained in <u>Section 5.01</u>, <u>Section 5.02</u> and <u>Section 5.05</u> shall be true and correct in all respects on and as of the Effective Date and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)    Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)    Buyer shall have delivered to Sellers duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in <u>Section 3.02(b)</u>.

(d)    The Bankruptcy Court shall have entered the Bidding Procedures Order on or before the Bidding Procedures Order Deadline.

(e)    The Bankruptcy Court shall have entered the Sale Order as contemplated by <u>Section 6.21(c)</u> on or before the Sale Order Deadline and the Sale Order shall not have been stayed, appealed, vacated, reversed, or modified as of the Closing Date.

(f)     Sellers shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth only in Section 7.03(a) and Section 7.03(b) have been satisfied (the "Buyer Closing Certificate").

## ARTICLE VIII
## NON-SURVIVAL

Section 8.01.   Non-Survival.   Subject to the limitations and other provisions of this Agreement, except in the case of actual fraud, the representations and warranties contained herein and in any certificate delivered pursuant hereto shall terminate and be of no further force or effect at Closing (and no party shall have liability thereunder at or after the Closing); provided, that the representations and warranties in Section 4.01, Section 4.02, Section 4.07, Section 4.23, Section 5.01, Section 5.02 and Section 5.05 shall survive the Closing and will remain in full force and effect until the date that is twelve (12) months from the Closing Date. All covenants and agreements of the parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein.

## ARTICLE IX
## TERMINATION

Section 9.01.   Termination.   This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of the Sellers Representative and Buyer;

(b)     by Buyer by written notice to the Sellers Representative if Buyer is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Sellers pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VII and such breach, inaccuracy or failure has not been cured by Sellers within twenty (20) Business Days of Sellers Representative's receipt of written notice of such breach from Buyer;

(c)     by the Sellers Representative by written notice to Buyer if Sellers are not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VII and such breach, inaccuracy or failure has not been cured by Buyer within twenty (20) Business Days of Buyer's receipt of written notice of such breach from Sellers;

(d)     by Buyer or the Sellers Representative in the event that (i) there is any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or (ii) any Governmental Authority issues a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order has become final and non-appealable;

(e)     by the Sellers Representative or Buyer, upon notice to the other at any time following  the Closing Date Deadline if the Closing shall not have occurred on or before the Closing Date Deadline; provided, however, that the right to terminate this Agreement under this Section 9.01(e) shall not be available to any party (i) who is in material breach of this Agreement or (ii) whose failure to fulfill any obligation (including failure to satisfy or be ready, willing and able to satisfy any condition set forth in Section 7.02, if such notice is given by the Sellers Representative, or Section 7.03, if such notice is given by Buyer) under this Agreement has been the cause of, or resulted in, the failure of the Closing to be consummated by the Closing Date Deadline;

(f)     automatically, if Sellers enter into a definitive agreement with respect to an Alternative Transaction and the Bankruptcy Court enters an Order approving an Alternative Transaction; provided, however, that if the Auction is held and Buyer is designated as the Back-up Bidder as provided in Section 6.21(g), then this Agreement shall not terminate pursuant to this subsection (f) until the earlier of (i) closing of the Alternative Transaction and (ii) thirty (30) days following the completion of the Auction;

(g)     by Buyer as a result of the failure of the Bankruptcy Court to have entered the Bidding Procedures Order by no later than the Bidding Procedures Order Deadline or if the Bidding Procedure Order is modified, reversed, vacated, stayed or otherwise rendered ineffective;

(h)     by Buyer as a result of the failure of the Bankruptcy Court to have entered the Sale Order by no later than the Sale Order Deadline or if the Sale Order is modified, reversed, vacated, stayed or otherwise rendered ineffective;

(i)     by Buyer if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; or

(j)     the Bankruptcy Court enters an Order that otherwise precludes the consummation of the transactions set forth herein on the terms and conditions set forth in this Agreement, subject to any limitations set forth in the Bidding Procedures Order.

Section 9.02.   Breakup Fee and Expense Reimbursement.

(a)     Upon the date that the Sellers consummate (i) an Alternate Transaction; or (ii) a Chapter 11 Plan that contemplates or results in an Alternate Transaction or achieves a comparable result under the Bankruptcy Code, Sellers, jointly and severally, shall immediately pay in cash to Buyer a breakup fee in an amount equal to $540,000 (the "Breakup Fee").

(b)     If this Agreement is terminated for any reason other than by Seller pursuant to Section 9.01(c), Sellers, jointly and severally, shall immediately upon demand pay in cash to Buyer, in addition to the Breakup Fee (if any), an amount up to $360,000 of reasonable and documented fees, costs and expenses of Buyer incurred in connection with the transactions contemplated by this Agreement, including reasonable attorneys' fees and other professional fees (collectively, the "Expense Reimbursement"); provided, however, that, notwithstanding the foregoing, if this Agreement is terminated pursuant to Section 9.01(f), then

49

the Expense Reimbursement shall be payable upon the earliest to occur of (i) the time that the Breakup Fee is payable; and (ii) thirty (30) days after the date on which the Auction occurs.

(c)     Sellers' obligation to pay the Breakup Fee and the Expense Reimbursement pursuant to this Section 9.02 shall survive termination of this Agreement and shall constitute super-priority administrative expenses of the Sellers, which shall be senior to all other administrative expense claims and payable from Seller's cash or other collateral of Sellers under Section 364 (c)(1) of the Bankruptcy Code. The parties acknowledge and agree that the agreements set forth in this Section 9.02 are an integral part of the transactions contemplated under this Agreement and constitute liquidated damages and not a penalty. The parties acknowledge that Buyer would not have entered this Agreement without the provisions set forth in this Section 9.02.

Section 9.03.   Effect of Termination.

(a)     In the event of the termination of this Agreement as provided in Section 9.01 hereof, this Agreement shall no longer remain in force and effect and thereafter there shall be no liability or obligation on the part of any party hereto, except that (i) subject to Section 9.03(b), no termination of this Agreement pursuant to Section 9.01 hereof shall relieve any party of any liability for a breach of any provision of this Agreement or any Transaction Document occurring on or before the effective time of such termination (including any breach that resulted in termination) or for any Losses incurred by the other parties as a result of such breach, and (iii) the provisions of Section 6.01, this Section 9.03, ARTICLE X and any related definitions set forth in elsewhere in this Agreement shall survive any such termination of this Agreement, subject to any limitations set forth therein.

(b)     Buyer understands and acknowledges that if this Agreement is terminated by the Sellers Representative pursuant to Section 9.01(c) or Section 9.01(e) (only if the failure of the Closing to have occurred before the End Date is the result of Buyer's failure to fulfill any obligation under this Agreement which failure has been the cause of, or resulted in, the failure of the Closing to be consummated on or before the End Date (such termination, a "Buyer End Date Breach")), Sellers will suffer material damages.  The parties agree that such damages are difficult to quantify and thus Sellers' retention of the Deposit is a reasonable approximation of such damages.  Accordingly, if this Agreement is terminated by the Sellers Representative pursuant to Section 9.01(c) or upon a Buyer End Date Breach, Sellers shall be entitled to retain the Deposit as liquidated damages and not as a penalty. Sellers receipt and retention of the Deposit shall be sole and exclusive remedy against Buyer, in the event that Sellers Representative terminates this Agreement pursuant to Section 9.01(c) or upon a Buyer End Date Breach.

Section 9.04.   Specific Performance.   The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties will be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.   Notwithstanding the foregoing, this Section 9.04 shall not prohibit either party from pursuing any other remedies, whether one or more, available to such party under this Agreement or under applicable Law in the event of the other party's breach of this Agreement; provided, that, for the avoidance of

doubt, under no circumstances shall the Sellers be permitted or entitled to receive both a grant of specific performance resulting in the consummation of the Closing and the payment of the Deposit as if the Closing had not occurred in accordance with Section 9.03(b).

## ARTICLE X
## MISCELLANEOUS

Section 10.01. Expenses.  Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby will be paid by the party incurring such costs and expenses, whether or not the Closing occurs.

Section 10.02. Sellers Representative.

(a)      Each Seller irrevocably appoints HHG as the representative, agent and proxy for such Seller (the "Sellers Representative") for all purposes under this Agreement and the Transaction Documents, including the full power and authority to act on such Seller's behalf:  (i) to consummate the transactions contemplated by the Transaction Documents; (ii) to negotiate disputes arising under, or relating to, the Transaction Documents; (iii) to receive and disburse to such Seller any funds received on behalf of Sellers under the Transaction Documents; (iv) to withhold any amounts received on behalf of Sellers pursuant to the Transaction Documents or otherwise to satisfy any and all obligations or liabilities incurred by Sellers or the Sellers Representative in the performance of its duties hereunder or thereunder; (v) to execute and deliver any amendment or waiver to this Agreement or the Transaction Documents (in each case, without the prior approval of Sellers); and (vi) to take all other actions to be taken by or on behalf of Sellers in connection with the Transaction Documents.  Sellers further agree that such agency and proxy are coupled with an interest, are therefore irrevocable without the consent of the Sellers Representative and shall survive the bankruptcy, dissolution or liquidation of any Seller.  All decisions and actions by the Sellers Representative shall be binding upon all of the Sellers, and no Seller shall have the right to object, dissent, protest or otherwise contest the same. The Sellers Representative shall have no duties or obligations hereunder, including any fiduciary duties, except those set forth herein, and such duties and obligations shall be determined solely by the express provisions of this Agreement.

(b)      Each Seller severally, for itself only and not jointly, agrees to indemnify and hold harmless the Sellers Representative and its Representatives against all expenses (including reasonable attorneys' fees), judgments, fines and amounts incurred by such Persons in connection with any action, suit or proceeding to which the Sellers Representative or such other Person is made a party by reason of the fact that it is or was acting as, or at the direction of, the Sellers Representative pursuant to the terms of this Agreement.

(c)      Neither the Sellers Representative nor any of its Representatives shall incur any liability to any Seller by virtue of the failure or refusal of such Persons for any reason to consummate the transactions contemplated hereby or relating to the performance of their duties hereunder, except for actions or omissions constituting intentional and knowing fraud.  The Sellers Representative and its Representatives shall have no liability in respect of any

action, claim or proceeding brought against such Persons by any Seller, regardless of the legal theory under which such liability or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise, if such Persons took or omitted taking any action in good faith.

(d)    In the event that the Sellers Representative becomes unable or unwilling to continue in its capacity as the Sellers Representative, or if the Sellers Representative resigns as the Sellers Representative, a majority-in-number of the Sellers may, by written consent, appoint a new representative as the Sellers Representative.  Notice and a copy of the written consent appointing such new representative and bearing the signatures of a majority-in-number of the Sellers must be delivered to Buyer and each Seller.  Such appointment will be effective upon the later of the date indicated in the consent or the date such consent is received by Buyer.

(e)    Buyer shall be entitled to rely upon any action or decision of, or instruction by, or any document or other paper delivered by, the Sellers Representative on behalf of the Sellers (without any obligation to inquire into the authority of the Sellers Representative or the genuineness or correctness of such document or other paper or any signature of the Sellers Representative), and Buyer shall not be liable to any Seller for any action taken or omitted to be taken by Buyer in such reliance or with respect to actions, decisions and determinations of the Sellers Representative.

Section 10.03. Notices.  All notices, requests, consents, claims, demands, waivers and other communications hereunder will be in writing and deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as may be specified in a notice given in accordance with this Section 10.03):

| | |
|---|---|
| If to Sellers: | c/o HH Global II B.V.<br>1925 Eastchester Dr.<br>High Point, NC 27265<br>E-mail:  Pierre.deVillemejane@heritagehome.com<br>Attention:  Pierre de Villemejane |
| with a copy (that will not constitute notice) to: | Young Conaway Stargatt & Taylor, LLP<br>Rodney Square<br>1000 N. King Street<br>Wilmington, Delaware 19801<br>E-mail:  cgrear@ycst.com<br>Attention:  Craig D. Grear |

| If to Buyer: | Hickory Chair, LLC |
|---|---|
| | 401 11th Street NW |
| | Hickory, North Carolina 28601 |
| | E-mail:  bhucks@centuryfurniture.com |
| | Attention:  Brandon M. Hucks |

with a copy (that will not
constitute notice) to:    McGuireWoods LLP
201 North Tryon Street, Suite 3000
Charlotte, North Carolina 28202
E-mail:  hmarshall@mcguirewoods.com
Attention:  Harrison L. Marshall, Jr.

Section 10.04. <u>Interpretation</u>.    For purposes of this Agreement, (a) the words "include," "includes" and "including" will be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.    Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.    This Agreement will be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein will be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

Section 10.05. <u>Disclosure Schedules</u>.  Each representation, warranty and covenant set forth herein shall have independent significance.  Any item or matter required to be disclosed on a particular section of the Disclosure Schedules pursuant to this Agreement shall be deemed to have been disclosed if information for such item or matter complying with such disclosure requirements is set forth on another section of the Disclosure Schedules, to the extent reasonably apparent that such information applies to such particular section of the Disclosure Schedules.

Section 10.06. <u>Headings</u>.  The headings in this Agreement are for reference only and will not affect the interpretation of this Agreement.

Section 10.07. <u>Severability</u>.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 10.08. <u>Entire Agreement</u>.    This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.  In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

Section 10.09. <u>Successors and Assigns</u>.  This Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Neither party may assign its rights or obligations hereunder without the prior written consent of the other party; <u>provided</u>, that notwithstanding the foregoing, in connection with any one or more sales of Sellers' assets approved by an Order or Orders of the Bankruptcy Court, the Sellers may assign their respective rights or obligations hereunder to one or more purchasers, successors, or assignees of the assets and other businesses conducted by Sellers and their respective Affiliates.

Section 10.10. <u>No Third-Party Beneficiaries</u>.    This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or will confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 10.11. <u>Amendment and Modification; Waiver</u>.  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.  No waiver by any party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party will operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement will operate or be construed as a waiver thereof; nor will any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

Section 10.12. <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a)     This Agreement will be governed by and construed in accordance with the internal laws of the State of North Carolina without giving effect to any choice or conflict of law provision or rule (whether of the State of North Carolina or any other jurisdiction).

(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY SHALL BE INSTITUTED IN THE BANKRUPTCY COURT AND, TO THE EXTENT THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT ACCEPT JURISDICTION TO

ADJUDICATE SUCH MATTER MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF NORTH CAROLINA IN EACH CASE LOCATED IN MECKLENBURG COUNTY, STATE OF NORTH CAROLINA. IF A PARTY INITIATES AN ACTION OR PROCEEDING IN NORTH CAROLINA STATE COURT, IT MUST BE DESIGNATED AS A COMPLEX BUSINESS CASE TO BE ASSIGNED TO A SPECIAL SUPERIOR COURT JUDGE OF THE NORTH CAROLINA BUSINESS COURT CASE TO THE FULLEST EXTENT PERMITTED BY N.C. GEN. STAT. § 7A 45.4, RULES OF GENERAL PRACTICE 2.1 AND 2.2 AND THE NORTH CAROLINA BUSINESS COURT RULES.    EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING.  SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN WILL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT.  THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.12(c).

Section 10.13. Counterparts.  This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement.  A signed copy of this Agreement or any Transaction Document delivered by facsimile, e-mail or other means of electronic transmission will be deemed to have the same legal effect as delivery of an original signed copy of this Agreement or any Transaction Document.

[*SIGNATURE PAGE FOLLOWS*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**BUYER**

HICKORY CHAIR, LLC
a North Carolina limited liability company

By: _____

    Name: Brandon M. Hucks
    Title: Sr. Vice President

*[Signature Page to Purchase Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLERS**

HERITAGE HOME GROUP LLC,
a Delaware limited liability company

By: _____
    Name: Pierre de Villemejane
    Title: Chief Executive Officer

HHG REAL PROPERTY LLC,
a Delaware limited liability company

By: _____
    Name: Pierre de Villemejane
    Title: Chief Executive Officer

HHG GLOBAL DESIGNS LLC,
a Delaware limited liability company

By: _____
    Name: Pierre de Villemejane
    Title: Chief Executive Officer

**Exhibit 2**

**Bidding Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------------------x
                                              :
In re:                                        :   Chapter 11
                                              :
HERITAGE HOME GROUP LLC, et al.,              :   Case No. 18-11736 (____)
                                              :
        Debtors.¹                             :   Jointly Administered
                                              :
-------------------------------------------------------------x
```

**BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS'
ASSETS RELATED TO THE LUXURY BRANDS BUSINESS**

On August [●], 2018, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order [Docket No.[●]] (the "Bidding Procedures Order"),² by which the Court approved, among other things, the following procedures (the "Bidding Procedures"). These Bidding Procedures set forth the process by which the Debtors are authorized to solicit bids and, if necessary, conduct an auction (the "Auction") for the sale (the "Sale") of substantially all of the Debtors' assets related to the Debtors' going-concern business of designing, manufacturing, sourcing, licensing, and selling home furnishings under the Hickory Chair, Pearson, Maitland-Smith, and La Barge brands (the "Luxury Brands Business" or the "Assets"), in accordance with and as described in that certain agreement (the "Stalking Horse Purchase Agreement"), dated as of July 29, 2018, by and among the Debtors, and Hickory Chair, LLC (the "Stalking Horse Bidder").

**1.    Submissions to the Debtors**.

All submissions to the Debtors required to be made under these Bidding Procedures must be directed to each of the following persons unless otherwise provided (collectively, the "Notice Parties"):

    a.    **Debtors**.  Heritage Home Group LLC, 1925 Eastchester Drive, High Point, North Carolina 27265, Attn:  Robert Albergotti (Robert.Albergotti@heritagehome.com).

    b.    **Debtors' Counsel**.  Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Pauline Morgan (pmorgan@ycst.com), Ken Enos (kenos@ycst.com), and Jaime Chapman (jchapman@ycst.com).

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are:  Heritage Home Group LLC (9506); HH Global II B.V. (0165); HH Group Holdings US, Inc. (7206); HHG Real Property LLC (3221); and HHG Global Designs LLC (1150).  The Debtors' corporate headquarters is located at 1925 Eastchester Drive, High Point, North Carolina 27265.

² All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

      c.      **Debtors' Investment Banker**.  Houlihan Lokey Capital Inc., 111 S. Wacker Drive, 37th Floor, Chicago, Illinois 60606, Attn: Andrew Turnbull (aturnbull@hl.com) and Ryan Sandahl (rsandahl@hl.com).

      d.      **Committee's Counsel**.  ●.

**2.**      **Potential Bidders**.

      The Debtors and their advisors have identified, and may in the future identify, parties they believe potentially may be interested in consummating (and potentially may have the financial resources necessary to consummate) a competing transaction.  To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale (each, a "Potential Bidder") must deliver or have previously delivered, if determined to be necessary by the Debtors:

      a.      an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement"), to the extent not already executed; and

      b.      proof by the Potential Bidder of its financial capacity to close a competing transaction, including payment of any cure amount with respect to any contract that may be assigned, which may include current unaudited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach), the adequacy of which the Debtors and their advisors will determine in consultation with any official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "Committee").

**3.**      **Qualified Bidders**.

      a.      A "Qualified Bidder" is a Potential Bidder:  (i) who has satisfied the requirements of Sections 2 (a) and (b) above; and (ii) whose Bid (as defined below) is a Qualified Bid (as defined below).  Promptly after the Bid Deadline, the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder.  The Stalking Horse Bidder shall be deemed a Qualified Bidder at all times.

      b.      For the avoidance of doubt, Potential Bidders may submit a Bid for any or all of the Assets, provided that such Bid(s), when taken as a whole along with other Bids, is determined by the Debtors, in consultation with the Committee and in accordance with Section 3(a) of these Bidding Procedures, to constitute a Qualified Bid, provided that in determining the value of the Bid, the Debtors will not be limited to evaluating the dollar amount of the Bid, but may also consider factors including the proposed revisions to the Stalking Horse Purchase Agreement and other factors affecting the speed, certainty and value of the proposed transactions.

      c.      If any Potential Bidder is determined by the Debtors, in consultation with the Committee, not to be a Qualified Bidder, the Debtors will refund such Qualified

Bidder's Deposit (as defined below) on or within three (3) business days such determination is made.

d.    The Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Except as otherwise set forth in the Stalking Horse Purchase Agreement, without the written consent of the Debtors (in consultation with the Committee), a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid during the period that such Qualified Bid remains binding as specified in these Bidding Procedures, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid; *provided* that any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

e.    Any disputes related to these Bidding Procedures, including whether a Bid constitutes a Qualified Bid, shall be resolved by the Court.

**4.    Due Diligence**.

a.    **Diligence Provided to Potential Bidders**.

Only Potential Bidders that have entered into a Confidentiality Agreement shall be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Debtors.  **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement**.  The Debtors will provide to each Potential Bidder that has entered into a Confidentiality Agreement due diligence information as the Debtors determine to be reasonable in the circumstances.  For all Potential Bidders (not including the Stalking Horse Bidder), the due diligence period will end on the Bid Deadline, and, subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Assets, the Debtors' liabilities, or the Sale ("Confidential Sale Information") to any person, *except* to a Potential Bidder that has entered into a Confidentiality Agreement or to such Potential Bidder's duly-authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement.  The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided* that the Debtors may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment, in consultation with the Committee, have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale or are not reasonably likely to become a Qualified Bidder (as defined below).

The Debtors also reserve the right to withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder that the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors.  Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not approved by the Debtors as a Potential Bidder.

**All due diligence requests must be directed to Houlihan Lokey.**

b.    **Diligence Provided by Potential Bidders**.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate the Sale.  Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such Potential Bidder is not a Qualified Bidder or that a Bid made by such Potential Bidder is not a Qualified Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures.  Each recipient of confidential information agrees to use, and to instruct its advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process and these chapter 11 cases or in accordance with the terms of any applicable confidentiality agreement.

Notwithstanding the foregoing and the provisions contained in any applicable confidentiality agreement, the Debtors and the Debtors' advisors may disclose confidential information:  (i) with the prior written consent of the applicable Potential Bidder and the Debtors; (ii) to the professional advisors of the Committee as necessary hereunder, and (iii) as otherwise required law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

**5.    Bid Requirements**.

A proposal, solicitation, or offer (each, a "Bid") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (collectively, the "Bid Requirements"), as determined by the Debtors in their reasonable business judgment, in consultation with the Committee, shall constitute a "Qualified Bid."  For the avoidance of doubt, the Bid of the Stalking Horse Bidder as set forth in the Stalking Horse Purchase Agreement will be deemed a Qualified Bid for all purposes.

a.    **Assets**.  Each Bid must clearly state which Assets the Qualified Bidder is agreeing to purchase, and which liabilities of the Debtors the Qualified Bidder is agreeing to assume ("Assumed Liabilities").

b.    **Purchase Price**.  Each Bid must clearly set forth the purchase price to be paid, including and identifying separately any cash and non-cash components (the "Purchase Price").

c.    **Minimum Bid**.  The aggregate consideration proposed by each Bid must equal or exceed the sum of the following (a "Minimum Bid") provided that in determining the value of the Bid, the Debtors will not be limited to evaluating the dollar amount of the Bid, but also may consider factors including the proposed revisions to the Stalking Horse Purchase Agreement and other factors affecting the speed, certainty, and value of the proposed transactions:

(i)      the Base Amount of $17,450,000; *__plus__*

(ii)     an assumption of the Assumed Liabilities set forth in the Stalking Horse Purchase Agreement on terms no less favorable to the Debtors than the Stalking Horse Purchase Agreement, and/or the dollar value of any such liabilities that are not "Assumed Liabilities" in such Bid, each as determined in the Debtors' business judgment, in consultation with the Committee; *__plus__*

(iii)    $540,000, the maximum dollar value of the Bid Protections (as defined below); *__plus__*

(iv)     a minimum bid increment of $500,000.

d.    **Deposit**.  With its Bid, each Potential Bidder must submit by wire transfer of immediately available funds, a cash deposit in the amount equal to 7.5% of the aggregate cash and non-cash Purchase Price set forth in the Bid,[3] to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Deposit").

e.    **Same or Better Terms**.  Each Bid must be on terms that are not more burdensome than the terms of the Stalking Horse Purchase Agreement, as determined by the Debtors, in consultation with the Committee.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the Sale and shall include a schedule of assumed contracts to the extent applicable to the Bid, and a copy of the Stalking Horse Purchase Agreement clearly marked to show all changes requested by the Potential Bidder, including those related to the respective Purchase Price and Assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such Bid (the "Qualified Bid Documents").

f.    **Contingencies; No Financing or Diligence Outs**.  A Bid shall not be conditioned on: (i) obtaining financing; (ii) shareholder, board of directors, or other internal approval; or (iii) the outcome or completion of a due diligence review by the Potential Bidder.  Notwithstanding the foregoing, a Bid may be subject to (i) the accuracy at the closing of the Sale of specified representations and warranties and (ii) the satisfaction at the closing of the Sale of specified conditions, which shall not be more burdensome than those set forth in the Stalking Horse Purchase Agreement, as determined in the Debtors' business judgment, in consultation with the Committee.

g.    **Identity**.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the Sale), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any

---

[3]  In determining the amount of the Deposit, the implied value of any securities to be provided as consideration under the Bid must be included, but the value of the Assumed Liabilities may be excluded.

Bid. Each Bid must also include contact information for the specific persons and counsel whom the Debtors and their advisors should contact regarding such Bid.

h.     **Demonstrated Financial Capacity**. A Qualified Bidder must have, in the Debtors' business judgment, in consultation with the Committee, the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.

i.     **Committed Financing**. To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include committed financing documented to the satisfaction of the Debtors, in consultation with the Committee, which demonstrates that the Potential Bidder has received sufficient debt or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid.

j.     **Binding and Irrevocable**. A Qualified Bid must be irrevocable unless and until the Debtors accept a higher or otherwise better Bid and such Qualified Bidder is not selected as the Backup Bidder (as defined herein).

k.     **Expenses; Disclaimer of Fees**. Each Bid (other than that set forth in the Stalking Horse Purchase Agreement) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Potential Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is waiving any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

l.     **Authorization**. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

m.     **As-Is, Where-Is**. Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to submitting the Bid; (ii) has relied solely upon its own independent review, investigation, and inspection of any documents and the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Qualified Bid Documents.

n.     **Adherence to Bid Procedures**.  By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

o.     **Consent to Jurisdiction**.  Each Potential Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the development and enforcement of these Bidding Procedures, the Sale documents, and the closing of the Sale, as applicable.

p.     **Bid Deadline**.  Each Bid must be transmitted by email (in pdf or similar format) so as to be **actually received** on or before 5:00 p.m. (prevailing Eastern Time) on September [12], 2018 (the "Bid Deadline") by the Notice Parties.

The Debtors, in consultation with the Committee, reserve the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.  The Debtors, in consultation with the Committee, may accept a single Qualified Bid or multiple Bids for the Debtors' assets that if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid.  The Debtors, in consultation with the Committee, may also permit a Potential Bidder that satisfied the requirements of Section 3.a.i hereof and that submitted a Bid by the Bid Deadline for a material portion of the Assets but such Bid was not identified as a component of a single Qualified Bid consisting of multiple Bids, to participate in the Auction and to submit a higher or otherwise better Bid that in subsequent rounds of bidding may be considered, together with other Bids for the Debtors' assets, as part of a single Qualified Bid.

**6.     Right to Credit Bid**.

At the Auction, subject to section 363(k) of the Bankruptcy Code, any Qualified Bidder who has a valid and perfected lien on any of the Assets (a "Secured Creditor") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code, unless otherwise ordered by the Court for cause.

**7.     Auction**.

If the Debtors receive a Qualified Bid, other than that set forth in the Stalking Horse Purchase Agreement, the Debtors will conduct an Auction to determine the Successful Bidder.  If the Debtors do not receive a Qualified Bid (other than that of the Stalking Horse Bidder), the Debtors will not conduct an Auction and shall designate the Stalking Horse Bidder as the Successful Bidder.

Prior to the Auction, the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid, as determined in the Debtors' reasonable business judgment, in consultation with the Committee (the "Baseline Bid").  The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors reasonably deem, in consultation with the Committee, relevant to the value of the Qualified Bid to the Debtors' estates, which may include, among other things: (i) the number, type, and nature of any changes to the applicable Stalking Horse Purchase Agreement, if any, requested by the Qualified Bidder, including the type and amount of

Assets sought to be acquired and obligations sought to be assumed in the Qualified Bid; (ii) the amount and nature of the total consideration; (iii) the likelihood of the Qualified Bidder's ability to close the applicable Sale and the timing thereof; (iv) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (v) the tax consequences of such Qualified Bid (collectively, the "Bid Assessment Criteria").

The Auction, if necessary, shall take place at 10:00 a.m. (prevailing Eastern Time) on September [18], 2018, at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801, or such later date and time as selected by the Debtors. The Auction shall be conducted in a timely fashion according to the following procedures:

a.     **The Debtors Shall Conduct the Auction**.

The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid. All incremental Bids made thereafter shall be Overbids and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Creditors of the Debtors may attend the Auction if they send written notice by email to the Debtors' counsel (pmorgan@ycst.com, kenos@ycst.com, and jchapman@ycst.com) of their intention to attend the Auction on or before the Bid Deadline and in such notice identify the representatives who will attend on behalf of the creditor; *provided*, *however*, that the Debtors may limit the number of attendees per creditor to a reasonable number. The Qualified Bidders and the Stalking Horse Bidder may appear at the Auction in person or through duly authorized representatives.

b.     **Terms of Overbids**.

"Overbid" means any Bid made at the Auction by a Qualified Bidder[4] subsequent to the Debtors' announcement of the Baseline Bid. Each Overbid must comply with the following conditions:

(i)     **Minimum Overbid Increment**. The initial Overbid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration provided for by the Baseline Bid by an incremental amount that is not less than the sum of $[500,000] (a "Minimum Overbid Increment"). Upon the solicitation of each subsequent round of Overbids, the Debtors may, in their business judgment, in consultation with the Committee, modify the amount or structure of the applicable Minimum Overbid Increment.

Additional consideration in an Overbid may include: (1) cash and noncash consideration; *provided* that the value for such noncash consideration shall be determined by the Debtors in their reasonable business judgment; and

---

[4] Or Qualified Bidders, in the event of a joint bid as allowed by the Debtors.

(2) in the case of a Bid by a Secured Creditor, a credit bid of up to the full amount of such Secured Creditor's allowed secured claim, subject to section 363(k) of the Bankruptcy Code and any other restrictions set forth herein.

(ii) **Conclusion of Each Overbid Round**.   Upon the solicitation of each round of applicable Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "Overbid Round Deadline") by which time any Overbids must be submitted to the Debtors.

(iii) **Overbid Alterations**.   An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, in consultation with the Committee, but shall otherwise comply with the terms of these Bidding Procedures.

(iv) **Announcing Highest Bid**.   Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors, in consultation with the Committee, have identified an Overbid as being higher or otherwise better than the Baseline Bid or the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid, as applicable, for a given asset package (for each asset package, the "Prevailing Highest Bid").   The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid.

(v) **Overbids by the Stalking Horse Bidder**.   The Stalking Horse Bidder will be entitled, but not obligated, to submit Overbids and will be entitled in any such Overbids to include the full amount of the Bid Protections in lieu of cash, and such amount shall be equal to cash for purposes of evaluating the Overbid.

c.   **Consideration of Overbids**.

The Debtors reserve the right, in their reasonable business judgment, and in consultation with the Committee and the Stalking Horse Bidder, to adjourn the Auction one or more times to, among other things:  (i) facilitate discussions among the Debtors, the Committee, and Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount.

d.   **Closing the Auction**.

(i)   The Auction shall continue until there is only one Bid or collection of Bids, as applicable, that the Debtors determine, in their reasonable

business judgment and in consultation with the Committee, to be the highest or otherwise best Bid. Such Bid or Bids, as applicable, shall be declared the "Successful Bid," and such Qualified Bidder (or Qualified Bidders) the "Successful Bidder," at which point the Auction will be closed. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.

(ii)   For the avoidance of doubt, but without limiting the Bid Protections or the provisions of any Stalking Horse Purchase Agreement, nothing in these Bidding Procedures shall prevent the Debtors from exercising their respective fiduciary duties under applicable law.

(iii)   The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid; *provided*, *however*, that the Debtors, in consultation with the Committee and subject to approval by the Court, may determine to accept such Bid if such Bid may otherwise be deemed the Successful Bid.

(iv)   As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Qualified Bid Documents for the Successful Bid and Backup Bid to be filed with the Court.

(v)   Following the closing of the Auction, the Debtors shall not initiate contact with, solicit, or encourage proposals from any person or entity with respect to the Luxury Brands Business.

e.   **No Collusion; Good-Faith Offer**.

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith offer and it intends to consummate the Sale if selected as the Successful Bidder.

8.   **Backup Bidder**.

a.   Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment, in consultation with the Committee (the "Backup Bid"), shall be required to serve as a backup bidder (the "Backup Bidder"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.

b.   The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder. The

Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable, until the closing of the Sale with the Successful Bidder.  The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the Successful Bidder and shall thereafter be returned within five (5) business days.

c.    If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may, in consultation with the Committee, select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Backup Bid without further order of the Court or notice to any party.  In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors.  The Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

**9.    Reservation of Rights**.

Without prejudice to the rights of the Stalking Horse Bidder under the terms the Stalking Horse Purchase Agreement, the Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment, in consultation with the Committee, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (i) extending the deadlines set forth in these Bidding Procedures; (ii) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (iii) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (iv) canceling the Auction; and (v) rejecting any or all Bids.

**10.    Sale Hearing**.

A hearing to consider approval of each Sale to the Successful Bidder (or to approve the Stalking Horse Purchase Agreement, as applicable, if no Auction is held) (the "Sale Hearing") is currently scheduled to take place on or before [●] (prevailing Eastern Time) on September [25], 2018, before the Honorable [●], at the Court, 824 Market Street, [●]th Floor, Courtroom No. [●], Wilmington, Delaware 19801.

**The Sale Hearing may be continued to a later date by the Debtors**, **in consultation with the Committee, by filing a notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party.**

At the Sale Hearing, the Debtors shall present the Successful Bid to the Court for approval.

**11.    Bid Protections**.

To provide an incentive and to compensate the Stalking Horse Bidder for performing the substantial due diligence and incurring the expenses necessary for entering into the Stalking Horse Purchase Agreement with the knowledge and risk that arises from participating in the

subsequent bidding process, the Debtors have agreed to provide the Stalking Horse Bidder with the Breakup Fee and Expense Reimbursement (as defined in the Stalking Horse Purchase Agreement) (the "Bid Protections").

The Bid Protections are payable pursuant to the terms and conditions of, and under certain circumstances as set forth in, the Stalking Horse Purchase Agreement.  Payment of the Bid Protections shall be governed by the Stalking Horse Purchase Agreement and the Bidding Procedures Order.  The Bid Protections will be an allowed super-priority administrative expense claim in accordance with the terms of the Stalking Horse Purchase Agreement and pursuant to the Bidding Procedures Order, senior to all other administrative expense claims against the Debtors' estates.

The Stalking Horse Bidder shall have standing to appear and be heard on all issues related to the Auction, the Sale, and related matters, including the right to object to the conduct of the Auction and interpretation of these Bidding Procedures.

**12.     Return of Deposit**.

The Deposit of the Successful Bidder shall be applied to the Purchase Price of the transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or within five (5) business days after the Auction.

If the Successful Bidder fails to consummate the Sale because of a breach by the Successful Bidder, the Debtors will not have any obligation to return the Deposit paid by the Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the Sale with the Backup Bidder without the need for an additional hearing or order of the Court.

**13.     Fiduciary Out**.

Nothing in these Bidding Procedures shall require the Debtors' board of directors or members, as applicable, to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent the Debtors' board of directors or members, as applicable, determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law; *provided* that, in the event of any such action, all rights and remedies of the Stalking Horse Bidder in these Bidding Procedures or the Stalking Horse Purchase Agreement shall be preserved.

## __Exhibit 3__

**Sale Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------------x
                                                                   :
In re:                                                             :    Chapter 11
                                                                   :
**HERITAGE HOME GROUP LLC, et al.,**                               :    Case No. 18-11736 (____)
                                                                   :
         Debtors.[1]                                               :    Jointly Administered
                                                                   :
-------------------------------------------------------------------x

**NOTICE OF PROPOSED SALE, BIDDING PROCEDURES, AUCTION,**
**AND SALE HEARING RELATED TO THE LUXURY BRANDS BUSINESS**

       **PLEASE TAKE NOTICE** that the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on July [●], 2018 (the "Petition Date").  On the Petition Date, the Debtors filed a motion [D.I. ●] (the "Sale Motion")[2] seeking authority, among other things, to sell (the "Sale") substantially all of the Debtors' assets related to the Debtors' going-concern business of designing, manufacturing, sourcing, licensing, and selling home furnishings under the Hickory Chair, Pearson, Maitland-Smith, and La Barge brands (the "Luxury Brands Business" or "Acquired Assets") to Hickory Chair, LLC (the "Stalking Horse Bidder"), or other Successful Bidder, free and clear of all liens, claims, encumbrances, and other interests, other than those permitted  in the applicable purchase agreement,.

       **PLEASE TAKE FURTHER NOTICE** that, on August [●], 2018, the Bankruptcy Court entered an order [D.I. ●] (the "Bidding Procedures Order"), granting certain of the relief sought in the Motion, including, among other things, approving (i) the Bidding Procedures, which are attached as Exhibit 2 to the Bidding Procedures Order and (ii) procedures for the assumption and assignment of contracts and leases in connection with the Sale Transaction (the "Assumption and Assignment Procedures").

       **PLEASE TAKE FURTHER NOTICE** that approval of the Sale of the Acquired Assets to the Stalking Horse Bidder or other Successful Bidder may result in, among other things, the assumption, assignment, and/or transfer by the Debtors of certain executory contracts and unexpired leases.  If you are counterparty to an executory contract or unexpired lease with the Debtors, you will receive a separate notice regarding the Assumption and Assignment Procedures that contains additional relevant dates and other information that may impact you as counterparty to such executory contract or unexpired lease.

       **PLEASE TAKE FURTHER NOTICE** that, all interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety.  The deadline by which all Bids must be *actually received* is **5:00 p.m. on September [12], 2018 (EDT)** (the "Bid Deadline").

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are: Heritage Home Group LLC (9506); HH Global II B.V. (0165); HH Group Holdings US, Inc. (7206); HHG Real Property LLC (3221); and HHG Global Designs LLC (1150).  The Debtors' corporate headquarters is located at 1925 Eastchester Drive, High Point, North Carolina 27265.

[2]  Capitalized terms used in this Notice and not immediately defined have the meanings given to such terms in the Sale Motion.

**Contact Persons for Parties Interested in Submitting a Bid**

The Bidding Procedures set forth in detail the requirements for submitting a Qualified Bid, and any person interested in making an offer to purchase the Acquired Assets **must** comply with the Bidding Procedures. **Only Qualified Bids will be considered by the Debtors**. Any persons interested in making an offer to purchase the Acquired Assets should contact the Debtors' investment banker: Houlihan Lokey Capital Inc., 111 S. Wacker Drive, 37th Floor, Chicago, Illinois 60606, Attn: Andrew Turnbull (aturnbull@hl.com) and Ryan Sandahl (rsandahl@hl.com).

**Obtaining Additional Information**

Copies of the Sale Motion and the Bidding Procedures Order, as well as all related exhibits including the Asset Purchase Agreement and the Bidding Procedures, notice of Successful Bidder (when filed), and all other related documents filed with the Bankruptcy Court (collectively, the "Sale Documents") are available free of charge on the website of the Bankruptcy Court-appointed claims and noticing agent for the Chapter 11 Cases, Kurtzman Carson Consultants LLC ("KCC"), http://www.kccllc.net/heritagehome. The Sale Documents also are available, free of charge, upon request to KCC (tel: 888-249-2741; fax: 310-751-1561; heritagehomeinfo@kccllc.com) or the Debtors (Michael Girello, paralegal, tel: 302-571-6600; fax: 302-571-1253; mgirello@ycst.com).

**Important Dates and Deadlines**

The dates and deadlines set forth below have been established pursuant to the Bidding Procedures Order.

1.  The deadline to file an objection with the Bankruptcy Court to the entry of an order approving the sale (the "Sale Order") and all objections related to the Stalking Horse Bidder (collectively, "Sale Objections") is **4:00 p.m. (EDT) on September [17], 2018 (EDT)** (the "Sale Objection Deadline").

2.  The deadline to submit a Qualified Bid is **5:00 p.m. (EDT) on September [12], 2018**.

3.  In the event that the Debtors timely receive a Qualified Bid in addition to the Qualified Bid of the Stalking Horse Bidder, the Debtors intend to conduct an Auction for the Acquired Assets. The Auction, if any, will be held at **10:00 a.m. (EDT) on September [18], 2018** at the offices of counsel for the Debtors, Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, Delaware 19801 (or such other place and time as the Debtors timely communicate to all entities entitled to attend the Auction).

4.  The deadline for objections to the conduct of the Auction and the terms of a Sale to a Successful Bidder other than the Stalking Horse Bidder (collectively, "Auction Objections") **is 4:00 p.m. (EDT) on September [21], 2018** (the "Auction Objection Deadline").

5.  A hearing (the "Sale Hearing") to consider the Sale presently is scheduled to be held on **September [25], 2018 at [●] (EDT)**, before the Honorable [●], at the Bankruptcy Court, 824 North Market Street, ●th Floor, Courtroom No. ●, Wilmington, Delaware 19801. The Sale Hearing may be adjourned from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court or by notice filed on the docket of the Chapter 11 Cases.

**Filing Objections**

Sale and Auction Objections, if any, must:  (a) be in writing; (b) state with specificity the nature of such objection; (c) comply with the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware; and (d) be filed with the Bankruptcy Court and served upon, so as to be **actually received** on or prior to the Sale Objection Deadline or the Auction Objection Deadline, as applicable, by the following parties: (i) counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Pauline K. Morgan, Esq. (pmorgan@ycst.com), Kenneth J. Enos, Esq. (kenos@ycst.com), and Jaime Luton Chapman, Esq. (jchapman@ycst.com); (ii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware, 19801, Attn: Linda Richenderfer, Esq. (Linda.richenderfer@usdoj.gov); (iii) counsel to the Pre-Petition Agent and DIP Agent, Blank Rome LLP, 1201 North Market Street #800, Wilmington, Delaware 19801, Attn: Regina Kelbon, Esq. (Kelbon@BlankRome.com) and Stanley B. Tarr, Esq. (Tarr@BlankRome.com); (iv) counsel to the Pre-Petition Term Agent, Cozen O'Connor, 1201 North Market Street, Suite 1001, Wilmington, Delaware 19801, Attn: Mark Felger, Esq. (mfelger@cozen.com) and Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Attn: Jeffrey D. Saferstein, Esq. (JSaferstein@paulweiss.com), Jacob A. Adlerstein, Esq. (JAdlerstein@paulweiss.com), and Sarah Harnett, Esq. (SHarnett@paulweiss.com); (v) counsel to the Stalking Horse Bidder, McGuireWoods LLP, 201 North Tryon Street, Suite 3000, Charlotte, North Carolina 28202, Harrison L. Marshall, Jr., Esq. (hmarshall@mcguirewoods.com); and (vi) counsel to any statutory committee appointed in the Chapter 11 Cases (collectively (i)–(vi), the "Objection Recipients").

**CONSEQUENCES OF FAILING TO TIMELY ASSERT AN OBJECTION:**

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE A SALE OBJECTION ON OR BEFORE THE SALE OBJECTION DEADLINE, OR RAISE AN AUCTION OBJECTION ON OR BEFORE THE AUCTION OBJECTION DEADLINE, IN ACCORDANCE WITH THE ENTERED BIDDING PROCEDURES ORDER MAY BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE TRANSFERRED ASSETS OF THE DEBTOR ESTATES FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS EFFECTED THEREUNDER.**

Dated: ●, 2018  
      Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Pauline K. Morgan (No. 3650)  
Kenneth J. Enos (No. 4544)  
Jaime Luton Chapman (No. 4936)  
Ashley E. Jacobs (No. 5635)  
Shane M. Reil (No. 6195)  
Rodney Square  
1000 North King Street  
Wilmington, Delaware 19801  
Telephone:  (302) 571-6600  
Facsimile:  (302) 571-1253

*Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit 4</u>**

**Notice of Assumption and Assignment**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------x
                         :
In re:                        :   Chapter 11
                         :
**HERITAGE HOME GROUP LLC, et al.,**  :   Case No. 18-11736 (____)
                         :
        Debtors.[1]         :   Jointly Administered
                         :
-------------------------------------------------------------------x  RE: Docket No. ___

**NOTICE OF POTENTIAL ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE PROPOSED SALE
OF DEBTORS' ASSETS RELATED TO THE LUXURY BRANDS BUSINESS**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

      The above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on July [●], 2018 (the "Petition Date"). On the Petition Date, the Debtors filed a motion [D.I. ●] (the "Sale Motion")[2] seeking authority, among other things, to sell (the "Sale") substantially all of the Debtors' assets related to the Debtors' going-concern business of designing, manufacturing, sourcing, licensing, and selling home furnishings under the Hickory Chair, Pearson, Maitland-Smith, and La Barge brands (the "Luxury Brands Business" or the "Acquired Assets") to Hickory Chair, LLC (the "Stalking Horse Bidder"), or other Successful Bidder, free and clear of all liens, claims, encumbrances, and other interests, other than those permitted in the applicable purchase agreement.

      On August [●], 2018, the Bankruptcy Court entered an order [D.I. ●] (the "Bidding Procedures Order"), granting certain of the relief sought in the Motion, including, among other things, approving (i) the Bidding Procedures, which were attached as Exhibit 2 to the Bidding Procedures Order and (ii) procedures for the assumption and assignment of contracts and leases in connection with the Sale (the "Assumption and Assignment Procedures").

      Upon the closing of the Sale, the Debtors intend to assume and assign to the Stalking Horse Bidder or any other Successful Bidder(s) the Assigned Contracts. A schedule listing the Assigned Contracts (the "Assigned Contracts List") may be accessed free of charge on the website of the Court-appointed claims and noticing agent for the Debtors' chapter 11 cases, Kurtzman Carson Consultants LLC, http://www.kccllc.net/heritagehome (the "Case Website"). In addition, the cure payments, if any, necessary for the assumption and assignment of the Assigned Contracts (the "Cure Payments") are set forth on the Assigned Contracts List.

      **YOU ARE RECEIVING THIS NOTICE BECAUSE THE STALKING HORSE BIDDER HAS IDENTIFIED YOU AS A COUNTERPARTY TO A POTENTIAL ASSIGNED CONTRACT.**

      Pursuant to the Assumption and Assignment Procedures, the Stalking Horse Bidder may modify the list of Assigned Contracts until the opening of business on the date of the Auction, and the Debtors reserve the right

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, as applicable, are: Heritage Home Group LLC (9506); HH Global II B.V. (0165); HH Group Holdings US, Inc. (7206); HHG Real Property LLC (3221); and HHG Global Designs LLC (1150). The Debtors' corporate headquarters is located at 1925 Eastchester Drive, High Point, North Carolina 27265.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Sale Motion.

at any time after the Assumption and Assignment Service Deadline and before the closing of a Sale, to: (i) supplement the list of Assigned Contracts with previously omitted executory contracts or unexpired leases; (ii) remove an executory contract or unexpired lease from the list of executory contracts and unexpired leases ultimately selected as Assigned Contracts that the Successful Bidder proposes be assumed and assigned to it in connection with a Sale or add to such list; and/or (iii) modify the previously stated Cure Payment associated with any Assigned Contract.  Any counterparty impacted by such a modification will receive notice thereof and an opportunity to object to the proposed assumption and assignment of the Assigned Contract, if applicable.

### OBTAINING ADDITIONAL INFORMATION

Copies of the Bidding Procedures Order, the Bidding Procedures and any other related documents are available free of charge on the Case Website.

### IMPORTANT DATES AND DEADLINES

1.    The deadline to file an objection with the Bankruptcy Court to the entry of an order approving the Sale (the "Sale Order") is **4:00 p.m. (Eastern Time) on September [17], 2018** (the "Sale Objection Deadline").

2.    The Auction for the Acquired Assets, if one is necessary, will commence at **10:00 a.m. (Eastern Time) on September [18], 2018**, at the offices of Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, Delaware 19801 (or at any other time and location as the Debtors may designate on proper notice).

3.    A hearing (the "Sale Hearing") to consider the proposed Sale will be held before the Bankruptcy Court at **[●] (Eastern Time) on September [25], 2018**, or such other date as determined by the Court, at 824 North Market Street, Wilmington, Delaware 19801.

### FILING ASSUMPTION AND ASSIGNMENT OBJECTIONS

Pursuant to the Assumption and Assignment Procedures, objections to the proposed assumption and assignment of an Assigned Contract (each "Assigned Contract Objection"), including any objection relating to the Cure Payment, must:  (a) be in writing; (b) state with specificity the nature of such objection and alleged Cure Payment, including applicable and appropriate documentation in support of such alleged Cure Payment; (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed with the Bankruptcy Court and served on the following parties so as to be **actually received no later than 4:00 p.m. (Eastern Time) on September [___], 2018** (the "Assumption and Assignment Objection Deadline"):  (i) counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Pauline K. Morgan, Esq. (pmorgan@ycst.com), Kenneth J. Enos, Esq. (kenos@ycst.com) and Jaime Luton Chapman, Esq. (jchapman@ycst.com); (ii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, DE, 19801, Attn: Linda Richenderfer, Esq. (Linda.richenderfer@usdoj.gov); (iii) counsel to the Pre-Petition Agent and DIP Agent, Blank Rome LLP, 1201 North Market Street #800, Wilmington, DE 19801, Attn: Regina Kelbon, Esq. (kelbon@BlankRome.com) and Stanley B. Tarr, Esq. (Tarr@BlankRome.com); (iv) counsel to the Pre-Petition Term Agent, Cozen O'Connor, 1201 North Market Street, Suite 1001, Wilmington, DE 19801, Attn: Mark Felger, Esq. (mfelger@cozen.com) and Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019, Attn: Jeffrey D. Saferstein, Esq. (JSaferstein@paulweiss.com), Jacob A. Adlerstein, Esq. (JAdlerstein@paulweiss.com), and Sarah Harnett, Esq. (SHarnett@paulweiss.com); (v) counsel to the Stalking Horse Bidder, McGuireWoods LLP, 201 North Tryon Street, Suite 3000, Charlotte, NC 28202, Harrison L. Marshall, Jr., Esq. (hmarshall@mcguirewoods.com); and (vi) counsel to any statutory committee appointed in the chapter 11 cases (collectively, the "Notice Parties").  Any objections to the Successful Bidder's proposed form of adequate assurance of future performance must be filed and served on the Notice Parties so as to be **actually received no later than 4:00 p.m. (Eastern Time) on September [21], 2018**.

2

## CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE OBJECTIONS

To the extent that any party does not timely object as set forth above, such party may be: (i) forever barred from objecting to the assumption and assignment of any of the Assigned Contracts identified on the Assigned Contracts List, including, without limitation, asserting any additional cure payments or requesting additional adequate assurance of future performance as it relates to the Sale to the Successful Bidder(s); (ii) deemed to have consented to the applicable Cure Payment, if any, and to the assumption and assignment of the applicable Assigned Contract as part of the Sale to the Successful Bidder(s); (iii) bound to such corresponding Cure Payment, if any; (iv) deemed to have agreed that the Stalking Horse Bidder or any other Successful Bidder has provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (v) deemed to have agreed that all defaults under the applicable Assigned Contract arising or continuing prior to the Assumption and Assignment Objection Deadline have been cured as a result or precondition of the assignment, such that the Stalking Horse Bidder or any other Successful Bidder or the Debtors shall have no liability or obligation with respect to any default occurring or continuing prior to the Assumption and Assignment Objection Deadline, and from and after the date of the assignment, the applicable Assigned Contract shall remain in full force and effect for the benefit of the Stalking Horse Bidder or any other Successful Bidder and such party in accordance with its terms; (vi) deemed to have waived any right to terminate the applicable Assigned Contract or designate an early termination date under the applicable Assigned Contract as a result of any default that occurred and/or was continuing prior to the assignment date; and (vii) deemed to have agreed that the terms of the Sale Order shall apply to the assumption and assignment of the applicable Assigned Contract.

Dated:  ●, 2018
       Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

---

Pauline K. Morgan (No. 3650)
Kenneth J. Enos (No. 4544)
Jaime Luton Chapman (No. 4936)
Ashley E. Jacobs (No. 5635)
Shane M. Reil (No. 6195)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

*Counsel to the Debtors and Debtors in Possession*

3

01:23457793.2